UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

TRANSPORTES NAVIEROS Y : 
TERRESTRES, S.A. DE C.V. :
                                :

           Plaintiff, :
                                :

   -against- :          07 CV 3076 (LAP)
                                :

FAIRMOUNT HEAVY TRANSPORT N.V., :
                                :      ECF CASE

           Defendant. :

-------------------------------------------------------------X

## MEMORANDUM OF LAW IN
## <u>SUPPORT OF MOTION TO VACATE ATTACHMENT</u>

 

TISDALE & LENNON, LLC
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 354-0025 (phone)
(212) 869-0067 (fax)

*Attorneys for Defendant*
*Fairmount Heavy Transport N.V.*

Charles E. Murphy, Esq.

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...................................................................................................1

II. STATEMENT OF FACTS.....................................................................................................4

   A. The Settled Dispute Between Fairmount and Oceanografia ...................................................5

   B. The Current Dispute Between Transportes Navieros Y Terrestres
     and Fairmount.......................................................................................................................6

   C. The Vessel's Ownership and Arrest.....................................................................................7

   D. The Information Supplied By TNT and the Release of the Vessel ........................................9

   E. TNT Suffered No Loss ......................................................................................................11

   F. TNT, OSA and Con-Dive are Closely Related Companies..................................................12

   G. The Criminal Proceeding Has Not Been Filed Against FHT in Mexico ...............................14

III. ARGUMENT
POINT ONE
IT IS PLAINTIFF'S BURDEN TO PROVE WHY THE ATTACHMENT SHOULD
NOT BE VACATED ....................................................................................................................16

POINT TWO
PLAINTIFF FILED ITS FRIVOLOUS CLAIM AGAINST DEFENDANT FOR THE
IMPROPER PURPOSE OF RETALIATION.................................................................................17

POINT THREE
ALTERNATIVELY, PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(6)
THE COURT SHOULD REDUCE THE AMOUNT OF THE ATTACHMENT TO AN
AMOUNT COMMENSURATE WITH PLAINTIF'S PROVABLE DAMAGES, IF ANY ............22

IV. CONCLUSION......................................................................................................................24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TRANSPORTES NAVIEROS Y                        :
TERRESTRES, S.A. DE C.V.                      :
                                             :
              Plaintiff,                      :
                                             :
       -against-                              :       07 CV 3076 (LAP)
                                             :
FAIRMOUNT HEAVY TRANSPORT N.V.,               :
                                             :
              Defendant.                      :
-----------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE ATTACHMENT

### I. PRELIMINARY STATEMENT

Defendant, Fairmount Heavy Transport N.V. ("FHT"), by its undersigned counsel,

Tisdale & Lennon, LLC, submits the within Memorandum of Law in Support of Motion to

Vacate Attachment pursuant to Rules E(4)(f) and Rule E(6) of the Supplemental Rules for

Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.  Pursuant to an

Ex Parte Attachment Order dated April 17, 2007, which authorized the attachment of FHT's

property in an amount up to $10,220,000.00, Plaintiff, Transportes Navieros Y Terrestres, S.A.

De C.V., ("TNT"), has purportedly restrained an electronic funds transfer involving FHT in the

amount of $1,256,354.84.

For the reasons set forth in the accompanying Declaration of William Luke Marsh,

Declaration of Jan Fredrik van der Stelt, Declaration of Arturo Arista, and Declaration of Charles

E. Murphy, and for the reasons explained herein, the Ex Parte Order should be vacated because

(1) TNT's claim for wrongful arrest is so lacking in merit as to be characterized as frivolous; (2)

TNT has abused the attachment remedy by bringing a claim that is intended to harass and cause

financial injury to FHT, which is an improper practice that reveals a want of equity so manifest

as to require vacatur; and (3) the amount attached is excessive because TNT has suffered no damages from the arrest that never delayed the vessel. Concisely stated, TNT has alleged in its Verified Complaint that FHT wrongfully arrested the M/V CABALLO AZTECA and, consequently, that TNT was unable to deliver its vessel as required by a charter party contract with a company named Con-Dive, LLC. It is not disputed that FHT arrested the vessel in support of FHT's contract dispute with a company named Oceanografia S.A. De C.V. ("OSA"), a controversy that was the subject of a separate action in this court captioned *Fairmount Heavy Transport N.V. v. Oceanografia S.A. De C.V.*, 06 CV 15491 (TPG), and which action was dismissed after OSA funded a $950,000.00 settlement in favor of FHT. In this case, TNT has alleged that the vessel arrest was illegal because TNT, and not OSA, owned the vessel. TNT has further alleged that it has suffered damages in the amount of $10,220,000.00.

Importantly, TNT's liability case is without merit because the arrest, as well as the purported lost charter with Con-Dive, coincided exactly with a time when the vessel was laid up for repairs in a Rotterdam shipyard, *i.e.*, the vessel entered the shipyard for repairs more than three years prior to the six month arrest and departed the shipyard nearly three months after the arrest was lifted. That is, the arrest neither delayed the vessel nor its repairs. Perhaps more importantly, TNT's claim is brought in bad faith where the companies TNT, OSA, and Con-Dive are intimately related, if not alter egos, and whose principals are now performing in concert to bring this retaliatory action against FHT for the improper purpose of harassment. Notably missing from TNT's Verified Complaint is any mention that the owners of OSA also own TNT. Similarly, TNT failed to disclose that it is the shipping arm of OSA. That TNT and OSA are related companies owned and operated by the same individuals is no secret; such information is ascertainable through a Dun & Bradstreet company search. Also, the principal witness for OSA

2

in the settled dispute between FHT and OSA was its Director General, Mr. Amado Yanez. At all

material times, Mr. Yanez also directed the activities of TNT. Mr. Yanez is the primary

stockholder and the "President Council" of OSA. Similarly, OSA's Assistant Director General,

Mr. Wesley Freeman, is listed by the Texas Register of Corporations as the "governing person"

for Con-Dive, LLC and is further listed on Con-Dive's website as the "President" and main

contact of that company. By any objective measure, therefore, TNT's naked allegation that it

suffered damages of $10,220,000.00 by virtue of a lost contract with Con-Dive is immediately

suspect.

