```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
TRANSPORTES NAVIEROS Y                      :
TERRESTRES, S.A. DE D.V.,                   :
                                            :
                  Plaintiff,                :
                                            :     07-CV-3076(LAP)
       - against -                          :
                                            :
FAIRMOUNT HEAVY TRANSPORT N.V.,             :
                                            :
                  Defendant,                :
------------------------------------------------------------ X
```

## TNT'S OPPOSITION TO FAIRMOUNT'S MOTION TO VACATE ATTACHMENT

This memorandum is respectfully submitted by Transportes Navieros y Terrestres, S.A. de C.V. ("TNT") in opposition to Fairmount's motion to vacate the attachment in this case.

In its supporting memorandum, Fairmount makes extreme but erroneous allegations. Fairmount spins a conspiracy theory under which three distinct companies – TNT, Oceanografia S.A. de C.V., and Con-Dive, LLC – have allegedly conspired to fabricate a damage claim for wrongful arrest in order to get back at Fairmount for suing Oceanografia in a prior suit. In spinning this tale, Fairmount relies on affidavits from witnesses who engage in rank speculation unsupported by evidence. Fairmount also neglects to mention important facts of which it is aware.

In the three business days since Fairmount filed its brief and supporting papers, we have been consulting with witnesses in four countries (Mexico, United States, the Netherlands, and England) and distant time zones. It has been difficult in the short time available to gather all the relevant

1

evidence to counter the conspiracy alleged by Fairmount. As a result, this submission, in order to meet the deadline, must of necessity be concise and in essentially outline form. In support of this brief, we have attached several declarations from knowledgeable witnesses, the net effect of whose testimony is to demonstrate that Fairmount's allegations are fantasy.

1. **Fairmount wrongfully denies the existence of a criminal proceeding in Mexico – and, surprisingly, neglects to inform the Court of the important events there.**

In support of its motion, Fairmount attaches an affidavit from a Mexican lawyer, who essentially denies that there is any criminal proceeding pending in Mexico. The suggestion is that TNT has simply lied about this in its Complaint.

The simple fact is that a criminal action has indeed been filed in Mexico. Further, that complaint is being acted upon by the relevant district attorney in Mexico. As outlined in the attached affidavit of Mexican counsel, Omar Olvera, the Mexican criminal suit against Fairmount is proceeding. See Olvera Declaration (Exhibit "A"). Mr. Olvera is a well respected law professor at the leading law school in Mexico. He has written horn books on Mexican maritime and commercial law and participated in drafting both the Mexican maritime code and the Mexican commercial code. We encourage the Court to carefully review Mr. Olvera's affidavit, wherein he explains the basis in Mexican law for the criminal fraud action pending in Mexico against Fairmount. He further explains why the legal opinion provided by Fairmount's Mexican counsel is not only incorrect, but irresponsibly so.

Mr. Olvera also explains what has transpired in Mexico since the criminal suit was filed. As Olvera explains, a vessel owned by Fairmount (the FAIRMOUNT GLACIER) was arrested in Mexico as part of this Mexican litigation. Fairmount was scheduled to meet with the relevant district

2

attorney in Mexico to be interviewed in connection with the claim. In blatant violation of Mexican law, however, Fairmount's vessel made a run for it and sailed from the port -- without a compulsory pilot -- with the Mexican police in pursuit.

It is remarkable that Fairmount could deny the existence of a Mexican criminal proceeding in light of these events. It is also misleading, to say the least, for Fairmount to ignore altogether the vessel arrest in Mexico and the subsequent unlawful departure of Fairmount's vessel from the port. The instant Rule B suit was filed only after Fairmount's detained vessel unlawfully fled Mexico, depriving TNT of lawful security for its claim. Viewed in this light, one need not accept Fairmount's conspiracy theory in order to understand why this Rule B suit was initiated.

**2. Fairmount's arrest of the CABALLO AZTECA was plainly wrongful, as Fairmount would have known had it merely consulted the Mexican vessel registry.**

Arresting a vessel is an extreme remedy and, before undertaking an arrest, the plaintiff really ought to take all reasonable steps to ensure that the vessel is owned by the party with whom the plaintiff has a dispute – not some innocent third-party, with whom it has no dispute. It was, of course, known to Fairmount that the CABALLO AZTECA was a vessel from Mexico. The simplest and most logical means of checking the ownership of the vessel would be to contact the relevant authorities in the Mexican government. Specifically, the Mexican government maintains a ship register, which provides up-to-date information concerning the ownership of Mexican vessels. See Olvera Declaration (Exhibit "A").

Fairmount arrested the CABALLO AZTECA on November 10, 2005. As of this date, the official vessel registry in Mexico listed TNT as the owner of record of the CABALLO AZTECA. This is confirmed by the affidavit of Omar Olvera, to which is appended a copy of the registry

document. (See Exhibit "A".) Indeed, on page 9 of its supporting memorandum, Fairmount itself acknowledges that the Mexican Ship Register reflected on October 27, 2005 that the owner of the vessel was TNT.

