UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
TRANSPORTES NAVIEROS Y                      :
TERRESTRES, S.A. DE D.V.,                   :
                                            :
            Plaintiff,                      :
                                            :       07-CV-3076(LAP)
    - against -                             :
                                            :
FAIRMOUNT HEAVY TRANSPORT N.V.,             :
                                            :
            Defendant,                      :
------------------------------------------------------------- X

### DECLARATION OF WESLEY FREEMAN

I, WESLEY FREEMAN, testify as follows:

1. I am president of Con-Dive, LLC.

2. In this capacity, I negotiated and signed a charter agreement with TNT for use of its vessel CABALLO AZTECA. Under the terms of this agreement, Con-Dive was to charter the vessel for one year and was to pay a charter hire rate of $100,000 per day.

3. I was aware at the time that the CABALLO AZTECA was under arrest in the shipyard. I was not concerned about this, however, as I fully expected that the arrest would be lifted before the vessel was needed for the work some months in the future.

4. The charter agreement, attached as Exhibit "A," referenced a delivery date of approximately March 15, 2006. The agreement was negotiated in December 2005, and the referenced delivery date was an estimated one with some flexibility in part because we did not know exactly on which date we would be needing the vessel at the time the agreement was signed.

5. Ultimately, TNT was unable to deliver the vessel. I do not have my file in front of me and cannot recall specific dates. (If necessary, I will supplement this statement in the future.) I do remember, however, that the CABALLO AZTECA was still under arrest in a shipyard undergoing repairs when we required delivery of the vessel.


EXHIBIT C

6. As a result of TNT's inability to deliver the vessel, Con-Dive was forced to hire another vessel from another company to perform this work for our customer, W & T Offshore. The project involved hurricane reparations.

7. Con-Dive intends to enforce its legal rights under its charter agreement with TNT. If the charter agreement entitles Con-Dive to a penalty of 10% of the projected charter hire as a result of TNT's failure to deliver the vessel, then this is a right that Con-Dive intends to enforce. We have requested payment of this sum from TNT but have not yet received any of these monies.

8. I understand that an allegation has been made that Con-Dive is a corporate affiliate of Oceanografia and/or TNT. This is not true. Con-Dive is a Louisiana limited liability company with its principal office in Houston, Texas. There is no common ownership whatever between Con-Dive and either TNT or Oceanografia. My company does not share offices with either TNT or Oceanografia. To the best of my knowledge, the board of directors of Con-Dive is entirely distinct from the boards of both Oceanografia and TNT.

9. It is also incorrect to say that I am an employee of Oceanografia. I have served as a consultant to Oceanografia but that role has been minimized since I started my own company, Con-Dive.

I attest under penalty of perjury that the above statements are true and correct to the best of my knowledge.

Signed this 01 day of May, 2007.

*[signature]*

WESLEY FREEMAN

Issued by
The Documentary Committee of
The Baltic and International Maritime Council (BIMCO),
(First edition published 1975)
REVISED 1989

Adopted by
International Support Vessel Owners' Association (ISOA), London

Copyright; published by
The Baltic and International Maritime Council
(BIMCO), Copenhagen
September 1989

| | |
|---|---|
| Transportes Maritimos Mexes, SA de CV<br>Carr. Praiso Puerto Ceiba, Km. 1 S/N<br>Entre Boulevard Manuel A. Romero Zurita calle A. Fonapo<br>Col. Quintin Arauz<br>86600 Paraiso, Tab.<br>Mexico | 2929 Briar Park<br>Suite 440<br>Houston, Tx. 77042<br>U. S. A. |
| 4 Vessel's name (Cl. 1(a))<br>Caballo Azteca | 5 Date of delivery (Cl. 2(a))<br>March 15, 2006     6 Cancelling date (Cl. 2(a) and (c))<br>April 20, 2006 |
| 7 Port or place of delivery (Cl. 2(a))<br>Port Fourchon, LA. | 8 Port or place of redelivery/notice of redelivery (Cl. 2(c))<br>Cd. del Carmen, Camp. Mexico, at sea bouy<br>(i) Port or place of redelivery<br>Cd. del Carmen, Campeche, Mexico<br>(ii) Number of days notice of redelivery<br>30 days |
| 9 Period of hire (Cl. 1(a))<br>365 days (Firm) | 10 Extension of period of hire (optional) (Cl. 1(b))<br>(i) Period of extension<br>180 days at charteres option<br>(ii) Advance notice for declaration of option (days)<br>30 days |
| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>End of voyage if less than 30 days past hire period<br>(i) Voyage or well (state which)<br><br>(ii) Maximum extension period (state number of days)<br>180 days | 12 Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>(i) Lump sum<br>USD $ 750,000.00<br>(ii) When due<br><br>13 Port or place of mobilisation (Cl. 2(b)(i))<br>Port Fourchon, LA |
| 14 Early termination of charter (state amount of hire payable) (Cl. 26(a))<br>N/A | 15 Number of days notice of early termination (Cl. 26(a))<br>N/A     16 Demobilisation charge (lump sum)(Cl. 2(e) and Cl. 26(a))<br>5 days at daily rate |
| 17 Area of operation (Cl. 5(a))<br>US Gulf of Mexico area | 18 Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>Construction and accomodation always under vessels capabilty |

(continued)





