UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TRANSPORTES NAVIEROS Y                          :
TERRESTRES, S.A. DE C.V.                        :
                                                :
                Plaintiff,                      :
                                                :
        -against-                               :       07 CV 3076 (LAP)
                                                :
FAIRMOUNT HEAVY TRANSPORT N.V.,                 :
                                                :
                Defendant.                      :
------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO VACATE ATTACHMENT

                              TISDALE & LENNON, LLC
                              11 West 42nd Street, Suite 900
                              New York, NY 10036
                              (212) 354-0025 (phone)
                              (212) 869-0067 (fax)

                              *Attorneys for Defendant*

Charles E. Murphy, Esq.
Nancy R. Peterson, Esq.

# TABLE OF CONTENTS

POINT I
PLAINTIFF HAS FAILED TO MEET ITS BURDEN TO SUSTAIN THE ATTACHMENT
BECAUSE IT HAS NOT COME FORTH WITH EVIDENCE SHOWING THAT IT HAS A
PRIMA FACIE VALID MARITME CLAIM..................................................................................1

TNT's underlying claim is not maritime in nature.........................................................................2

POINT II
THE ATTACHMENT SHOULD BE VACATED BECAUSE PLAINTIFF
HAS FAILED TO SET FORTH ANY RELIABLE PROOF OF ITS DAMAGES ........................3

    a. Plaintiff has failed to come forth with any actual evidence for its loss of profit
       damages besides self-serving statements issued by self-interested parties .............................4

    b. TNT's claim for $3,650,000.00 in liquidated damages that it may or may not have
       to pay to Con-Dive under the charter party is premature and unripe, and thus cannot
       serve as a basis for a Rule B attachment................................................................................8

POINT III
TNT'S ATTACHMENT SHOULD BE VACATED OR
REDUCED BECAUSE IT FAILED TO: (1) ACT REASONABLY
AFTER THE ALLEGED INJURY; AND (2) MITIGATE ITS DAMAGES...................................9

POINT IV
THE ATTACHMENT SHOULD BE VACATED BECAUSE TNT HAS
FAILED TO SHOW THAT IT HAS, OR WILL SOON, INITATE PROCEEDINGS TO
RECOVER ITS ALLEGED DAMAGES FOR WRONGFUL ATTACHMENT ...........................11

POINT V
TNT'S ATTEMPTS TO DISTRACT THE COURT WITH
ERRONEOUS AND IRRLEVENT FACTS SHOULD BE IGNORED .........................................13

POINT VI
PLAINTIFF FILED ITS FRIVOLOUS CLAIM AGAINST
DEFENDANT FOR THE IMPOPRER PURPOSE OF RETALIATION .....................................15

CONCLUSION................................................................................................................................16

Defendant, Fairmount Heavy Transport N.V. ("FHT"), by its undersigned counsel, Tisdale & Lennon, LLC, submits the within Reply Memorandum of Law in Support of its Motion to Vacate the Maritime Attachment pursuant to Rules E(4)(f) and Rule E(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule __").

As will be shown herein, Plaintiff, Transportes Navieros Y Terrestres, S.A. De C.V., ("TNT") has failed to provide any evidence regarding the validity of its claim for wrongful arrest, the admiralty nature thereof, and the damages requested in its Complaint. Instead of providing substantiation for its claims, TNT attempts to distract the Court by alleging various irrelevant and erroneous facts in the hopes that the Court will not notice its failure to meet the basic requirements of Rule B and that the attachment was initiated in bad faith, solely for retributive purposes. This attachment is merely "payback" for FHT's recent successful litigation over TNT's affiliated company, Oceanografia ("OSA"). For the reasons stated herein, TNT's attachment should be vacated in its entirety or in the alternative reduced to an appropriate level.

## POINT I

### PLAINTIFF HAS FAILED TO MEET ITS BURDEN TO SUSTAIN THE ATTACHMENT BECAUSE IT HAS NOT COME FORTH WITH EVIDENCE SHOWING THAT IT HAS A PRIMA FACIE VALID MARITME CLAIM

"A district court *must vacate* an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 2006 U.S. App. LEXIS 19302, *2-3, 28-30 (2d Cir. 2006)(emphasis added). It is a plaintiff's burden at the post-attachment hearing to show that it has a prima facie valid maritime claim. Plaintiff's failure to do so is fatal to a Rule B attachment. *Id.* at 28-29.