Given this background, FHT leaves TNT to its proof at the Rule E (4)(f) hearing to

demonstrate *inter alia* (1) that it has a prima facie valid admiralty claim under Dutch law for

wrongful arrest in the circumstances where the arrest never delayed the vessel or its repairs[1]; (2)

that it suffered actual damages considering that the same people control TNT, OSA, and Con-

Dive and considering TNT's convenient allegation that its breached charter just so happened to

be with Con-Dive; and (3) that it can produce evidence at the post-attachment hearing sufficient

to prove that its $10,220,000.00 damage claim is not excessive. By way of example, Paragraph

12 of TNT's Verified Complaint alleges $3,650,000.00 in liquidated damages owed or paid to

Con-Dive as a result of an alleged breached charter party, the very existence of which FHT

disputes, and another $6,570,000.00 in lost profits from the lost Con-Dive charter. As part of

TNT's burden to prove why the attachment should not be vacated, this Court must be satisfied

that TNT sustained damages, and if so, that those damages are accurately calculated in the

Verified Complaint.

---

[1] Pursuant to Supplemental Admiralty Rule B and *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434
(2d Cir. 2006) a plaintiff must allege a prima facie valid maritime claim to be entitled to a Rule B attachment. TNT
offers no support for its proposition that its claim for wrongful arrest, which claim it purports to be pursuing in a
Mexican criminal proceeding, constitutes a prima facie valid maritime claim. FHT has researched the issue and,
tellingly, has not identified any analogous case law that supports TNT.

In *Rolls Royce Industrial Power, (INDIA) v. M.V. FRATZIS*, 119 AMC 393, 397, 95 CV 2630 (CSH)(S.D.N.Y.) Judge Haight held that the appropriate three-part analysis to be undertaken by the Court is such situations is as follows:

> [T]here are three questions which arise out of the authorities cited [including Admiralty Rule E(4)(f), Admiralty Rule E(6) and former Local Admiralty Rule 12] and others, to which I will come...
>
> The first: Is the plaintiffs' claim so lacking in merit as to be characterized as frivolous?
>
> If that question is answered in the negative, then one comes to the second question which is: In obtaining the attachment at issue, have the plaintiffs engaged in improper practices to such a degree, or do the circumstances reveal a want of equity so manifest, as to require that the attachment be vacated in its entirety?
>
> And the third question, if that be answered in the negative, is this: Is the amount attached excessive or is it reasonably necessary to secure the plaintiffs' claims?

*Rolls Royce Industrial Power, (INDIA)*, 119 AMC at 397. FHT respectfully submits that this Court should vacate the attachment pursuant to Rule E(4)(f) because TNT's claim is frivolous. Vacatur is also appropriate because TNT action is nothing more than a tit-for-tat retaliation for FHT's earlier attachment of OSA's funds. Alternatively, pursuant to Rule E(6) the attachment should be reduced to zero because TNT has not sustained damages.

## II. **STATEMENT OF FACTS**

The facts pertaining to the instant Motion to Vacate Attachment are more fully set forth in the accompanying Declaration of William Luke Marsh ("Marsh Declaration"), Declaration of Jan Fredrik van der Stelt ("van der Stelt Declaration"), Declaration of Arturo Arista ("Arista Declaration") and Declaration of Charles Murphy ("Murphy Declaration").

A. The Settled Dispute Between Fairmount **and** Oceanografia

Pursuant to a charter party concluded on September 15, 2005, OSA agreed to charter

from FHT the semi-submersible barge FAIRMOUNT FJORD plus the tug AHTS DE HONG for

the carriage of a pipelay barge from Mumbai, India to one safe port in the Gulf of Mexico. *See*

*Amended Verified Complaint in Fairmount Heavy Transport N.V. v. Oceanografia S.A. De C.V.,*

06 CV 15491 (TPG), attached to *Murphy Declaration as Exhibit 1*. During the course of the

charter, certain disputes arose between FHT and OSA regarding *inter alia* OSA's failure to pay

freight to FHT, which amounts were due and owning under the charter party. *Id.* After OSA

breached the charter party contract by failing to pay to FHT outstanding freight, the contract was

legally terminated on October 27, 2005. *Id.* As a result of OSA's breach of the contract, FHT

sustained damages in the total principal amount of $2,676,433.40. *Id.* Pursuant to the charter

party, all disputes were to be submitted to arbitration in London with English Law to apply. *Id.*

In accordance with the arbitration clause, FHT commenced arbitration against OSA on

November 7, 2005 and served its written claim submissions on May 18, 2006. *Id.*

In an effort to secure its claim in the arbitration, FHT attempted to obtain security by way

of a vessel arrest in Rotterdam, which effort is described more fully below. *Marsh Declaration*

*at ¶ 2.* FHT's attempt to obtain security in such a manner proved unsuccessful. *Marsh*

*Declaration at ¶ 8.* As a result, on December 27, 2006 FHT filed an action in the United States

District Court for the Southern District of New York captioned *Fairmount Heavy Transport N.V.*

*v. Oceanografia S.A. De C.V.*, 06 CV 15491 (TPG). *Murphy Declaration at ¶ 5.* Pursuant to an

ex parte attachment order in that case, FHT attached OSA's property in the amount of