In other words, two crucial facts are undisputed: (1) Fairmount arrested the CABALLO AZTECA, as property of Oceanografia, when in fact the vessel belonged to TNT; and (2) at the time of the arrest, this was a matter of public record, which easily could have been ascertained had Fairmount merely consulted the official Mexican Ship Register, which was of course the most logical place to check on the ownership of a Mexican vessel.

In light of these facts, as attested to by Dutch counsel, Michael Hajdasinski, Fairmount's arrest of the CABALLO AZTECA was wrongful and actionable under Dutch law. See Hajdasinski Declaration (Exhibit "B"). As Mr. Hajdasinski also confirms, charter hire lost during a period of arrest can be a recoverable element of damage for a wrongful attachment. See Exhibit "B". As Mr. Olvera attests, the arrest also was wrongful and actionable under Mexican law. (See Exhibit "A".)

**3. Fairmount is wrong that no effort was made to lift the attachment.**

An essential element of Fairmount's conspiracy theory is that TNT refrained from taking any action to lift the arrest in order to setup Fairmount for a fabricated damage claim. As part of this theory, Fairmount suggests (on no facts) that a charter agreement between TNT and Con-Dive never really existed and that TNT and its alleged customer, Con-Dive, LLC, along with Oceanografia, were in effect one and the same entity, which was out to "get" Fairmount. This allegation is baseless and essentially unsupported.

Attached are declarations from Wesley Freeman, President of Con-Dive, LLC (see Exhibit "C"), and of Hermilio Escobedo, a principal executive in TNT (See Exhibit "D"). Both attest that

a charter agreement for the CABALLO AZTECA was executed by them on behalf of their respective companies. Both also attest to actual facts demonstrating that the companies were fully distinct entities with separate owners, directors, management, offices, and businesses.

Further, contrary to Fairmount's representations, TNT *did* advise prior to the expiration of six months that it, not Oceanografia, was the owner of the CABALLO AZTECA. In fact, as shown in the declaration of the vessel's chief engineer, Mario Flores Reyes, this was told to the delegates of Fairmount at the very time that the arrest papers were served in November 2005. See Declaration of Mr. Flores (Exhibit "E").

Further, as explained in the statement of TNT executive, Mr. Escobedo, TNT requested – and expected – that the arrest issue would be resolved by Oceanografia. Escobedo asked OSA to attend to the arrest problem and get it resolved since it pertained to a dispute between Oceanografia and Fairmount. See Exhibit "D". Oceanografia's president, Amado Yanez, advised TNT's Escobedo that he had hired a lawyer in the Netherlands to attend to the problem. With the vessel remaining in the shipyard undergoing repairs for a period of additional months, TNT was not overly concerned about the arrest and was satisfied that efforts were underway to resolve the problem.

Indeed, at TNT's request, Oceanografia did hire Dutch counsel. The Dutch lawyer was Sebastian Moolenaar. Mr. Moolenaar confirms that Yanez did in fact hire him for advice concerning the arrest immediately after it took place. See Mr. Moolenaar's Declaration (Exhibit "F"). As Mr. Moolenaar explains, he requested various documents, with translations, from Oceanografia over a period of months while the vessel continued undergoing repairs in the shipyard. While this may seem a lengthy period of time, as Moolenaar confirms, this is what transpired. Mr. Moolenaar ultimately advised Oceanografia that the arrest was in his judgment improper but that any lawsuit

for wrongful arrest would have to be commenced by TNT, as the vessel's current owner. See Exhibit "F". This led to the engagement by TNT of counsel (Michael Hajdasinski) recommended by Mr. Moolenaar. Using the information gathered by Mr. Moolenaar, Hajdasinski provided irrefutable evidence to Fairmount that the CABALLO AZTECA belonged to TNT on the day of the arrest. The chief evidence was, of course, the Mexican ship register entry for the CABALLO AZTECA – a public record that had been equally available to Fairmount since before the arrest was made. The arrest was ultimately lifted on or about May 16, 2006.

TNT acted reasonably during the period of arrest. It knew that its crew aboard the CABALLO AZTECA had advised immediately at the time of the arrest that a mistake had been made – that it owned the vessel, not Oceanografia. TNT understood that OSA was working to resolve the arrest and had hired a Dutch lawyer for this purpose. This seemed appropriate to TNT since the arrest pertained to a dispute that involved Oceanografia, the vessel's prior owner, and not TNT. TNT's inclination to rely on these efforts was reasonable, especially in light of the fact that it knew repairs would be proceeding in the shipyard for a period of additional months in any case.

Ultimately, when the time for delivery under the charter agreement with Con-Dive arrived, it was both true that the vessel remained under arrest and that the repairs were still incomplete. The *reason* the repairs were incomplete, however, is that the vessel had been wrongfully arrested. Attached as Exhibit "G" is the declaration of Adriann Eggens, the managing director of the Niestern Sander repair yard near Rotterdam where the vessel was undergoing repairs. As explained below, Mr. Eggens estimates that the arrest delayed the completion of repairs by approximately four months.