EXHIBIT F-1

(continued)    "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels    PART I

| | |
|---|---|
| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d))<br>USD $ 100,000.00 (One Hundred Thousand Dollars of the United States of America 00/100 USD Cy) per day pro rata.<br>Exclude Diesel Fuel & Lube and Water for the vessel during the contract period | 20. Extension hire (if agreed, state rate) (Cl. 10(b))<br>Same rate established in Box 19 |
| 21. Invoicing for hire and other payments (Cl. 10(d))<br>Invoice should be issued 30 (Thirty) days in arrears<br><br>(i) state whether to be issued in advance or arrears<br>Arrears<br><br>(ii) state to whom to be issued if addressee other than stated in Box 2<br>Same<br><br>(iii) state to whom to be issued if addressee other than stated in Box 3<br>Same | 22. Payments (state mode and place of payment, also state beneficiary and bank accounts) (Cl. 10(e))<br>Bank deposit or wire transfer of the funds to the Owners account |
| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(e))<br>Payment to be done by Charterers 30 days from date of invoice | 24. Interest rate payable (Cl. 10(e))<br>2% per month     25. Maximum audit period (Cl. 10(f))<br>One year |
| 26. Meals (state rate agreed) (Cl. 5(c)(i))<br>To be provided by the Charterers    27. Accommodation (state rate agreed) (Cl. 5(c)(i))<br>Within the number of persons allowed by the certificates, charterers | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 13(f))<br>Applicable |
| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br>Sublet is not allowed without pre-approval by the Owners | 30. War (state name of countries) (Cl. 19(e))<br>N/A |
| 31. General average (place of settlement – only to filled in if other than London) (Cl. 21)<br>New York, USA | 32. Breakdown (state period) (Cl. 25(b)(v))<br>2 (Two) days |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed. If Cl. 31(c) agreed also state place of arbitration) (Cl. 31)<br>United Satates of America | 34. Numbers of additional clauses covering special provisions, if agreed |
| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28)<br>Same address as stated in Box 3 | 36. Names and addresses for notices and other communications required to be given by the Charerers (Cl. 28)<br>Same address as stated in Box 2 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, as well as PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 28.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| [signature]<br>Hermilo Escobedo Obrador<br>Transportes Navieros y Terrestres, S.A. de C.V. | [signature]<br>Raymond Wesley Freeman<br>Con-Dive, LLC |

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**1. Period**
(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as "the Vessel"), for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.
(b) Subject to Clause 10(b), the Charterers have the option to extend the charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10 (ii).
(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(ii)) in progress, such time not to exceed the period stated in box 11(iii).

**2. Delivery and Redelivery**
(a) _Delivery._ – Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat.
(b) _Mobilisation._ – (i) The Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7. The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 13.
(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the vessel and/or goods lost or not lost.
(c) _Cancelling._ – If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5 and shall state in such notice the date by which they will be able to deliver the vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter party. If the Charterers do not give such notice than the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purpose of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any issue incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.
(d) _Redelivery._ – The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(i) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii).
(e) ~~Demobilisation. – The Charterers shall pay a lump sum without discount in the amount as stated in Box 16 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party.~~

**3. Condition of Vessel**
(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A", attached hereto, and undertake to so maintain the Vessel during the period of service under this Charter Party.
(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way it to operate effectively at all times for the services as stated in Clause 5.

**4. Survey**
The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing, the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys.

**5. Employment and Area of Operation**
(a) The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 18, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel where their own property and having regard to her capabilities and the nature of her employment. Unless otherwise agreed, the Vessel shall not be employed as a diving platform.
(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permissions and licences.
(c) _The Vessel's Space_ – The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:
(i) Persons other than crewmembers, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 26 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation.
(ii) Lawful cargo whether carried on or under deck.
(iii) Explosives and dangerous cargo whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo.
(iv) Hazardous and noxious substances, subject to Clause 12(g), proper notification and any pertinent regulations.
(d) _Laying-up of Vessel._ – The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel.

**6. Master and Crew**
(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.
(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be the Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agents.
(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.



arrangements may be necessary, always under the direction of the Master. 146
(c) If the Charterers have reason to be dissatisfied with the conduct of the 147
Master or any Officer or member of the Crew, the Owners on receiving 148
particulars of the complaint shall promptly investigate the matter and if the 149
complaint proves to be well founded, the Owners shall as soon as reasonably 150
possible make appropriate changes in the appointment. 151
(d) The entire operation, navigation, and management of the Vessel shall be in 152
the exclusive control and command of the Owners, their Master, Officers and 153
Crew. The Vessel will be operated and the services hereunder will be 154
rendered as required by the Charterers, subject always to the exclusive 155
right of the Owners or the Master of the Vessel to determine whether operation 156
of the Vessel may be safely undertaken. In the performance of the Charter 157
Party, the Owners are deemed to be an independent contractor, the 158
Charterers being concerned only with the results of the services performed. 159