TNT's attachment should be vacated because it has shown neither that its claim is prima facie valid nor that it is maritime in nature.

### TNT's underlying claim is not maritime in nature

It is not the defendant's burden to disprove the maritime nature of a plaintiff's claim at a Rule E(4)(f) hearing. Rather, as indicated above, *the plaintiff must come forward with facts and legal authority showing that its underlying claim is maritime in nature in order to avoid vacatur*. Here, TNT has failed to cite *any* case law or facts in support of its bald assertion that its claim is maritime in nature and subject to admiralty jurisdiction under U.S. law.

TNT alleges that the action underlying its request for security in this instant matter is a criminal case, instituted in Mexico, which requests damages for the wrongful arrest of its vessel "CABALLO AZTECA." There is no evidence that TNT has brought a claim against FHT in Mexico. *See Point IV, infra*. In addition, TNT has failed to cite *any* case law indicating that a claim for wrongful arrest is maritime in nature under U.S., Dutch or Mexican law, let alone any authority indicating that a *criminal action in Mexico* would be considered a maritime claim such that it would be subject to U.S. admiralty jurisdiction.

Plaintiff has failed to show that its claim for wrongful arrest is maritime in nature. Even assuming *arguendo* that it is, a claim for wrongful arrest loses its maritime flavor when prosecuted as a damages claim under the Mexican penal code. Just as a claim for breach of charter party loses its maritime nature when reduced to a settlement agreement because the uniquely maritime elements have been removed from the underlying claim, Plaintiff's claim for wrongful arrest lost its maritime qualities (if it had any in the first place, which Defendant denies) when it was allegedly reduced into a criminal action in Mexico.

### POINT II

## THE ATTACHMENT SHOULD BE VACATED BECAUSE PLAINTIFF HAS FAILED TO SET FORTH ANY RELIABLE PROOF OF ITS DAMAGES

It is well settled that a plaintiff must reasonably estimate its damages in a Rule B action or its attachment may be reduced. *See Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996). Frivolous damages will not stand. Here, TNT's damages are non-existent, or grossly over-estimated at best, and are entirely unsupported by the evidence submitted to the Court. TNT was given an opportunity to substantiate the damages claimed in its opposition memorandum. However, it failed to come forth with any evidence showing that it actually incurred the over $10 million in damages claimed in its Verified Complaint.

TNT's Verified Complaint states that TNT has "suffered substantial damages, consisting of liability for liquidated damages under the charter in amount of 10% of the contract's value, or $3.65 million loss of net earnings under the charter in an approximate amount of $6,570,000.00, as best can be presently ascertained; together with other damages to be proved at the trial of this matter." *See TNT's Verified Complaint ¶12*. However, as is made clear from the Declaration of Mr. Wesley Freeman ("Freeman Decl."), Con-Dive has yet to recover *any* damages from TNT. *See Freeman Decl. ¶7*. Mr. Freeman reveals that Con-Dive's claim against TNT is highly speculative. That is, Mr. Freeman merely confirms that *if* Con-Dive has a claim, it intends to enforce it. *Id.* Thus, it is clear that not even Con-Dive is sure that it will pursue a claim against TNT. As will be discussed in Point II (b), *infra,* TNT's claim for reimbursement from FHT is premature and unripe, as the damages claim between TNT and Con-Dive has yet to be resolved by judgment or settlement. Furthermore, as will be addressed below, evidence supporting TNT's remaining claim for loss of profits is strikingly absent as well.

3

### a. Plaintiff has failed to come forth with any actual evidence for its loss of profit damages besides self-serving statements issued by self-interested parties

TNT has claimed loss of profit damages in the amount of $6,570,000.00, based on the arrest's alleged disruption of the FHT-Con-Dive charter party. However, the sparse evidence submitted regarding the FHT-Con-Dive charter party indicates that the charter party, if it exists at all, was created solely to manufacture otherwise non-existent damages for a claim for wrongful arrest. The facts further indicate that even assuming a valid charter party existed, the vessel was not delayed beyond its delivery date, and that the delay, if any, was not caused by the arrest. Thus, as TNT's damage claim for loss of profits is totally unsupported the evidence, the attachment should be vacated with regard to the $6.57 million claimed therefore.