$3,604,999.50, which amount fully secured FHT's arbitration claim inclusive of interest and

costs. *Id.* Thereafter, OSA moved to vacate the attachment and also moved for countersecurity

in the amount of $13,000,000.00, in relation to its counterclaim that FHT, and not OSA, had breached the charter party. *Murphy Declaration at ¶ 6.* After oral argument, FHT and OSA agreed to settle their claims in consideration of a $950,000.00 payment from OSA to FHT. *Murphy Declaration at ¶ 7.* Thereafter, the parties submitted for Judge Griesa's signature a Stipulation and Turn Over Order in respect of the attached funds, pursuant to which $950,000.00 would be paid to FHT in settlement and the balance would be paid to OSA. *Id.* Judge Griesa signed the Order on March 21, 2007. *See Turn Over Order dated March 21, 2007 attached to Murphy Declaration as Exhibit 2.* The funds were turned over by the garnishee bank and the case was dismissed. *Murphy Declaration at ¶ 8.* Subsequently, on April 10, 2007 FHT and OSA entered into a written settlement agreement that contains a confidentiality clause regarding its provisions. *Marsh Declaration at ¶ 16.*

**B.  The Current Dispute Between Transportes Navieros Y Terrestres and Fairmont**

In this case, TNT filed its Verified Complaint against FHT on April 17, 2007. *See TNT's Verified Complaint against FHT attached to Murphy Declaration as Exhibit 3.* TNT has alleged that FHT wrongfully arrested the M/V CABALLO AZTEC between November 10, 2005 and May 17, 2006 because TNT, and not OSA, then owned the vessel. *Id. at ¶ 7, 10.* Further, TNT has alleged that on or about December 12, 2005 it entered into a charter party with Con-Dive for the charter of the vessel, pursuant to which the vessel was to be delivered on March 15, 2006 to Port Fourchon, Louisiana. *Id. at ¶ 4-5.* Curiously, TNT has alleged that when it entered into the charter party with Con-Dive, the vessel had already been under arrest for more than one month, which causes one to question TNT's and Con-Dive's motives for entering into such an arrangement, if one ever existed. Moreover, TNT has alleged that prior to the commencement of its charter with Con-Dive, the vessel was brought to a shipyard in Rotterdam, The Netherlands

for modifications to enable it to meet the specifications of the charter party. *Id. at ¶ 6.* TNT has

also alleged that as a result of the wrongful arrest, it was unable to deliver the vessel as required

by the charter and, thus, was in breach of the charter with Con-Dive. *Id. at ¶ 11.* TNT has

alleged that it suffered damages of $10,220,000.00 as a result of FHT's arrest, which is

$3,650,000.00 in liquidated damages to Con-Dive and $6,570,000.00 in lost profits that TNT

would have earned had it performed the charter. *Id. at ¶ 11-12.*

It is not denied that the vessel was arrested on the application of FHT. *Marsh*

*Declaration at ¶ 2.* It is, however, denied that the arrest was wrongful or that the damages

alleged to have been suffered by TNT, if any, were caused by the arrest. *Id.* FHT's London

solicitors, Ince & Co., were responsible for causing FHT's Dutch law firm, Smallegange van

Dam & Van der Stelt (hereinafter "FHT's Dutch lawyers"), to effect the arrest. *Marsh*

*Declaration at ¶ 3.*

## C. **The Vessel's Ownership and the Arrest**

When the vessel was arrested, FHT was engaged in a London arbitration against OSA.

*Marsh Declaration at ¶ 4.* The principal witnesses for OSA were its Director General, Mr.

Amando Yanez, and its Assistant Director General, Mr. Wesley Freeman. *See email exchanges*

*related to the arbitration attached to Marsh Declaration as Exhibit 1.* In the arbitration, FHT

was claiming damages for breach of a charter party and the purpose of the arrest was to obtain

security for that claim. *Marsh Declaration at ¶ 5.* The information that FHT obtained at the

time, which included data from an investigative source named Sea Web, indicated that the

registered owner of the vessel was OSA. *See information that FHT relied upon attached to*

*Marsh Declaration as Exhibit 2.* These seemed to indicate unequivocally that the registered

owner of the Vessel was OSA. *Marsh Declaration at ¶ 5.* Further confirmation that the

7

registered owner was indeed OSA was received when the Mexican lawyers, Garza Tello, attended the Mexican Ship Registry. *Id.* They learned that there were various "legal acts" registered concerning the vessel including a "Registry of Property" of the vessel in favor of OSA and a "Registry of a Trust" in which OSA appeared as settlor and Interacciones Banca Mutiple, a Mexican financial institution, as beneficiary. *Id.*

FHT's investigations had revealed that the vessel was under repair at a Dutch shipyard, which is where it had been for the previous three years. *Marsh Declaration at ¶ 6.* FHT did not expect, therefore, that the arrest would produce any immediate security, but reasoned that it would be helpful to have the arrest in place should circumstances change. *Id.* On November 7, 2005 FHT's Dutch lawyers received instructions from FHT to make arrangements for a conservatory arrest on the vessel. *van der Stelt Declaration at ¶ 2.* In addition to the inquiries already described, FHT's Dutch lawyers checked the ownership through the Database of Lloyds/Fairplay, which confirmed that the vessel was at the material time owned by OSA. *Id.* FHT's Dutch lawyers also checked with the shipyard where it was confirmed that the vessel arrived on or about October 7, 2002 at the shipyard for repairs and/or conversions to be carried out.[2] *Id.*

On November 9, 2005 FHT filed an arrest petition with the Dutch court, and consequently the President of the Groningen District Court granted leave. *See Arrest Petition attached to van der Stelt Declaration as Exhibit 1.* FHT effected the arrest on November 10, 2005. *van der Stelt Declaration at ¶ 3.* FHT served the arrest documents on OSA in accordance with the relevant Articles in the Dutch Code of Civil Procedures and in accordance with the

---

[2] According to the current Database of Lloyd's/Fairplay, the ownership of the vessel changed from OSA to TNT in May of 2006. *See copy of vessel details from the Lloyd's/Fairplay database attached to van der Stelt Declaration as Exhibit 2.*

Hague Convention 1965. *See arrest documents served on OSA attached to van der Stelt Declaration as Exhibits 3 and 4.*