**4. TNT has a good-faith claim for damages.**

Having no choice but to essentially admit that it wrongfully arrested the CABALLO AZTECA (under the false assumption that it belonged to Oceanografia), Fairmount focuses its attack on TNT's damages. Contrary to Fairmount's unsupported speculation, the charter agreement between TNT and Con-Dive, LLC was a real one. This is proved by the attached declarations of principals on both sides of the contract, namely Con-Dive's Freeman and TNT's Escobedo. See Exhibits "C" and "D". Although this contract was signed in December 2005, after the vessel had been placed under arrest, this was reasonable under the circumstances. TNT had an opportunity for a lucrative contract. From the date the agreement was signed, TNT would not be expected to deliver the vessel for at least four months. It was fully expected that the arrest would be resolved and the repairs completed in the shipyard by that time.

As the manager of the shipyard in charge of the CABALLO AZTECA project states, however, the vessel's arrest delayed the completion of the repairs for approximately four months. See Eggens' Declaration (Exhibit "G"). As Mr. Eggens explains, the arrest caused the shipyard to suspend work on the CABALLO AZTECA. The shipyard did so because in the shipyard's experience, an arrest typically means that the shipyard will not be paid for its work. But for the arrest, the repairs to the CABALLO AZTECA could have been completed in mid-to-late March, in time to save TNT's charter agreement with Con-Dive.

Under the terms of the charter (attached as Exhibit 1 to Freeman's declaration), TNT would have earned $100,000 per day for a 365-day period, or the approximate sum of $36.5 million dollars. Because the repairs were delayed and the vessel remained under arrest, however, TNT was unable

to perform under the charter agreement. As a proximate result, it sustained millions in damages, as will be further proved at trial.

TNT's conduct was reasonable under the circumstances. It is no defense to Fairmount's plainly wrongful arrest to complain that its victim could have been more active sooner in attempting to reverse Fairmount's unlawful arrest.

## Conclusion

TNT has easily carried its burden of demonstrating that this Court's attachment orders were proper. In order for a maritime plaintiff to defeat a challenge to the validity of a maritime attachment under Rule E(4)(f), a plaintiff need only demonstrate that the attachment was properly issued, i.e. (1) that it has a valid *prima facia* admiralty claim, (2) that the defendant cannot be found within the district, and (3) the defendant's property may be found in the district.[1]  In other words, the Rule E(4)(f) hearing is not intended to resolve the dispute *on the merits*, but merely to determine that the technical requirements of Rule B were met.

In this case, Fairmount does not dispute that they cannot be "found" within the district or that the EFT under attachment is its property. Nor does Fairmount deny that TNT's claim is maritime in nature. Rather, Fairmount merely challenges the attachment on grounds that TNT lacks a *prima facia* case.

The burden of establishing a *prima facia* is, of course, a light one. As this Court has explained:

---

[1] See, e.g., *Winter Storm Shipping, Ltd. v. TPI Ltd.*, 310 F.3d 263 (2nd Cir. 2002).

> Although review of extraneous evidence is appropriate, plaintiffs in a Rule E(4)(f) proceeding should not be required to prove their case. Discovery has not yet been had, and it would defeat the purpose of attachment – preserving defendants' assets in case plaintiff is able to prevail at trial or on summary judgment – to require at this stage that plaintiffs asserting a "valid prima facie maritime claim" prove that the facts in the complaint are true.[2]

TNT need not prove its case in order to defeat Fairmount's motion to vacate. TNT need only demonstrate basic *prima facia* facts in support of its claim. The declarations of knowledgable witnesses attached to this opposition memorandum plainly establish a *prima facia* basis for TNT's claim. Fairmount's motion to vacate should be denied.

        The Plaintiff,

        TRANSPORTES NAVIEROS Y
        TERRESTRES, S.A. DE D.V..

By: *[signature]*
        Martin F. Casey (MFC1415)
        CASEY & BARNETT, LLC
        317 Madison Avenue, 21st Floor
        New York, New York 10017
        (212) 286-0225 - telephone
        (212) 296–261 - facsimile
        mfc@caseybarnett.com

---

[2] *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F.Supp.2d 275, 279-280 (SDNY 2006)(citing *Japan Line, Ltd. v. Willco Oil Ltd.*, 424 F.Supp. 1092, 1094 (D.Conn.1976)); see also *North of England Protecting and Indem. Ass'n v. M/V Nara*, 1999 WL 33116416, at *2 (E.D.La.1999)("A rule E(4)(f) hearing is not intended to definitely resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant.").

.

10

## AFFIRMATION OF SERVICE

I hereby certify that on May 8, 2007, a copy of the foregoing was filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

*Martin F. Casey*
Martin F. Casey (MFC 1415)