7. Owners to Provide 160
(a) The Owners shall provide and pay for all provisions, wages and all other 161
expenses of the Master, Officers and Crew all maintenance and repair of the 162
Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, 163
except as otherwise provided in this Charter Party, for all insurance on the 164
Vessel, all dues and charges directly related to the Vessel's flag and/or 165
registration, all deck, cabin and engineroom stores, cordage required for 166
ordinary ship's purposes mooring alongside in harbour, and all fumigation 167
expenses and de-ratisation certificates. The Owners' obligations under this 168
Clause extend to cover all liabilities for consular charges appertaining to the 169
Master, Officers and Crew, customs or import duties arising at any time during 170
the performance of this Charter Party in relation to the personal affects of the 171
Master, Officers and Crew, in relation to the stores, provisions and other 172
matters as aforesaid which the Owners are to provide and/or pay for and the 173
Owners shall refund to the Charterers any sums they or their agents may have 174
paid or been compelled to pay in respect of such liability. 175
(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' 176
expense with any towing and anchor handling equipment specified in Section 177
5(b) of ANNEX "A". If during the Charter Period any such equipment becomes 178
lost, damaged or unserviceable, other than as a result of the Owners' 179
negligence, the Charterers shall either provide, or direct the Owners to 180
provide, an equivalent replacement at the Charterers' expense. 181

8. Charterers to Provide 182
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, 183
lubricants, water, dispersants, firefighting foam and transport thereof, port 184
charges, pilotage and boatmen and canal steersmen (whether compulsory or 185
not), launch hire (unless incurred in connection with the Owners' business), 186
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and 187
charges, agencies and commissions incurred on the Charterers' business, 188
costs for security or other watchmen, and of quarantine (if occasioned by the 189
nature of the cargo carried or the ports visited whilst employed under this 190
Charter Party but not otherwise). 191
(b) At all times the Charterers shall provide and pay for the loading and 192
unloading of cargoes so far as not done by the Vessel's crew, cleaning of 193
cargo tanks, all necessary dunnage, , uprights and shoring equipment for 194
securing deck cargo, all cordage except as to be provided by the Owners, all 195
ropes slings and special runners (including bulk cargo discharge hoses) 196
actually used for loading and discharging, inert gas required for the 197
protection of cargo, and electrodes used for offshore works, and shall 198
reimburse the Owners for the actual cost of replacement of special mooring 199
lines to offshore units, wires, nylon spring lines etc. used for offshore works, 200
all hose connections and adaptors and further, shall refill oxygen-acetylene 201
bottles used for offshore works. 202
(c) The Charterers shall pay for customs duties, all permits, import duties 203
(including costs involved in establishing temporary or permanent importation 204
bonds), and clearance expenses, both for the Vessel and/or equipment, 205
required for or arising out of this Charter Party. 206

9. Bunkers 207
Unless otherwise agreed, the Vessel shall be delivered with bunkers and 208
lubricants as on board and redelivered with sufficient bunkers to reach the 209
next bunkering stage en route to her next port of call. The Charterers upon 210
delivery and the Owners upon redelivery shall take over and pay for the 211
bunkers and lubricants on board at the prices prevailing at the times and 212
ports of delivery and redelivery. 213

10. Hire and Payments 214
(a) Hire. – The Charterers shall pay Hire for the Vessel at the rate stated in Box 215
19 per day or pro rata for part thereof from the time that the Vessel is delivered 216

to the Charterers until the expiration or earlier termination of this Charter 217
Party. 218
(b) Extension Hire. – If the option to extend the Charter Period under Clause 219
1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be 220
mutually agreed between the Owners and the Charterers. 221
(c) Adjustment of Hire. – The rate of hire shall be adjusted to reflect 222
documented changes, after the date of entering into the Charter Party or the 223
date of commencement of employment, whichever is earlier, in the Owners' 224
costs arising from changes in the Charterers' requirements or regulations 225
governing the Vessel and/or its Crew of this Charter Party 226
(d) Invoicing. – All invoices shall be issued in the contract currency stated in 227
Box 19. In respect of reimbursable expenses incurred in currencies other 228
than the contract currency, the rate of exchange into the contract currency 229
shall be that quoted by the Central Bank of the country of such other currency 230
as at the date of the Owners' invoice. Invoices covering Hire and any other 231
payments due shall be issued monthly as stated in Box 21(i) or at the 232
expiration or earlier termination of this Charter Party. Notwithstanding the 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at 234
the time of delivery. 235
(e) Payments. – Payments of Hire, bunker invoices and disbursements for the 236
Charterers' account shall be received within the number of days stated in Box 237
23 from the date of receipt of the invoice. Payment shall be made in the 238
contract currency in full without discount to the account stated in Box 22. 239
However any advances for disbursements made on behalf of and approved by 240
the Owners may be deducted from Hire dues. 241
If payment is not received by the Owners within 5 banking days following the 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 243
on the amount outstanding from and including the due date until payment is 244
received. 245
Where an invoice is disputed, the Charterers shall in any event pay the 246
undisputed portion of the invoice but shall be entitled to withhold payment of 247
the disputed portion provided that such portion is reasonably disputed and 248
the Charterers specify such reason. Interest will be chargeable at the rate 249
stated in Box 24 on such disputed amounts where resolved in favour of the 250
Owners. Should the Owners prove the validity of the disputed portion of the 251
invoice, balance payment shall be received by the Owners within 5 banking 252
days after the dispute is resolved. Should the Charterers' claim be valid, a 253
corrected invoice shall be issued by the Owners. 254
In default of payment as herein specified, the Owners may require the 255
Charterers to make payment of the amount due within 5 banking days of 256
receipt of notification from the Owners; failing which the Owners shall have 257
the right to withdraw the Vessel without prejudice to any claim the Owners 258
may have against the Charterers under this Charter Party. 259
While payments remains due the Owners shall be entitled to suspend the 260
performance of any and all of their obligations hereunder and shall have no 261
responsibility whatsoever for any consequences thereof, in respect of which 262
the Charterers hereby indemnify the Owners, and Hire shall continue to 263
accrue and any extra expenses resulting from such suspension shall be for 264
the Charterers' account. 265
(f) Audit. – The Charterers shall have the right to appoint an independent 266
chartered accountant to audit the Owners' books directly related to work 267
performed under this Charter Party at any time after the conclusion of the 268
Charter Party, up to the expiry of the period stated in Box 25, to determine the 269
validity of the Owners' charges hereunder. The Owners undertake to make 270
their records available for such purposes at their principal place of business 271
during normal working hours. Any discrepancies discovered in payments 272
made shall be promptly resolved by invoice or credit as appropriate. 273