Although TNT has submitted a document which appears to be a charter party, this document does not indicate the dates of signature! Thus it is unclear when the document was actually executed. In addition, the dates specified by the charter party itself do not support TNT's loss of profit claim. As stated by TNT through its attorney, the Vessel was not required to be delivered to Con-Dive until June 8, 2006, well after the arrest was lifted on May 16, 2006. *See Exhibit 5 annexed to the First Van Der Stelt Declaration.* It is only now, contrary to its earlier letter, that TNT claims that the Vessel was due in Mexico before May 16, 2006. This is very convenient now that TNT is attempting to attach FHT's assets. TNT should not be able to arrange and/or alter the facts of the case at its whim. TNT's statements with regards to the Vessel's delivery date should be considered an admission, and direct evidence that the FHT-Con-Dive charter party, if it existed at all, was never affected by the arrest.

In addition, further evidencing that the loss of profit damages have been wholly manufactured is the fact that the charter party was entered into between two hopelessly intertwined entities, who both are related to OSA, the party against whom FHT successfully

4

pursued a claim against only weeks before.[1] This relationship was largely explored in FHT's initial memorandum. The accompanying Second Declaration of William Marsh ("Second Marsh Decl.") further explores and demonstrates the corporate commingling between TNT, OSA and Con-Dive. TNT and Con-Dive have denied this claim, but, once again a cursory investigation belies their statements to the Court.

Con-Dive's president, Wesley Freeman, indicates that Con-Dive is a wholly separate and independent entity and that he merely acts as a consultant for OSA. However, a decision issued by the English High Court of Justice in June of 2006, reveals that Mr. Freeman recently identified himself and gave testimony as "the director of operations of OSA." *See Oceanografia SA De CV v. DSND Subsea AS decision annexed to Second Marsh Decl. as Exhibit 8.* Furthermore, Mr. Freeman has failed to address why in October of 2005, just weeks before he signed the alleged TNT-Con-Dive Charter Party, that he was writing from and receiving e-mails at the address wesfre@oceanografia.com.mx and calling himself the "Director General Adjunto, Oceanografia SA de Cv." *See Second Marsh Decl. ¶11.*

Hermillio Escobedo Obrador's statements as to TNT's corporate independence from OSA have also been revealed to misleading and unreliable. Mr. Escobedo's statements indicate that he is in a management position at TNT. *See Declaration of Hermilo Escobedo Obrador ("Obrador Decl.") ¶¶1, 10.* In this capacity, he attested to the fact that TNT and OSA are "not related to another in any way." However, contrary to the preceding statement and invalidating Mr. Escobedo's credibility, the Dun & Bradstreet report of OSA dated April 30, 2007 indicates that Mr. Escobedo is also the manger of sales of OSA! *See Second Marsh Decl. ¶5.*

---

[1] This is also further evidence that TNT's attachment was enacted solely for retributive purposes, impermissible pursuant to the law of this Circuit, and for this reason should be dismissed.

Thus, not only are the links between OSA, FHT and Con-Dive quite clear, but it appears that Mr. Freeman and Mr. Escobedo have misrepresented that they and their respective companies are completely independent from OSA. As Mr. Freeman's and Mr. Escobedo's declarations seem to be only loosely based on the truth, they should be given no weight in this proceeding.

In addition, TNT has not submitted any communications between itself and Con-Dive regarding the establishment of the alleged charter party, nor any documentation showing how the terms were negotiated. In general, parties seeking to enter into a charter party will communicate frequently through e-mail or fax when negotiating the terms of contract. Here, there is no evidence of negotiation or preliminary correspondence concerning the charter, further evidencing the hollow deal between the inter-related parties.

Finally, the timing of the charter party and as well as the justifications for it (or lack thereof) indicate that neither TNT nor Con-Dive had any intention of following through on their respective obligations. The vessel had been in the repair yard for over three years, and had recently been arrested. However, Con-Dive merely states that "it was not concerned about this" when deciding whether to charter the vessel. *See Freeman Decl.* ¶3. Con-Dive also states that the Vessel was chartered on flexible terms from TNT, allowing for delivery at Con-Dive's option and providing for an unusually large penalty for non-delivery given the circumstances, *i.e.* that the vessel was under arrest and this would be its first voyage after prolonged repairs. Con-Dive's lack of concern at the arrest and the prolonged repairs, combined with the highly favorable terms of delivery is compelling evidence that the charter party was a mere formality, and was never actually intended to be a binding document. The FHT-Con-Dive charter party, as shown above, was not a contract of maritime transportation, but merely mechanism to artificially increase TNT's damages.