**D.  The Information Supplied by TNT and the Release of the Vessel**

It was not until May 15, 2006, *i.e.*, six months into the arrest, that TNT first contacted FHT's Dutch lawyers.  Specifically, TNT's Dutch lawyers, Van Traa Solicitors, Mr. Michael Hajdasinski (hereinafter "TNT's Dutch lawyers") sent a facsimile that attached a statement by Notary Public Cortes Caro dated April 21, 2006, from which it appeared that the ownership in the vessel had been transferred from OSA to TNT on October 27, 2005, as well as a transcript of the vessel's registration in the Mexican Ship Register.  *van der Stelt Declaration at ¶ 6.*  Prior to May 15, 2006, FHT's Dutch lawyers had not been contacted by OSA or by its legal representatives. *van der Stelt Declaration at ¶ 7.*  Likewise, prior to May 15, 2006 FHT had not been contacted by any other party that showed interest in the vessel and/or in the claim brought by FHT against OSA. *Id.*

The fax message received from TNT's Dutch lawyers on May 15, 2006 stated that the vessel was being prepared to leave the shipyard. *van der Stelt Declaration at ¶ 8.*  In that letter, TNT's Dutch lawyers demanded an immediate lifting of the arrest and placed FHT on notice that maintaining the arrest could result in a claim for wrongful arrest. *See fax dated May 15, 2006 from TNT's Dutch lawyers to FHT's Dutch lawyers (with free translation from Dutch to English) attached to van der Stelt Declaration as Exhibit 5.*  On May 16, 2006, FHT's Dutch lawyers and TNT's Dutch lawyers exchanged faxes regarding TNT's request that the arrest be lifted. *See faxes dated May 16, 2006 exchanged between Dutch lawyers for FHT and TNT attached to van der Stelt Declaration as Exhibit 6.*  Based upon the documents provided by TNT's Dutch lawyers, on May 16, 2006 FHT confirmed to TNT that the arrest was lifted. *van der Stelt*

*Declaration at ¶ 9.* The Vessel was released from arrest on May 16, 2006 following receipt by Mr. van der Stelt, the day before, from Mr. Hajdasinski of Messrs. Van Traa Advocaten, the Dutch lawyers acting for TNT, of information tending to suggest that the registered owner of the vessel was actually TNT and not OSA. *Id.* In his message to Mr. van der Stelt, Mr. Hajdasinski had demanded the immediate release of the vessel as it was ready to sail from the yard to start a 450-day charter commencing on June 8, 2006 at a daily rate of US$100,000.00. *Marsh Declaration at ¶ 2; see also fax dated May 15, 2006 from TNT's Dutch lawyers to FHT's Dutch lawyers (with free translation from Dutch to English) attached to van der Stelt Declaration as Exhibit 5.* TNT threatened that unless the vessel was immediately released, FHT faced a potential claim of $45,000,000.00. *Id.*

The Bailiff advised the authorities of the lifting of the arrest and confirmed this in writing in his fax message of May 17, 2006 to the Port Authorities, Groningen Seaports and the Harbor Police. *See correspondence dated May 17, 2006 from Bailiff to Port Authorities attached to van der Stelt Declaration as Exhibit 7.* From information received from the Port Authorities of Delfzijl, the vessel did not sail from Delfzijl until July 27, 2006. *See copy of information provided by Port Authorities attached to van der Stelt Declaration as Exhibit 8.*

Since the arrest was lifted on May 16, 2006, there have been no contacts between FHT's Dutch lawyers and TNT/OSA. *van der Stelt Declaration at ¶10.* It is noteworthy that FHT has never been held liable in the Dutch jurisdiction for an alleged wrongful arrest, nor has FHT even been served with a claim for wrongful arrest in the Dutch jurisdiction, in connection with the arrest of the vessel. *Id.* As a matter of Dutch law, the vessel arrest did not prevent the repair yard from carrying out its repairs as planned. *van der Stelt Declaration at ¶11.* Further, no contact was ever received from the shipyard that suggested that the arrest was causing, or might

somehow cause, a delay to their works. *Id.* On the contrary, the shipyard's insurance brokers advised FHT's Dutch lawyers that work was done by the yard intermittently on the vessel due to intermittent payment of the yard's invoices. *Id.* As such, the vessel arrest did not delay, and could not have delayed, the yard's completion of the repairs. *Id.*

The vessel remained under arrest at the shipyard for six months between November 10, 2005 and May 16, 2006. *Marsh Declaration at ¶ 7.* During the entire period before May 15, 2006 no one sought to question or challenge the arrest. *Id.* Importantly, the vessel did not sail from the yard until July 27, 2006 – over two months after the arrest was lifted, and some 51 days after the June 8, 2006 charter was supposedly due to have commenced. *van der Stelt Declaration at ¶ 10; Marsh Declaration at ¶ 9.*

In accordance with Dutch law, the law applicable in respect of the arrest proceedings, a claim for wrongful arrest cannot be brought against FHT. *van der Stelt Declaration at ¶ 12.* TNT has not held FHT liable. *Id.* TNT has not put FHT on notice. *Id.* TNT has not shown any documentary evidence that could support an alleged claim for wrongful arrest. *Id.* With reference to the above circumstances and facts, an alleged claim for wrongful arrest, if brought by TNT against FHT in a Dutch jurisdiction, would fail. *van der Stelt Declaration at ¶ 12.*

## E.  TNT Suffered No Loss

In light of the foregoing, it is impossible to identify any connection between the arrest and TNT's alleged losses. *Marsh Declaration at ¶ 10.* Perhaps it is because of this impossibility that TNT has alleged facts in its Verified Complaint that are contrary to TNT's allegations of May 15, 2006, and in a manner inconsistent with what actually happened. Thus, Paragraph 5 of the Verified Complaint has alleged that the Vessel was to be delivered on March 15, 2006 under the charter party with Con-Dive, which is three months earlier than the June 8,

11

2006 delivery date alleged by Mr Hajdasinski, TNT's Dutch lawyer, in his letter dated May 15, 2006. *Marsh Declaration at ¶ 10.*