11. Suspension of Hire 274
(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of 275
Master, Officers and Crew, breakdown of machinery, damage to hull or other 276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be 277
payable in respect of any time lost and any Hire paid in advance shall be 278
adjusted accordingly provided always however that Hire shall not cease in the 279
event of the Vessel being prevented from working as aforesaid as a result of: 280
(i)   the carriage of cargo as noted in Clause 5(c)(iii) and (iv); 281
(ii)  quarantine or risk of quarantine unless caused by Master, Officers or 282
      Crew having communication with the shore at any infected area not in 283
      connection with the employment of the Vessel without the consent or the 284
      instructions of the Charterers; 285
(iii) deviation from her Charter Party duties or exposure to abnormal risks at 286
      the request of the Charterers; 287
(iv)  detention in consequence of being driven into port or to anchorage 288
      through stress or weather or trading to shallow harbours or to river or 289

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.



| | |
|---|---|
| ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred; | 290 291 292 |
| (v) detention on damage by ice; | 293 |
| (vi) any act or omission of the Charterers, their servants or agents. | 294 |
| (b) *Liability for Vessel not Working.* – The Owners' liability for any loss, damage or delay sustained by the Charterers as a result of the Vessel being prevented from working by any cause whatsoever shall be limited to suspension of hire. | 295 296 297 298 |
| (c) *Maintenance and Drydocking.* – Notwithstanding sub-clause (a) hereof, the Charterers shall grant the Owners a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of the Charter Period for maintenance and repairs excluding drydocking (hereinafter referred to as "maintenance allowance"). | 299 300 301 302 303 |
| ~~The Vessel shall be drydocked at regular intervals. The Charterers shall place the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated by the Owners at a later date) having facilities suitable to the Owners for the purpose of such drydocking.~~ | 304 305 306 307 |
| ~~During reasonable voyage time taken in transits between such port and Area of Operation the Vessel shall be on hire and such time shall not be counted against the accumulated maintenance allowance.~~ | 308 309 310 |
| ~~Hire shall be suspended during any time taken in maintenance, repairs and drydocking in excess of the accumulated maintenance allowance.~~ | 311 312 |
| ~~In the event of less time being taken by the Owners for repairs and drydocking or, alternatively, the Charterers not making the Vessel available for all or part of this time, the Charterers shall, upon expiration or earlier termination of the Charter Party, pay the equivalent of the daily rate of Hire then prevailing in addition to Hire otherwise due under this Charter Party in respect of all such time not so taken or made available.~~ | 313 314 315 316 317 318 |
| ~~Upon commencement of the Charter Period, the Owners agree to furnish the Charterers with the Owners' proposed drydocking schedule and the Charterers agree to make every reasonable effort to assist the Owners in adhering to such predetermined drydocking schedule for the Vessel.~~ | 319 320 321 322 |
| **12. Liabilities and Indemnities** | 323 |
| (a) *Owners.* – Notwithstanding anything else contained in this Charter Party excepting Clauses 5(c)(iii), 7(b), 8(b), 12(g), 15(c) and 21, the Charterers shall not be responsible for loss of or damage to the property of the Owners or of their contractors and sub-contractors, including the Vessel, or for personal injury or death of the employees of the Owners or of their contractors and sub-contractors, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, injury or death is caused wholly or partially by the act, neglect, or default of the Charterers, their employees, contractors or sub-contractors, and even if such loss, damage, injury or death is caused wholly or partially by unseaworthiness of any vessel; and the Owners shall indemnify, protect, defend and hold harmless the Charterers from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, personal injury or death. | 324 325 326 327 328 329 330 331 332 333 334 335 336 337 |
| (b) *Charterers.* – Notwithstanding anything else contained in this Charter Party excepting Clause 21, 13, and 37, the Owners shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the Charterers or of their contractors and sub-contractors, including their offshore units, or for personal injury or death of the employees of the Charterers or of their contractors and sub-contractors (other than the Owners and their contractors and sub-contractors) or of anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, liability, injury or death is caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors, and even if such loss, damage, liability, injury or death is caused wholly or partially by the unseaworthiness of any vessel; and the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death. | 338 339 340 341 342 343 344 345 346 347 348 349 350 351 352 353 354 355 |
| (c) *Consequential Damages.* – Neither party shall be liable to the other for, and each party hereby agrees to protect, defend and indemnify the other against, any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Charter Party, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance. | 356 357 358 359 360 361 |
| (d) *Limitations.* – Nothing contained in this Charter Party shall be construed or | 362 |
| held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of this Charter Party or against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party. | 363 364 365 366 367 368 369 370 |
| (e) *Himalaya Clause.* – (i) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Charterers shall also apply to and be for the benefit of the Charterers' parent, affiliated, related and subsidiary companies; the Charterers' contractors, sub-contractors, clients, joint ventures and joint interest owners (always with respect to the job or project on which the Vessel is employed); their respective employees and their respective underwriters. | 371 372 373 374 375 376 377 378 |
| (ii) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' parent, affiliated, related and subsidiary companies; the Owners' sub-contractors, the Vessel, its Master, Officers and Crew, its registered owner, its operator, its demise charterer(s), their respective employees and their respective underwriters. | 379 380 381 382 383 384 385 386 |
| (iii) The Owners or the Charterers shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties. | 387 388 389 390 |
| (f) *Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but regardless of whether this option is exercised the other provisions of Clause 12 shall apply and shall be paramount)* In order to avoid disputes regarding liability for personal injury or death of employees or for loss of or damage to property, the Owners and the Charterers have entered into, or by this Charter Party agree to enter into, an Agreement for Mutual Indemnity and Waiver of Recourse (in a form substantially similar to that specified in ANNEX "C") between the Owners, the Charterers and the various contractors and sub-contractors of the Charterers. | 391 392 393 394 395 396 397 398 399 |
| (g) *Hazardous and Noxious Substances.* – Notwithstanding any other provision of this Charter Party to the contrary, the Charterers shall always be responsible for any losses, damages or liabilities suffered by the Owners, their employees, contractors or sub-contractors, by the Charterers, or by third parties with respect to the Vessel or other property, personal injury or death, pollution or otherwise, which losses, damages or liabilities are caused, directly or indirectly, as a result of the Vessel's carriage of any hazardous and noxious substances in whatever form as ordered by the Charterers, and the Charterers shall defend, indemnify the Owners and hold the Owners harmless for any expense, loss or liability whatsoever or howsoever arising with respect to the carriage of hazardous or noxious substances. | 400 401 402 403 404 405 406 407 408 409 410 |
| **13. Pollution** | 411 |
| **SEE ADDITIONAL CLAUSE 38.** | 412 |
| (a) Except as otherwise provided for in Clause 15(c)(iii), the Owners shall be liable for, and agree to indemnify, defend and hold harmless the Charterers against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of actual or potential pollution damage and the cost of cleanup or control thereof arising from acts or omissions of the Owners or their personnel which cause or allow discharge, spills or leaks from the Vessel, except as may emanate from cargo thereon or therein. | 413 414 415 416 417 418 |
| (b) The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions; proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or potential pollution damage, even where caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors or by the unseaworthiness of the Vessel. | 419 420 421 422 423 424 425 |
| **14. Insurance** Refer to Annex B | 426 427 428 429 430 431 432 433 434 |