6

In addition to the above, TNT's claim for damages is unfounded because the delay of the vessel was not caused by the arrest. That is, the causal relationship between the alleged delay in repairs and the arrest is too attenuated to support a loss of damages claim.

TNT improvidently relies on a repairmen's statement regarding the scheduling of repairs post-arrest to justify its damages claim. According to TNT, the arrest caused the repair delay set forth by Mr. Eggens and the vessel could not be delivered on time.[2] Thus, all damages are for the FHT. However, as confirmed the Mr. Eggens, the delay in repairs was not actually caused by the arrest! In fact, the repairmen were in no way prevented, by law or action, from repairing the vessel. *See Second Declaration of Jan Fredrik Van Der Stelt* ¶8. Rather, the repairmen made the decision to stop work on the vessel on an independent basis because they wanted to obtain payment upfront. *See Declaration of Adriaan Eggens ("Eggens Decl.")* ¶3. Mr. Eggens does not deny that the arrest in no way impeded the Yard's work. A yard's decision to wait for payment from its customer is based on their own independent calculus of the customer. The arrest had no legal effect on the repairmen or the Yard's billing policies. Thus, the level of causation between the arrest and the delay in repairs (which caused the vessel to miss its alleged delivery date) is too attenuated to support a $10 million dollar damages claim.

Furthermore, TNT maintains that even after the arrest, it had the right to enter into which ever contract it desired in relation to the Vessel. However, this is not so. As will be further explained, the aggrieved party has a continuing duty to mitigate its damages. *See Bay Casino, LLC v. M/V Royal Empress*, 20 F. Supp. 2d 440, 454 (E.D.N.Y. 1998)(reminding plaintiff it has a continuing duty to mitigate its damages). Thus, if a vessel is wrongfully arrested, it may not intentionally seek a contract that either side has no intention of performing in order to artificially

---

[2] It is noteworthy that according to the Company Register of the Chamber of Commerce Mr. Eggens has only been a director of the Yard since October 1, 2006, after the arrest had been lifted. Thus, his ability to testify as to the delay of the vessel's repairs before the arrest was lifted is called into serious question. *See Second Van Der Stelt Decl., Exhibit "1."*

7

increase its damages. Rather, it must act reasonably and seek to alternatively employ the vessel in order to mitigate and offset the damages to be incurred.

### b. TNT's claim for $3,650,000.00 in liquidated damages that it may or may not have to pay to Con-Dive under the charter party is premature and unripe, and thus cannot serve as a basis for a Rule B attachment

TNT's claim for damages based on amounts that TNT may or may not have to pay to Con-Dive under the charter party is unripe and contingent. That is, there is a condition precedent which must occur before TNT actually incurs any recoverable damages against FHT, namely the adjudication or settlement of Con-Dives' claim. The law of this Circuit is clear that absent compelling circumstances, a contingent claim is not a proper basis for security in a Rule B action.

Recent case law confirms the prinple that where the underlying claim has not been resolved, contingent claims remain premature and generally cannot serve as the basis for security in a Rule B attachment. *See Sonito Shipping Co., Ltd. v. Sun United Mar., Ltd.*, 2007 U.S. Dist. LEXIS 19531, at *21 (stating that "a number of district judges of this Court have vacated maritime attachments based upon comparable claims for contingent indemnity"); *see also J.K. Int'l, Pty., Ltd. v. Agriko S.A.S.*, 2007 U.S. Dist. LEXIS 10074 (S.D.N.Y. 2007)(finding that absent evidence that the ship owner intended to press a demurrage claim against the plaintiff, plaintiff's claim for contingent indemnity against cargo receivers "is simply too thin a reed to rest on when Plaintiff carries the burden of defending the Attachment").

The *Bottiglieri di Navigazione SPA v. Tradeline LLC* case, *supra*, best exemplifies the law on contingent claims in Rule B actions in this Circuit. In *Bottiglieri*, the Court found that until the underlying matter is resolved, an action based thereon is premature and thus, Rule B is not an available remedy. The Court went on to find that plaintiff's contingent claim would remain unripe until the Rule B plaintiff had actually been ordered to reimburse the underlying

8

claimant for the damages that it had paid. Thus, applying the *Bottiglieri's* court's reasoning, until TNT actually pays, or is ordered to pay, Con-Dive's claims, its contingent claim against FHT remain unripe and not amenable to security under Rule B.