Apart from an initial inquiry by the shipyard, there was no reaction at all to the arrest between the date it was made on November 10, 2005 and May 15, 2006. *Marsh Declaration at ¶ 11.* TNT's allegation in Paragraph 5 of the Verified Complaint, *i.e.*, that TNT was required to deliver the vessel to Con-Dive on March 15, 2006 in Louisiana, would therefore appear to be a pure fabrication inserted solely to justify the assertion made in Paragraph 11, *i.e.*, that TNT was unable to deliver the vessel to Con-Dive as a result of the arrest. *Marsh Declaration at ¶ 11.* If Paragraph 11 of the Verified Complaint is unsustainable it must follow that so too is Paragraph 12, which contains TNT's $10,220,000.00 damage claim. *Id.*

## F. TNT, OSA and Con-Dive are Closely Related Companies

There exists an extremely close relationship between TNT and OSA. *Marsh Declaration at ¶ 12.* TNT and OSA, if not actually one and the same, are effectively so given their close connection. *Id.* TNT is owned by the owners of OSA. *Id.* TNT is the shipping arm of OSA. *Id.* Market information obtained from Dun & Bradstreet confirms this connection. *See Dun & Bradstreet Report attached to Marsh Declaration as Exhibit 3.* Page 5 of that report names TNT as an affiliate of OSA on the express basis of its having "…either a similarity of parent company or because [it] share(s) similar stockholders." In this connection, it is also pertinent to look at the sections of the report dealing with management found on page 3, and stockholding found on page 4. These show Amando Yanez as a main stockholder and the "President Council". Further, the section of the Dun & Bradstreet report under the heading "antecedents", which is found on page 5, records that Mr. Yanez attended Texas A&M University. The extract from the Alumni Directory of the Texas A&M University Department of Oceanography contains Mr. Yanez'

name and lists his company as "Transportes navieros Y Terrestres Tiburcio, Sanchez de la

barquera No 46, Col. Merced Gomez Mixcoas, C.P. 03910 Mexico D.F." *See extract from Texas*

*A&M University Alumni Directory attached to Marsh Declaration as Exhibit 4.*

Similarly, there is a close connection between TNT and Con-Dive through OSA. *Marsh*

*Declaration at ¶ 15.* Recall that TNT has alleged that it entered into a charter party with Con-

Dive on December 12, 2005. Unfortunately, as the vessel was in the repair yard since 2002,

TNT's allegation in Paragraph 6 of the Complaint, *i.e.,* that "prior to the commencement of the

charter party, the vessel was brought to a shipyard in Rotterdam, The Netherlands for

modifications to enable it to meet the specifications of the [Con-Dive] charter party" cannot be

true. *Id.* Interestingly, Con-Dive did not even exist until September 29, 2005. *See extracts from*

*Louisiana Secretary of State Commercial Division and Texas Register of Corporations attached*

*to Marsh Declaration as Exhibit 5.* Moreover, the question of whether there ever was such a

charter party is highly questionable. *Marsh Declaration at ¶ 15.* This is because FHT's

investigations have revealed a clear link between Con-Dive and OSA and, therefore, TNT, such

as to cause serious doubt over the veracity of the assertion that there was a charter party. *Id.*

TNT's allegation that a charter party existed between it and Con-Dive is yet another

misstatement designed to give the appearance that there is a legitimate basis for TNT's action.

*Id.* The link is through Mr. Wesley Freeman, the Assistant Director General of OSA. *Id.*

Extracts from the Texas Register of Corporations show Wesley Freeman to be the "governing

person" for Con-Dive. *See extracts from Louisiana Secretary of State Commercial Division and*

*Texas Register of Corporations attached to Marsh Declaration as Exhibit 5.* Likewise, Con-

Dive's own website names Wesley Freeman as the president and main contact for that company.

*See extracts of Con-Dive's website attached to Marsh Declaration as Exhibit 6.*

## G. A Criminal Proceeding Has Not Been Filed Against FHT in Mexico

TNT has alleged at Paragraph 13 of its Verified Complaint that "a criminal proceeding

has been filed against Defendant in a court of law in Mexico based on the aforementioned facts

to assert its legal rights of redress for the wrongful arrest of its vessel." TNT's representation is

false and misleading for several reasons. *Arista Declaration at ¶4.* Criminal proceedings in

Mexico are not an appropriate forum to assert legal rights for a an alleged wrongful arrest

because if a party is found guilty, it will be incarcerated and subject to the payment of a specific

fine established in the Criminal Court. *Arista Declaration at ¶9.* Significantly, no money would

be reimbursed to the affected party. *Id.* Criminal complaints are not filed in courts of law in

Mexico. *Arista Declaration at ¶5.*

Under Mexican law, if a party considers that a crime has been committed, it may file a

complaint at the District Attorney's Office ("DA"). *Id.* The complaint is a narration of a series

of events that "could" be considered a crime. *Id.* The DA will make investigations such as

taking statements of the involved parties or requesting documentation before deciding whether to

prosecute the case. *Id.* Only if the DA elects to prosecute will it initiate a criminal action. *Id.*

Most significantly, an allegation of wrongful arrest of a vessel in a foreign country would not be

considered a crime under Mexican law. *Arista Declaration at ¶6.* If a claimant, such as TNT,

wished to prosecute its underlying claim in Mexico for civil damages, it would initiate a case for

wrongful arrest in a Commercial Court of Law, and not through a criminal complaint. *Id.* A DA

in Mexico would not have jurisdiction over an alleged crime that took place in a foreign country.