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

Rivf

### 15. Saving of Life and Salvage

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off hire from the time she leaves port or commences to deviate and she shall remain off-hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services.

All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessels' Master, Officers and Crew may have under any title.

If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew:

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance.

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or omission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or affecting repairs under sub-paragraph (ii) of this sub-clause, and time taken for such repairs shall not count against time granted under Clause 11(c).

(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.

### 16. Lien

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

### 17. Sublet and Assignment

(a) *Charterers.* – The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel.

(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 29 or pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers.

(c) *Owners.* – The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld.

Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned.

### 18 Substitute Vessel

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers' <u>and the Charteres Client</u> prior approval which shall not be unreasonably withheld.

### 19. War

(a) Unless the consent of tvhe Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers.

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks.

(c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of this war risks insurance on the Vessel the right to give any such orders or directions.

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation

under whose flag the Vessel sails becoming involved in war (whether there be 579
a declaration of war or not) either the Owners or the Charterers may terminate 580
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the 581
Owners in accordance with PART I if it has cargo on board after discharge 582
thereof at destination or, if debarred under this Clause from reaching or 583
entering it, at a near open and safe port or place as directed by the Owners, or 584
if the Vessel has no cargo on board, at the port or place at which it then is or if 585
at sea at a near, open and safe port or place as directed by the Owners. In all 586
cases Hire shall continue to be paid and, except as aforesaid, all other 587
provisions of this Charter Party shall apply until redelivery. 588
(f) If in compliance with the provisions of this Clause anything is done or is not 589
done, such shall not be deemed a deviation. 590
The Charterers shall procure that all Bills of Lading (if any) issued under this 591
Charter Party shall contain the stipulations contained in sub-clauses (a), (d) 592
and (f) of this Clause. 593

20. **Excluded Ports** 594
(a) The Vessel shall not be ordered to nor bound to enter without the Owners' 595
written permission (a) any place where fever or epidemics are prevalent or to 596
which the Master, Officers and Crew by law are not bound to follow the Vessel, 597
(b) any ice-bound place or any place where lights, lightships, marks and 598
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival 599
or where there is risk that ordinarily the Vessel will not be able on account of 600
ice to reach the place or to get out after having completed her operations. The 601
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on 602
account of ice, the Master considers it dangerous to remain at the loading or 603
discharging place for fear of the Vessel being frozen in and/or damaged he 604
has liberty to sail to a convenient open place and await the Charterers' fresh 605
instructions. 606
(b) Should the Vessel approach or be brought or ordered within such place, 607
or be exposed in any way to the said risks, the Owners shall be entitled from 608
time to time to insure their interests in the Vessel and/or Hire against any of 609
the risks likely to be involved thereby on such terms they shall think fit, the 610
Charterers to make refund to the Owners of the premium on demand. 611
Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost 612
including any lost owing to loss of or sickness or injury to the Master, Officers, 613
Crew or passengers or to the action of the Crew in refusing to proceed to such 614
place or to be exposed to such risks. 615