Here, TNT can show neither that the claim underlying its action against FHT has been resolved nor that there are any compelling circumstances which would justify maintaining the attachment. TNT will not even be able to show that the underlying claims will be resolved in the near future. To the contrary, it is indisputable that TNT's claims are highly speculative and contingent. Thus, for the foregoing reasons, TNT's claim for damages in relation to disbursements to Con-Dive remains unripe and the attachment should therefore be vacated.

**POINT III**

**TNT'S ATTACHMENT SHOULD BE VACATED OR
REDUCED BECAUSE IT FAILED TO: (1) ACT REASONABLY
AFTER THE ALLEGED INJURY; AND (2) MITIGATE ITS DAMAGES**

Even if an aggrieved party is otherwise blameless, it has a duty to mitigate its damages. *See Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 238 (D.N.Y. 1996) (finding that plaintiff had a duty to mitigate its damages and its claim must be offset by the savings it could have obtained by chartering another vessel for the term of the subcharter). As shown in *Dongbu Express, supra,* a reasonable calculation of loss of profit damages must include an offset for mitigation. A plaintiff is not entitled to run up its damages, or sit on its hands, while damages accrue.

Here, TNT failed to act reasonably in mitigating its damages after the arrest, and it has also failed to account for its estimated savings due to mitigation. Despite the fact that TNT was aware that the attachment was allegedly patently wrongful (as it was the Owner of the Vessel), it failed to come forth and submit any evidence of its ownership for over six months after the arrest was in place. TNT's claim that it informed a "delegate of Fairmount" that TNT, and not OSA,

9

was the owner of the vessel at the time of service of the arrest papers in no way satisfies its duty to act reasonably and typifies TNT's hollow arguments. The supposed "delegate of Fairmount" was the court bailiff, and such statements cannot reasonably be expected to be relayed to FHT. *See Second Van Der Stelt Decl. ¶10.*

TNT and OSA both disclaim the responsibility for responding to FHT's claim, claiming that each other should have acted to release the attachment. *See Obrador Decl. ¶3; See Declaration of Michael Hajdasinski. ¶3.* Disregarding the outlandish nature of this statement, given the close relationship between the parties, it was unreasonable for TNT to sit on its hands with evidence that the arrest was allegedly patently initiated in error, and enter into charter parties in order to create a larger amount of damages.

If TNT's position were endorsed, any time a vessel was arrested, the owner of that vessel should enter to the longest, most expensive charter with an affiliated company, because it has the possibility of increasing its damages should the arrest be wrongful. If the arrest is proved valid, there is no loss, since the affiliated company is actually one and the same as the vessel owner, and no damages were ever actually incurred. The law protects against such windfall scenarios by requiring the aggrieved party to act reasonably and attempt to mitigate its damages.

Here, TNT clearly failed to act reasonably by failing to set forth any evidence of ownership, for what it knew was an allegedly patently wrongful arrest. *See Second Van Der Stelt Decl. ¶6.* The arrest occurred in November of 2005, and TNT failed to assert that they owned the ship until March 15, 2006, at which time the arrest was promptly lifted. Any damages that TNT incurred were the result of its own unreasonable actions. An arrest is not an opportunity to create a windfall scenario. TNT has done just that, in order to retaliate against FHT for successfully litigating against its affiliate OSA. Therefore, as TNT's claims for damages are unreasonable and frivolous, the attachment should be vacated in its entirety.

In the alternative, TNT has failed to show that it attempted to mitigate its damages by chartering the vessel to another party. Thus, the Court should reduce TNT's attachment to take into account the amount of remuneration it would have reasonably received, had TNT actually mitigated its damages.

## POINT IV

### THE ATTACHMENT SHOULD BE VACATED BECAUSE TNT HAS FAILED TO SHOW THAT IT HAS, OR WILL SOON, INITATE PROCEEDINGS TO RECOVER ITS ALLEGED DAMAGES FOR WRONGFUL ATTACHMENT

There are two historical purposes for Rule B attachment; to obtain jurisdiction over the defendant and to obtain security for an ultimate judgment. These two purposes presume that an underlying proceeding has been, or will soon be filed.