*Arista Declaration at ¶7.*

Typically, when criminal complaints are filed in respect to maritime claims in Mexico it is because it is easier and simpler to obtain the temporary detention of a vessel, even where there are insufficient facts to support the accusation. *Arista Declaration at ¶8.* Conversely, it is difficult to obtain an arrest order against a vessel through a Commercial Court proceeding because only original or authenticated certified documents are admitted as evidence and the process lasts many days. *Id.* No such formalities are required by the DA and therefore a quick detention can be easily be reached. *Id.* Filing a complaint in a DA's office gives the DA the right to request the Harbor Master not to allow the vessel to sail until the DA finishes the investigations that it deems appropriate for a possible crime that had been committed. *Id.* In the meantime, the detention of the vessel is costly to its operators and therefore is generally used by claimants to force settlement or substitute security. *Id.*

FHT's investigation in Mexico has revealed that no criminal action is pending against FHT in respect to the facts described in the Verified Complaint. *Arista Declaration at ¶10.* That is, to FHT's knowledge no DA has elected to prosecute TNT's accusations. Based on the foregoing, the underlying claim for which TNT seeks security in New York has never been filed in any Mexican court. Not surprisingly, other than this attachment case in New York, FHT is unaware of any other lawsuit by TNT. As there is no ongoing proceeding in which TNT's claim will be adjudicated, this Court should exercise its discretion to vacate the attachment. For these reasons, the attachment is nothing more than a "tit-for-tat" retaliation for FHT's earlier attachment of OSA's funds. *Marsh Declaration at ¶ 17.*

15

### III. ARGUMENT

#### POINT ONE

#### IT IS PLAINTIFF'S BURDEN TO PROVE
#### WHY THE ATTACHMENT SHOULD NOT BE VACATED

A plaintiff that has obtained an ex parte Rule B attachment order shoulders the burden at

the post-attachment hearing to prove *inter alia* that "it has a valid prima facie admiralty claim

against the defendant." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445

(2d Cir. 2006).

Supplemental Admiralty Rule E(4)(f) of the Federal Rules of Civil Procedure provides:

Whenever property is arrested or attached, any person claiming an interest in it
shall be entitled to a prompt hearing at which the plaintiff shall be required to
show why the arrest or attachment should not be vacated or other relief consistent
with theses rules.

In such cases, Local Admiralty and Maritime Rule E.1 provides:

The adversary proceeding following arrest or attachment or garnishment that is
called for in Supplemental Rule E(4)(f) shall be conducted by a judicial officer
within three court days, unless otherwise ordered.

It is the plaintiff's burden to prove that the attachment is proper. The Second Circuit

Court of Appeals commented on Rule E(4)(f) in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty*

*Ltd.*, 460 F.3d 434 (2d Cir. 2006) and explained the following standard:

[A] district court must vacate an attachment if the plaintiff fails to sustain his
burden of showing that he has satisfied the requirements of Rules B and E. We
also believe vacatur is appropriate in other limited circumstances. While, as we
have noted, the exact scope of a district court's vacatur power is not before us, we
believe that a district court may vacate the attachment if the defendant shows at
the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent
jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the
defendant in the district where the plaintiff is located; or 3) the plaintiff has
already obtained sufficient security for the potential judgment, by attachment or
otherwise. n5

> n5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E. Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

*Id.* at 445.

Former Local Rule 12, to which the Second Circuit cited in note 5 of *Aqua Stoli*, provides

as follows:

> Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a manifest want of equity on the party of the plaintiff, be entitled to an order requiring the plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted, consistent with these rules or the supplemental rules.

*Aqua Stoli Shipping Ltd.*, 460 F.3d at 440.

Additionally, Supplemental Admiralty Rule E(6) provides that "Whenever security is

taken the court may, on motion and hearing, for good cause shown, reduce the amount of

security given...."   As set forth above, the court "has power, pursuant to Supplemental

Admiralty Rule E(6) to reduce the amount of the attachment when good cause is shown." *Sea*

*Transp. Contractors, Ltd. v. Indus. Chemiques du Senegal*, 411 F. Supp. 2d 386, 396 (S.D.N.Y.

2006).

## POINT TWO

### PLAINTIFF FILED ITS FRIVOLOUS CLAIM AGAINST DEFENDANT FOR THE IMPOPRER PURPOSE OF RETALIATION

In *Aqua Stoli*, the Second Circuit Court of Appeals held that given the exceptional

remedy of maritime attachments, the district courts have the inherent authority to vacate abusive

or unfair attachments. *Id.* at 442.  The Second Circuit so held in the context of praising Judge

Leval's holding in *Integrated Container Serv., Inc. v. Starlines Container Shipping, Ltd.*, 476

17

F.Supp. 119 (S.D.N.Y. 1979). The *Aqua Stoli* court held that "Then-District Judge Leval

astutely noted, however, the possibility of abuse by the attaching party in some circumstances."

*Aqua Stoli*, 460 F.3d at 442. One such case of abuse occurs when a party who can be "found" in

the Southern District of New York has assets attached "across the river" in the Eastern District of

New York. In *Integrated Container*, Judge Leval held that where there is an "abusive use of the

maritime attachment remedy…the courts may easily remedy the situation by exercising

discretion to set aside an unfair attachment." *Integrated Container*, 476 F.Supp. at 124. Based

on the facts of *Integrated Container*, which was itself an "across the river case," Judge Leval

found that the attachment was not unfair because "there can be no doubt that plaintiffs' need for

security is real, [and] that their quest for attachment is not a tactic of harassment." *Id.*; *see also*

*Central Hudson Gas and Elec. Corp. v. Empresa Naviera Santa, SA*, 845 F. Supp. 150, 153

(S.D.N.Y. 1994) ("The Rule was not abused, inasmuch as there was a substantial risk that

[plaintiff] would not be able to locate sufficient assets to satisfy its claims, which in turn were

not frivolous." (citations omitted)).