21. **General Average and New Jason Clause** 616
General Average shall be adjusted and settled in London unless otherwise 617
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. 618
Hire shall not contribute to General Average. Should adjustment be made in 619
accordance with the law and practice of the United States of America, the 620
following provision shall apply: 621
"In the event of accident, danger, damage or disaster before or after the 622
commencement of the voyage, resulting from any cause whatsoever, whether 623
due to negligence or not, for which, or for the consequence of which, the 624
Owners are not responsible, by statute, contract or otherwise, the cargo, 625
shippers, consignees or owners of the cargo shall contribute with the Owners 626
in General Average to the payment of any sacrifices, loss or expenses of a 627
General Average nature that may be made or incurred and shall pay salvage 628
and special charges incurred in respect of the cargo. 629
If a salving vessel is owned or operated by the Owners, salvage shall be paid 630
for as fully as if said salving vessel or vessels belonged to strangers. Such 631
deposit as the Owners, or their agents, may deem sufficient to cover the 632
estimated contribution of the cargo and any salvage and special charges 633
thereon shall, if required, be made by the cargo shippers, consignees 634
or owners of the cargo to the Owners before delivery". 635

22. **Both-to-Blame Collision Clause** 636
If the Vessel comes into collision with another ship as a result of the 637
negligence of the other ship and any act, neglect or default of the Master, 638
mariner, pilot or the servants of the Owners in the navigation or the 639
management of the Vessel, the Charterers will indemnify the Owners against 640
all loss or liability to the other or non-carrying ship or her owners insofar as 641
such loss or liability represent loss of or damage to, or any claim whatsoever 642
of the owners of any goods carried under this Charter Party paid or payable by 643
the other or non-carrying ship or her owners to the owners of said goods 644
and set-off, recouped or recovered by the other or non-carrying ship or her 645
owners as part of their claim against the Vessel or the Owners. The foregoing 646
provisions shall also apply where the owners, operators or those in charge of 647
any ships or ships or objects other than or in addition to the colliding ships or 648
objects are at fault in respect of a collision or contact. 649

23. **Structural Alterations and Additional Equipment** 650
The Charterers shall have the option of, at their expense, making structural 651
alterations to the Vessel or installing additional equipment with the written 652
consent of the Owners which shall not be unreasonably withheld but unless 653
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' 654
expense to her original condition. The Vessel is to remain on hire during any 655
period of these alterations or reinstatement. The Charterers, unless otherwise 656
agreed, shall be responsible for repair and maintenance of any such 657
alteration or additional equipment. 658

24. **Health and Safety** 659
The Owners shall comply with and adhere to all applicable international, 660
national and local regulations pertaining to health and safety, and such 661
Charterers' instructions as may be appended hereto. 662

25. **Taxes** 663
Each party shall pay taxes due on its own profit, income and personnel. The 664
Charterers shall pay all other taxes and dues arising out of the operation or 665
use of the Vessel during the Charter Period. 666
In the event of change in the Area of Operation or change in local regulation 667
and/or interpretation thereof, resulting in an unavoidable and documented 668
change of the Owners' tax liability after the date of entering into the Charter 669
Party or the date of commencement of employment, whichever is earlier, 670
Hire shall be adjusted accordingly. 671

26. **Early Termination** 672
(a) *For Charterers' Convenience.* – The Charterers may terminate this Charter 673
Party at any time by giving the Owners written notice as stated in Box 15 and 674
by paying the settlement stated in Box 14 and the demobilisation charge 675
stated in Box 16, as well as Hire or other payments due under the Charter 676
Party 677
(b) *For Cause.* – If either party becomes informed of the occurrence of any 678
event described in this Clause that party shall so notify the other party 679
promptly in writing and in any case within 3 days after such information is 680
received. If the occurrence has not ceased within 3 days after such 681
notification has been given, this Charter Party may be terminated by either 682
party, without prejudice to any other rights which either party may have, under 683
any of the following circumstances: 684
  (i) *Requisition.* – If the government of the state of registry and/or the flag of 685
the Vessel, or any agency thereof, requisitions for hire or title or 686
otherwise takes possession of the Vessel during the Charter Period. 687
  (ii) *Confiscation.* – If any government, individual or group, whether or not 688
purporting to act as a government or on behalf of any government, 689
confiscates, requisitions, expropriates, seizes or otherwise takes 690
possession of the Vessel during the Charter Period. 691
  (iii) *Bankruptcy.* – In the event of an order being made or resolution passed 692
for the winding up, dissolution, liquidation or bankruptcy of either party 693
(otherwise than for the purpose of reconstruction or amalgamation) or if 694
a receiver is appointed or if it suspends payment or ceases to carry on 695
business. 696
  (iv) *Loss of Vessel.* – If the Vessel is lost, actually or constructively, or 697
missing, unless the Owners provide a substitute vessel pursuant to 698
Clause 18. In the case of termination, Hire shall cease from the date the 699
Vessel was lost or, in the event of a constructive total loss, from the date 700
of the event giving rise to such loss. If the date of loss cannot be 701
ascertained or the Vessel is missing, payment of Hire shall cease from 702
the date the Vessel was last reported. 703
  (v) *Breakdown.* – If, at any time during the term of this Charter Party, a 704
breakdown of the Owners' equipment or Vessel results in the Owners 705
being unable to perform their obligations hereunder for a period 706
exceeding that stated in Box 32, unless the Owners provide a substitute 707
vessel pursuant to Clause 18. 708
  (vi) *Force Majeure.* – If a force majeure condition as defined in Clause 27 709
prevails for a period exceeding 15 consecutive days. 710
  (vii) *Default.* – If either party is in repudiatory breach of its obligations 711
hereunder. 712
Termination as a result of any of the above mentioned causes shall not relieve 713
the Charterers of any obligation for Hire and any other payments due 714