Where there is no underlying proceeding, and/or the underlying proceeding is unlikely to proceed, neither of the purposes of Rule B attachment would be served (because there will be no ultimate judgment and there is no need for jurisdiction). Thus security should not be awarded pursuant to Rule B where the proceeding to resolve the underlying claim has not, and will not likely be soon initiated in the proper forum. *See Eitzen Sealift A/S v. Cementos Andinos Dominicanos, SA*, 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y. 2005). This principle is only logical, as Rule B in an ancillary remedy, conducted in conjunction with a principal action. Unless the underlying proceeding will imminently be commenced, the request for security for that proceeding is premature.

Here, there is no evidence that an action has been, or will soon likely be, commenced against FHT by TNT on its wrongful attachment claim in any jurisdiction, including Mexico. TNT refers to criminal proceedings that allegedly are pending in Mexico in respect to a wrongful arrest of a vessel, as does TNT's Expert, Omar Olvera, however, the complaint filed at the offices Federal District Attorney which was attached to the Declaration of Mr. Olvera and of

11

which he declared that damages are claimed, does NOT reference the Defendant, FHT, and refers only to alleged *salaries owed to the crew*. No specific relief for damages is requested but only the detention of the vessel. *See Second Declaration of Arturo Arista ("Second Arturo Decl.")* ¶6.

Mr. Olvera also refers to another criminal complaint filed at the offices of the State District Attorney in Tabasco and declares that he attached said complaint. *See Declaration of Omar Olvera de Luna ("Olvera Decl.")* 5. The truth is, however, that he attached a letter from said District Attorney to the general offices of the State Public Prosecutors to assist them in informing three persons to assist to a conciliatory meeting. Mr. Olvera did not attach such alleged complaint to his declaration. The logical inference to be drawn is that he did not provide this Court with the complaint because it does not refer to a wrongful arrest or a prayer for damages, but rather to alleged lack of payment of salaries to the crew. *See Second Arturo Decl.* ¶7.

The failure to submit the "complaint" with all attachments, exemplifies TNT's motus operandi in this proceeding. TNT would like to submit just enough documentation so as to appear to have a claim. However, upon close examination all of TNT's arguments and evidence fall apart, revealing a few slights of hand and many misrepresentations of the truth.

As shown above, a cursory examination of the documentation attached to Mr. Olvera's declaration reveals that no action has been commenced against FHT in Mexico regarding TNT's wrongful attachment claim. Neither the complaint attached by Mr. Olvera nor the letter to the Mexican District Attorney make reference to the Defendant, FAIRMOUNT HEAVY TRANSPORT N.V.! *See Translations of Mr. Olvera's Exhibits "2," and "3" annexed to the Second Declaration of Charles Murphy as Exhibit "1" and "2" respectively.* Rather, the "complaint" at Olvera's Exhibit "3" refers to a different company. *See the accompanying*

12

*Declaration of Philip Jeffrey Adkins ("Adkins Decl.")*. No where in these exhibits is there a reference to TNT's supposed wrongful arrest claim.[3]

In light of the foregoing, it is evident that TNT obtained the instant Ex-Parte Order of Attachment on false pretenses. Particularly, TNT misrepresented the nature of the proceedings occurring in Mexico in order to obtain a Rule B attachment. In its Verified Complaint, TNT alleged that its claims for wrongful arrest were being resolved in Mexico. *See TNT's Verified Complaint ¶13*.

TNT has failed to submit any evidence in support of its allegation that has initiated an action against TNT for its alleged wrongful attachment claim. Thus, as TNT's attachment is neither seeking security for an ultimate judgment, nor attempting to obtain jurisdiction over FHT (as there is no action in which TNT would require either), TNT's claim for security under Rule B is premature and the attachment must be dismissed.

## POINT V

### TNT'S ATTEMPTS TO DISTRACT THE COURT WITH ERRONEOUS AND IRRLEVENT FACTS SHOULD BE IGNORED

TNT and TNT's legal expert, Mr. Olvera, regularly confuse the defendant "FAIRMOUNT HEAVY TRANSPORT N.V." with a similarly named company "FAIRMONT MARINE B.V." However, as mentioned above, these two companies are district and separate. The FAIRMONT GLACIER, the vessel that TNT's claims fled from justice belongs to FAIRMONT MARINE B.V. *NOT* the defendant. *See Adkins Decl. ¶6*. The Mexican complaint references FAIRMONT MARIME B.V., *NOT* the defendant. This type of confusion is central to FHT's position that TNT's claims are ill-conceived and frivolous and for this reason should be dismissed.