    Likewise, in *Bay Casino, LLC v. M/V ROYAL EMPRESS*, 1999 U.S. Dist. LEXIS 22357

(S.D.N.Y. 1999) in the context of a defendant's challenge to a maritime attachment, and where

the plaintiff provided "misleading information regarding projected profits and actual costs" the

court held that "plaintiff's lost profits claim is frivolous and, therefore, improperly included as

part of the security." *Id.* at *3-4. The *Bay Casino Court* further held that the claim was frivolous

because the very existence of the damages were uncertain, *i.e.*, where profits were speculative at

best, and that recovery was unwarranted where the plaintiff could not potentially prove loss to a

reasonable certainty standard. "It is well-settled that in attachment proceeding, the plaintiff need

not prove its damages with exactitude but the court must be satisfied that the plaintiff's claims

18

are not frivolous," *Id. at \*3* citing *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235

(S.D.N.Y. 1996). Addressing New York law, the court rejected the plaintiff's lost profits claim

and partially vacated the attachment because allowing security for a frivolous claim would have

put the plaintiff in a better position than it otherwise would have been without the defendant's

involvement. The *Bay Casino* court held as follows:

> Several grounds for such a finding [that the claim was frivolous] were apparent in
> both the parties' pleadings and in their representations to the Court in the hearing
> on this matter.
>
> The standard for proving an entitlement to lost profits requires that:
>
> a.  profits must have been lost because of the breach;
> b.  the loss must be capable of proof with reasonable certainty; and
> c.  the particular damages must have been in contemplation of the parties at the
>     time the agreement was made.
>                                    * * *
>
> While the plaintiff has a much lighter burden of proof in this [Rule E(4)(f)]
> proceeding than at trial, the Court still can find no basis in law or in fact to find
> plaintiff's claim non-frivolous....
>
> Additionally, neither in their pleadings, nor in their representations to this Court
> has plaintiff provided the Court with an evidentiary basis for historical profits that
> would indicate plaintiff's claims for lost profits constitutes anything more than
> bald speculation.  Absent this, especially in consideration of the fact that plaintiffs
> are marketing...a consumer driven , highly volatile venture[,] plaintiff cannot
> potentially prove loss to a reasonable certainty.
>
>                                    * * *
>
> Defendants cite <u>Rolls Royce v. Fratzis M.</u>, 1996 AMC 393, 396 (S.D.N.Y. 1995)
> in heralding the Court's responsibility to address the question of:
>
>> In obtaining the attachment...have the plaintiffs engaged in
>> improper practices to such a degree or do the circumstances reveal
>> a want of equity so manifest, as to require the attachment to be
>> vacated in its entirety.
>
> In reducing the security, this Court is mindful of its discretion under both law and
> equity.  Since plaintiffs will not be able to prove a claim for lost profits based
> solely on questionable projections, unsupported by historical profits, the Court

> declines to secure the claim...Considering the facts at bar, this Court considers that clear guidance in determining plaintiff's lost profits claim is frivolous. Thus, plaintiff's claim for lost profits will not be considered in calculating an appropriate security.

*Bay Casino*, 1999 U.S. Dist. LEXIS 22357 at *4-7.

The above holdings bring into sharp focus that district courts are empowered with authority to vacate frivolous and abusive attachments. As applied to this case, TNT's claim is frivolous such that vacatur is appropriate. First, the hopelessly intertwined companies TNT, OSA and Con-Dive have concocted a non-existent claim by alleging the wrongful arrest of the vessel, which arrest fell in the middle of a four year period during which the vessel laid unused in a Dutch shipyard starting in 2002. As explained in the accompanying declarations, neither the vessel nor its repairs were delayed by the six-month arrest that lasted from November 10, 2005 to May 16, 2006. TNT's frivolous claim constitutes retaliation for FHT's suit against OSA. TNT's claim was meant to harass and to cause financial hardship. By attaching $1,256,354.84 without a basis in fact or law, TNT has succeeded in accomplishing exactly what it set out to do.

Second, TNT's claim that it breached a charter party as a result of the arrest is patently false. Recall that TNT's Dutch lawyers advised FHT on May 15, 2006 that TNT was employing the vessel in Mexico commencing on June 8, 2006. Notwithstanding that FHT lifted the arrest on May 16, 2006, which date was well in advance of TNT's alleged June 8, 2006 delivery date, TNT curiously opted for the vessel to remain in the shipyard until July 27, 2006.

Third, TNT's allegations are in conflict. Paragraph 5 of TNT's Complaint alleged that TNT was required to deliver the vessel to Louisiana by March 15, 2006. This claim contradicts the allegation by TNT's Dutch lawyer of May 15, 2006 that TNT was required to deliver the vessel to Mexico by June 8, 2006. Considering that TNT decided not to remove the vessel from the shipyard until, July 27, 2006, FHT questions the existence of any charter party whereby TNT

was required to perform before that date. Similarly, assuming *arguendo* that such a charter party exists, the Court should be skeptical of any contract between TNT and Con-Dive because the reasonable inference is that any agreement entered into by these parties during the arrest was created to make it appear as though TNT was damaged by the arrest, when in fact it was not.

Fourth, TNT's claim at Paragraph 6 of its Complaint, *i.e.*, that it put the vessel into the Rotterdam shipyard for modifications pursuant to a December 12, 2005 charter party with Con-Dive, is nonsense. As above, TNT alleges that the vessel delivery date on the Con-Dive charter was March 15, 2006, which means that TNT has alleged that the vessel entered the shipyard for modifications sometime between December 12, 2005 and March 15, 2006. We know this to be false. The vessel entered the shipyard in 2002 whereas Con-Dive did not even exist until September 29, 2005. Further, it simply cannot be accepted that TNT entered a charter party with Con-Dive on December 12, 2005, *i.e.*, while the vessel was arrested. If this were true, TNT would not have delayed until May 15, 2006 to demand that FHT lift the arrest.

Fifth, it is noteworthy that TNT has alleged in Paragraph 13 of its Complaint that "[a] criminal proceeding has been filed against Defendant in a court of law in Mexico based on the aforementioned facts to assert its legal rights of redress for the wrongful arrest of its vessel". The fact that TNT has allegedly sought redress from a criminal court, instead of a commercial court sitting in admiralty, undercuts its bald assumption that its claim for wrongful arrest constitutes an admiralty claim. Without a valid prima facie admiralty claim submitted to an admiralty court or a maritime arbitration panel, TNT is not entitled to the pre-judgment remedy of maritime attachment. Significantly, TNT has cited no authority in support of its proposition that it has an admiralty claim against FHT. In this regard, FHT leaves TNT to its proof to

21

reconcile its prayer for a Rule B maritime attachment with its election to pursue its underlying

claim in a non-maritime criminal forum.