27. **Force Majeure** 715
Neither the Owners nor the Charterers shall be liable for any loss, damages or 716
delay or failure in performance hereunder resulting from any force majeure 717
event, including but not limited to acts of God, fire, action of the elements, 718
epidemics, war (declared or undeclared), warlike actions, insurrection, 719
revolution or civil strife, piracy, civil war or hostile action, strikes or 720

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.



differences with workmen (except for disputes relating solely to the Owners' 721
or the Charterers' employees), acts of the public enemy, federal or state laws, 722
rules and regulations of any governmental authorities having or asserting 723
jurisdiction in the premises or of any other group, organisation or informal 724
association (whether or not formally recognised as a government), and any 725
other cause beyond the reasonable control of either party which makes 726
continuance of operations impossible. 727

28. Notices and Invoices 728
Notices and invoices required to be given under this Charter Party shall be 729
given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate. 730

29. Wreck Removal 731
If the Vessel sinks and becomes a wreck and an obstruction to navigation and 732
has to be removed upon request by any compulsory law or authority having 733
jurisdiction over the area where the wreck is placed, the Owners shall be 734
liable for any and all expenses in connection with the raising, removal, 735
destruction, lighting or marking of the wreck. 736

30. Confidentiality 737
All information or data obtained by the Owners in the performance of this 738
Charter Party is the property of the Charterers, is confidential and shall not be 739
disclosed without the prior written consent of the Charterers. The Owners 740
shall use their best efforts to ensure that the Owners, any of their 741
sub-contractors, and employees and agents thereof shall not disclose any 742
such information or data. 743

31. Law and Arbitration 744
*) (a) This Charter Party shall be governed by English law and any dispute 745
arising out of this Charter Party shall be referred top arbitration in London, one 746
arbitrator being appointed by each party, in accordance with the Arbitration 747
Acts 1950 and 1979 or any statutory modification or re-enactment thereof for 748
the time being in force. On the receipt by one party of the nomination in 749
writing of the other party's arbitrator that party shall appoint their arbitrator 750
within 14 days, failing which the arbitrator already appointed shall act as sole 751
arbitrator. If two arbitrators properly appointed shall not agree they shall 752
appoint an umpire whose decision shall be final. 753
*) (b) Should any dispute arise out of this Charter Party, the matter in dispute 754
shall be referred to three persons at New York one to be appointed by each of 755
the parties hereto, and the third by the two so chosen; their decision or that of 756
any two of them shall be final, and for purpose of enforcing any award, this 757
agreement may be made a rule of Court. The arbitrators shall be members 758
of the Society of Maritime Arbitrators, Inc. of New York and the proceedings 759
shall be conducted in accordance with the rules of the Society. 760
*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration 761
at the place stated in Box 33 subject to the law and procedures applicable 762
there. 763
(d) If Box 33 in PART I is not filled in, sub-clause (a) of this clause shall apply. 764
*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33 765

32. Entire Agreement 766
This is the entire agreement of the parties, which supersedes all previous 767
written or oral understandings and which may not be modified except by a 768
written amendment signed by both parties. 769

33. Severability Clause 770
If any portion of this Charter Party is held to be invalid or unenforceable for 771
any reason by a court or governmental authority of competent jurisdiction, 772
then such portion will be deemed to be stricken and the remainder of this 773
Charter Party shall continue in full force and effect. 774

34. Demise 775
Nothing herein contained shall be construed as creating a demise of 776
the Vessel to the Charterers. 777

35. Definitions 778
"Well" is defined for the purpose of this Charter Party as the time required to 779
drill, test, complete and/or abandon a single borehole including any side- 780
track thereof. 781
"Offshore unit" is defined for the purpose of this Charter Party as any vessel, 782
offshore installation, structure and/or mobile unit used in offshore 783
exploration, construction, pipelaying or repair, exploration or production. 784
"Offshore site" is defined for the purposes of this Charter Party as the area 785
within three nautical miles of an "offshore unit" from or to which the Owners 786
are requested to take their Vessel by the Charterers. 787

"Employees" is defined for the purposes of this Charter Party as employees, 788
directors, officers, servants, agents or invitees. 789

36. Headings 790
The headings of this Charter Party are for identification only and shall not be 791
deemed to be part hereof or be taken into consideration in the interpretation 792
Or construction of this Charter Party 793

37. Penalties 794
Owner's are subject to be penalized per day rate of default on delivery of 795
of the vessel on the stipulated date on box No. 5 up to maximum 10% of the 796
total amount of the contract

38. Cancelling of Contract 797
Charterers will have the option to cancel the contract after April 20 if the vessel 798
was not delivered on date and place stipulated on box numbers 6 & 7 799

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document

ANNEX "A" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated

## VESSEL SPECIFICATION

1. **General**

   (a) Owner.  Name: Transportes Navieros y Terrestres, S A. de C V

   Address: Carr. Paraiso Puerto Ceiba Km. 1 S/N entre Blvd.