---

[3] The fact that the nature of the claims is not referenced in the Mexican complaints is further evidence that TNT's claims are not maritime in nature. TNT's claims have, at best, been reduced to monetary claims, wholly unrelated to maritime commerce.

13

In addition, in ¶3 of his Declaration, Mr. Olvera inaccurately states "[i]n Mexican Maritime Law, a vessel's wrongful arrest can be considered a crime." A specific citation or pinpoint reference is notably absent from this statement. Mexican Maritime Law is regulated mainly by the Navigation and Maritime Commerce Act and various International Conventions. However, Mr. Olvera could not cite to a specific article or section of any law that supports his view that a wrongful arrest can be considered a crime because Mexican Maritime law does not refer to crime but to administrative sanctions that could be imposed by the administrative authorities in certain cases. *See Second Arturo Decl. ¶16.*

Futhermore, Mr. Olvera conveniently does not make reference to article 6 of the Federal Rules of Criminal Proceedings that establish that the competent Court to resolve a crime is the one of the place where the crime was committed. In the present case, the wrongful arrest happened in another country. It goes against common sense to try to maintain that an alleged wrongful arrest is in fact committed "on board" the vessel in order to try to maintain that Mexican Courts would have jurisdiction over such allegation. *See Second Arturo Decl. ¶17.*

Mr. Olvera goes on to make the outrageous statement that damages can be sought by the complaint filed at the District Attorneys office. However, this statement is also inaccurate. The party that files a complaint may not request a relief for damages as Mr. Olvera maintains, except for certain specific crimes that are clearly named in the criminal code, and which do not include wrongful arrest. *See Second Arturo Decl. ¶21.* A criminal complaint filed at the District Attorneys office is only a description of certain events that will be evaluated by the District Attorney's to determine if in its view there are enough elements to prosecute a case or not. *See Second Arturo Decl. ¶19.*

Further inaccuracies are detailed in the accompanying Second Arturo Declaration. As Mr. Olvera's declaration sets forth an incomplete and inaccurate analysis of Mexican law, it should be disregarded.

### POINT VI

### PLAINTIFF FILED ITS FRIVOLOUS CLAIM AGAINST DEFENDANT FOR THE IMPOPRER PURPOSE OF RETALIATION

In *Aqua Stoli*, the Second Circuit Court of Appeals held that given the exceptional remedy of maritime attachments, the district courts have the inherent authority to vacate abusive or unfair attachments. *Id.* at 442. The Second Circuit so held in the context of praising Judge Leval's holding in *Integrated Container Serv., Inc. v. Starlines Container Shipping, Ltd.*, 476 F.Supp. 119 (S.D.N.Y. 1979).

All of the evidence submitted by FHT and, surprisingly, TNT, reveals that TNT procured the instant attachment in bad faith, solely for retributive purposes. Even the most basic elements of TNT's rule B action appear to be misrepresentations. The underlying action in Mexico was never commenced against FHT despite affirmative allegations to the otherwise. Con-Dive's president misrepresented his relationship to OSA. The charter party was executed under the most conspicuous terms, while under arrest following a three year period in the repair yard. The liquidated damages claimed to have been incurred by have not even been paid to Con-Dive. As every element of TNT's application for security is circumspect, if not outright fraudulent, its submissions and statements to this Court should be given absolutely no weight.

The equities also favor the FHT. It has been shown that TNT has been less than forthcoming regarding both it relationship with OSA and alleged execution of the charter party. Thus, the existence of a charter party and therefore a claim, is doubtful. As TNT has attempted to manipulate the Rule B attachment process for its own end, without regard to the veracity of its

15

own disclosures, the Court should apply its discretion to vacate TNT's attachment on an equitable basis.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Court grant FHT's motion to vacate the attachment, or in the alternative, reduce the attachment to an appropriate level.

Dated: May 11, 2007
   New York, NY

>
> Defendant,
> FAIRMOUNT HEAVY TRANSPORT N.V.,
>
> BY: *[signature]*
> Charles E. Murphy (CM 2125)
> TISDALE & LENNON, LLC
> 11 West 42nd Street, Suite 900
> New York, NY 10036
> (212) 354-0025
> (212) 869-0067 (fax)
> cmurphy@tisdale-lennon.com

16

## AFFIRMATION OF SERVICE

I hereby certify that on May 11, 2007, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: /s/ Charles E. Murphy
Charles E. Murphy (2125)