Sixth, an investigation has revealed that there is no criminal proceeding pending against

FHT in Mexico. Furthermore, aside from this case in New York, FHT is unaware of any lawsuit

in any court where TNT has alleged a claim for wrongful arrest and sought civil damages. As

such, there is no ongoing claim that requires security. For these reasons, the Court should vacate

the attachment.

**POINT THREE**

**ALTERNATIVELY, PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(6)
THE COURT SHOULD REDUCE THE AMOUNT OF THE ATTACHMENT TO AN
AMOUNT COMMENSURATE WITH PLAINTIFF'S PROVABLE DAMAGES, IF ANY**

Alternatively, FHT moves pursuant to Rule E(6) for a reduction of security, *i.e.*, the

release of the majority of the $1,256,354.84 under attachment. FHT so moves on the basis that

TNT's damages are either non-existent or grossly exaggerated. Supplemental Admiralty Rule

E(6) provides that " Whenever security is taken the court may, on motion and hearing, for good

cause shown, reduce the amount of security given...."    As set forth *supra*, the Court "has

power, pursuant to Supplemental Admiralty Rule E(6) to reduce the amount of the attachment

when good cause is shown." *Sea Transp. Contractors, Ltd. v. Indus. Chemiques du Senegal*, 411

F. Supp. 2d 386, 396 (S.D.N.Y. 2006).

In *Dongbu Express Co., Ltd. v. Navios Corp.*, 944 F.Supp. 235 (S.D.N.Y. 1996), the

vessel charterer sued the vessel owner and sought a maritime attachment in the Southern District

of New York in support of a London arbitration. At the same time, the charterer also brought an

attachment action in South Korea. The charterer attached funds in South Korea and in New

York. Consequently, the owner moved this district court for a partial release of the funds

22

attached in New York on the basis that the New York attachment was duplicative of the Korean attachment, and that the charter had become oversecured. Judge Scheindlin agreed that the charterer was oversecured and, therefore, ordered a partial release of the New York attachment pursuant to Rule E(6) because the amount restrained in New York exceeded the difference between charterer's provable damages and the amount of the Korean attachment. In so doing, Judge Scheindlin held that "in a an attachment proceeding, the plaintiff need not prove its damages with exactitude" and held further that "[b]ut *the court must be satisfied that plaintiff's claims are not frivolous.*" *Id.* at 237 (citations omitted)(emphasis added).

Similarly, in *Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y 2005) a corporation's motion for reduction in the amount of security under Rule E(4)(f) and E(6) was granted where the plaintiff failed to produce evidence to the court to justify the amount of the attachment. In *Daeshin Shipping*, Judge Buchwald applied the *Dongbu Express* standard in the case of a Rule E(6) challenge to a maritime attachment on the basis that the attachment was grossly exaggerated. That is, Judge Buchwald reviewed all of the evidence in the record concerning the plaintiff's claimed damages prior to reducing the amount of the attachment. "As plaintiff has succeeded in attaching the amount of $1,894,778, but only produced sufficient evidence to justify attaching $1,851,016.36, any funds in excess of this amount must be released." *Id.* at *6.

Finally, in *Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal*, 411 F. Supp. 2d 386 (S.D.N.Y. 2006), Judge Casey reduced the amount of a maritime attachment to a level that he viewed as reasonable under the circumstances and held as follows:

> A district court has the inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of the plaintiff.'" Blake Mar., Inc. v. Petrom S.A., 2005 U.S. Dist. LEXIS 26310, No. 05 Civ. 8033, 2005 WL 2875335, at 2 (S.D.N.Y. Oct. 31, 2005)(quoting

23

Southern District of New York Former Local Civil Rule 12 (1986)).  The Second Circuit has held that the "inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge." Greenwich Marine, Inc. v. S.S. Alexandria, 339 F. 2d 901, 905 (2d. Cir. 1965).

*Sea Transport Contractors, Ltd.*, 411 F. Supp. 2d at 391.  Judge Casey found that "good cause" existed per Rule E(6) to reduce the amount of the attachment where the complaint did not accurately allege the amount of damages as evidenced by the parties' underlying contract.

As applied to the facts of instant case, TNT is required to produce evidence at the post-attachment hearing to substantiate its $10,220,000.00 damage claim.  Based on the above authorities, TNT is not entitled to security for speculative claims for lost profits.  In this case, TNT has alleged lost profits in the amount of $6,570,000.00 and FHT respectfully submits that TNT cannot produce credible evidence to support this allegation.  Further, in respect of TNT's alleged liquidated damages penalty to Con-Dive of $3,650,000.00, TNT is required to produce evidence tending to prove that those damages are real.  In this regard, TNT should be made to produce evidence of payment to Con-Dive, which for the reasons already stated will not exist, and evidence that Con-Dive is pursuing through either the courts or arbitration recovery of this amount from TNT.  TNT's lack of evidence at the post-attachment hearing shall reveal that the $10,220,000.00 claimed by TNT is an arbitrary and unreasonably exaggerated figure that TNT included in its Rule B petition merely to harass and create financial hardship for FHT.  This Court should vacate the attachment.

### IV.  CONCLUSION

For the foregoing reasons, the Court should vacate the attachment and direct the garnishees to release all restrained funds.  In the alternative, this Court should reduce the amount of the attachment to a reasonable amount to secure only the provable damages.

Dated: May 1, 2007
     New York, NY

                         Defendant,
                         FAIRMOUNT HEAVY TRANSPORT N.V.,

BY: _____
                         Charles E. Murphy (CM 2125)
                         TISDALE & LENNON, LLC
                         11 West 42nd Street, Suite 900
                         New York, NY 10036
                         (212) 354-0025
                         (212) 869-0067 (fax)
                         cmurphy@tisdale-lennon.com

## AFFIRMATION OF SERVICE

I hereby certify that on May 3, 2007, a copy of the foregoing was filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Charles E. Murphy