   Manuel A. Romero Z. y calle A. Fonapo Col. Quintin Arauz

   (b) Operator  Name: Transportes Navieros y Terrestres, S A. de C V

   Address. Same

   (c) Vessel's Name. CABALLO AZTECA   Builder: Kherson Shipyard

   (d) Year Built: 1987

   (e) Type: Multipurpose Offshore Support

   (f) Classification and Society: Registro Italiano Navale (RINA)

   (g) Flag: Mexican

   (h) Date of next scheduled drydocking: 2008

2. **Performance**

   (a) Certified Bollard Pull (Tonnes) _____

   (b) Speed/Consumption (Non-Towing)
   (Approx. Daily Fuel Consumption)
   (Fair weather)

   Max. Speed: _____ Kts. (app.) _____ Tonnes

   Service Speed: _____ Kts (app.) _____ Tonnes

   Standby (main engines secured) _____ Tonnes

   (c) Approx. Towing/Working Fuel Consumption

   Engine Power  100%  _____ Tonnes

   (d) Type(s) and Grade(s) of Fuel Used: _____

3. **Dimensions and Capacities/Discharge Rates:**

   (a) L.O.A (m): ___ Breadth (m): ___ Depth (m): ___

   Max. Draught (m): ___

   (b) Deadweight (metric tons): ___

   | | | Discharge Rate | |
   |---|---|---|---|
   | (c) * Cargo Fuel max (m³): | | /hr at | head |
   | (d) * Drill Water max (m³): | | /hr at | head |
   | (e) Potable Water (m³): | | /hr at | head |
   | (f) Dry Bulk (m³/cu.ft): | In Tanks | /hr at | head |
   | (g) Liquid Mud (m³/barrels): | | /hr at | head |

   (max. SG) _____
   State type of recirculation system i.e.
   mechanical agitation, centrifugal pumps etc.

   (h) Cargo Deck Area (m²): ___  Capacity (m.t.): ___

   Length (m) x Breadth (m): ___

   Load Bearing Capacity ___

   (i) Heavy Weight Brine (m³/barrels): ___

   (max. SG) ___  /hr at ___ head

   * Multipurpose Tanks yes/no ___

4. **Machinery**

   (a) BHP Main Engines. _____

   (b) Engine Builder: _____

   (c) Number of Engines and Type: _____

   (d) Generators: _____

   (e) Stabilisers: _____

   (f) Bow Thruster(s) _____

   (g) Stern Thruster(s) _____

   (h) Propellers/Rudders: _____

   (i) Number and Pressure Rating of Bulk Compressors: _____

   (j) Fuel Oil Metering System _____

5. **Towing and Anchor Handling Equipment**

   (a) (i) Stern Roller (Dimensions): _____

   (ii) Anchor Handling/Towing Winch: _____

   (iii) Rig Chain Locker Capacity (Linear feet of 3 in. Chain): _____

   (iv) Tugger Winches: _____

   (v) Chain Stopper Make and Type: _____

   (b) (i) Towing Wire: _____

   (ii) Spare Towing Wire _____

   (iii) Work Wire: _____

   (iv) Spare Work Wire _____

   (v) Other Anchor Handling Equipment
   (e.g. Pelican Hooks, Shackles, Stretchers etc.): _____

6. (a) **Radios**

   Single Side Band _____

   VHF. _____

   Satcom. _____

   (b) Electronic Navigation Equipment: _____

   (c) Gyro: _____

   (d) Radar _____

   (e) Autopilot. _____

   (f) Depth Sounder

p.t.




## VESSEL SPECIFICATION

7. Fire Fighting Equipment

   (a) Class (FF1, FF2, FF3, other): _____

   (b) Fixed: _____

   (c) Portable: _____

8. Accommodation

   (a) Crew: _____   (b) Passengers: _____

9. Galley

   (a) Freezer Space ($m^3$): _____

   (b) Cooler ($m^3$): _____

10. Additional Equipment

    (a) Mooring Equipment: _____

    (b) Joystick: _____

    (c) Other: _____

11. Standby/Survivor/Certificate        Yes/No

    Nos _____

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated

## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) *Marine Hull Insurance.* – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance.* - Protection and Indemnity or Marine Liability Insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S.-$5 million whichever is greater, and shall include but not be limited to coverage for crew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) *General Third Party Liability Insurance.* – Coverage shall be for:
Bodily injury _____ per person
Property Damage _____ per occurrence.

(4) ~~*Workmen's Compensation and Employer's Liability Insurance for Employees.* – Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.~~

(5) ~~*Comprehensive General Automobile Liability Insurance.* – Covering all owned, hired and non-owned vehicles, coverage shall be for:~~
~~Bodily Injury    According to the local law.~~
~~Property Damage  In an amount equivalent to _____ single limit per occurrence.~~

(6) Such other insurances as may be agreed.

ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated

## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE
*(Optional, only applicable if stated in Box 28 in PART I)*

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an agreement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fruit of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.