UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
TRANSPORTES NAVIEROS Y
TERRESTRES, S.A. DE C.V.,

                Plaintiff,                 07 CV 3076 (LAP)

    -against-

FAIRMOUNT HEAVY TRANSPORT N.V.,

                Defendant.
------------------------------------------------------X

### SECOND DECLARATION OF WILLIAM LUKE MARSH

I, WILLIAM LUKE MARSH, declare as follows:

1. I am the same William Luke Marsh that made a declaration executed on 1 May 2007. I make this declaration in response to various facts and matters alleged in the declarations filed by TNT in opposition to FHT's application to vacate the attachment.

2. In my first declaration I identified various factors tending to show that OSA and TNT are effectively one and the same, and that there was a very close connection with the company Con-Dive, LLC tending to suggest that the loss which is alleged to have been caused by the arrest of the vessel *Caballo Azteca* was not in fact suffered. I have now read the declarations filed in support of TNT's motion and note that they contain very much which corroborates that which is set out in my first declaration and very little which refutes it.

3. *The Link Between TNT and OSA*

    The question of TNT and OSA being effectively one and the same is addressed in paragraph 8 of the declaration of Hermilo Escobedo Obrador, but all that does is make the bald assertion that TNT and OSA are:

> "... *two completely separate and distinct companies, with different ownership, different Board of Directors, different offices, different management, different offices, and different nature of the work. Thus both are not related to one another in any way.*"

I note that no attempt whatever is made to address the facts evidenced by the Dun & Bradstreet report which I obtained and which is attached at Exhibit 3 to my first declaration. Similarly nothing is said about the President of OSA, Mr Amado Yanez and the fact that he holds out his business address as being that of TNT (see Exhibit 4 to my first declaration). It might also be noted, in passing, that Mr Yanez has not deemed it necessary to make a statement. Doubtless this is deliberate in an attempt to distance TNT from OSA, but it cannot seriously be suggested that those acting on behalf of TNT cannot make contact with Mr Yanez. I note from the references on the declarations of the two Dutch lawyers, Mr Moolenaar and Mr Hajdasinski, that Mr Alfred Rufty of the New Orleans law firm, Harris & Rufty has obviously been retained by TNT to assist with the collection of evidence to support TNT's case. It was Mr Rufty who represented OSA in the proceedings brought against that company by FHT and who appeared on OSA's behalf in this Court.

4. No official corporate documentation is put forward to support any of the information set out in the second part of paragraph 8 of Mr Escobedo's declaration where he purports to identify the shareholders of TNT.

5. It is interesting to note that whilst Mr Escobedo is clearly of management level within TNT (he says in paragraph 1 that he is its "legal representative", and then in paragraph 10 that he signed the alleged charter with Con-Dive LLC on behalf of TNT) he asserts categorically that there is "different management" between TNT and OSA, but then, on page 3 of the Dun & Bradstreet report the management of OSA at 30 April 2007 is stated to include:

"Manager Sales

Mr Hermilo Escobedo Obrador"

6. In all the circumstances I would suggest that there are serious credibility issues about Mr Escobedo's evidence.

7.  The fact that OSA and TNT are one and the same is evident when one considers the statements of the two Dutch lawyers, Mr Moolenaar and Mr Hajdasinski alongside the statements of Mr Escobedo, Mr Freeman and Mr Eggens and pieces together the sequence of events as they are alleged to have happened, an exercise which, incidentally, also highlights quite how unlikely it is that the story about the alleged Con-Dive charterparty is true and that the document exhibited to Mr Freeman's declaration is genuine:

    (i)   OSA, through Mr Yanez, instructs AKD Prinsen Van Wijmen (Mr Moolenaar) *"in approximately November 2005 shortly after the vessel ... was arrested"*. Mr Yanez knows all about the repairs/modifications which were being undertaken in the yard (Moolenaar, paras 1 and 2), notwithstanding that OSA had ostensibly sold the vessel to TNT some three years previously (Escobedo, para 4 – but note the confirmation that the change of ownership was not registered in the National Public Maritime Register until October 2005). By that time the vessel had been in the yard for over three years (Eggens, para 2).

    (ii)  At some point thereafter Mr Escobedo learns of the arrest but does nothing because OSA was dealing with it (Escobedo, para 3). Mr Escobedo/TNT continue to do nothing about the arrest although the yard stops working on the vessel (Eggens, para 3), and then TNT happily enters a charter of the vessel with a March delivery date and carrying with it a potential liability of US$3.6 million in the event of non-delivery (Escobedo, para 10, Freeman, para 4).

    (iii) TNT continues to do nothing and Mr Moolenaar calls for the documents - but there is no rush for them to be provided or for Mr Moolenaar's advice and the whole process takes "a period of months", (Moolenaar, para 3).

    (iv)  This "period of months" having lapsed, Mr Moolenaar finally concludes that there is enough evidence to show that *"TNT apparently was the owner of the vessel at the time of the arrest"* and the arrest therefore *"appeared to be wrongful"*. He advises OSA that any challenge should come from TNT not OSA and TNT should therefore be separately represented (Moolenaar, para 4).

(v) At this point, presumably in about May 2006, TNT instruct Van Traa (Escobedo, para 11) who then write to Mr Van Der Stelt alleging that the vessel was due to be delivered under a charterparty commencing on 8 June and threatening a possible liability of US$45 million if the vessel is not released.

8. Having set out the sequence of events in this way it is worth pausing to recall the statements in paragraph 6 of the Verified Complaint that the vessel had been brought to the yard for modifications to enable her to meet the specifications in the TNT/Con-Dive charterparty. In my first declaration I pointed out that this was "palpable nonsense" having in mind the simple time line. The sequence of events outlined above shows beyond any semblance of a doubt just how hopeless the allegation in paragraph 6 of the Verified Complaint is. It is to be noted that TNT has not even bothered to try to address this.

9. The idea that FHT's actions were the cause in law of an alleged loss due to non-delivery under the alleged charterparty to Con-Dive is preposterous, even on TNT's own evidence and fails even a prima facie test. On page 6 of TNT's memorandum it is stated that:

"The <u>reason</u> the repairs were incomplete, however, is that the vessel had been wrongfully arrested."

The declaration of Mr Eggens is cited in support of this. However Mr Eggens in fact explains that the Yard stopped work because of "serious concerns about whether the shipyard will be paid" (Eggens, para 3), and the reason why the repairs were incomplete was "due to other projects in the shipyard" (Eggens, para 5). On page 7 the memorandum tries to deal with the causation problem by applying a simplistic "but for" test, but that really cannot hold water here. If TNT were faced with the Yard asking in mid-November to be paid for repair work (not unreasonable one might think) why did they not pay? TNT cannot blame FHT for TNT's failure to pay the Yard.

10. Further evidence tending to show that the attempts to distance OSA from all of this are hopeless, and dishonest, can be found in the document which is attached hereto as Exhibit 7. This is a list of vessels entered with the Gard P&I Club. Gard is a leading

provider of insurance against P&I risks for vessels entered with it. This list is valid as at yesterday, 10 May 2007 and shows that the *Caballo Azteca* is entered with Gard and its "Owner/manager/agent" is Oceanografia S.A. de CV.

11. *The Link Between TNT and Con-Dive, LLC Through OSA*

In his declaration Wesley Freeman addresses the link between TNT and OSA by talking only about the link or, in his case, the absence thereof, between Con-Dive and TNT and/or OSA. Mr Freeman says that there is no link because, as he puts it in paragraph 9 of this statement:

*"... it is also incorrect to say that I am an employee of Oceanografia. I have served as a consultant to Oceanografia but that role has been minimised since I started my own company, Con-Dive."*

However, this is demonstrated to be a lie by

(i) the document which is at Exhibit 5 to my first declaration and which recites that Con-Dive was formed in Louisiana on 20 September 2005, but

(ii) in October of that year (just weeks before he signed the alleged TNT Con-Dive charterparty) Wesley Freeman was writing from and receiving emails at the address "wesfre@oceanografia.com.mx" and calling himself "Director General Adjunto, Oceanografia SA de CV".

Significantly Mr Freeman has made no attempt whatever to address either of these points.

11. Another point which Mr Freeman has failed to address is the discrepancy between the delivery dates mentioned in the alleged Con-Dive charterparty (Freeman, para 4, exhibit A) and the date of 8 June mentioned by Mr Hajdasinki when he wrote to Mr van der Stelt on 15 May 2006. I have already demonstrated in my first declaration how this discrepancy entirely undermines paragraphs 11 and 12 of the Verified Complaint.

12. My firm does in fact have some prior knowledge and experience of Mr Freeman. There is attached at Exhibit 8 a copy of the judgment which was given by the English

High Court earlier this year in the case of *Oceanografia SA de CV v. DSND Subsea AS*. Ince & Co. acted for DSND and the issue in that case was whether OSA was bound by a London arbitration award obtained against it by DSND. OSA argued that it was not because it was not bound by the terms of the arbitration clause under which the arbitration had been commenced. The arbitrators determined their own jurisdiction as they were entitled to under the terms of the English Arbitration Act 1996, and OSA challenged that determination as it was entitled to under Section 67 of that Act (Section 67 entitles a party to arbitral proceedings to challenge any award of the arbitral tribunal as to its substantive jurisdiction). The specific reason why I refer to this judgment here is because one of the witnesses for OSA was Wesley Freeman. Paragraph 4 of the judgment records that:

"... *Both parties called witnesses to give oral evidence before me at the hearing which took place over three days in April 2006. OSA called <u>Mr Raymond Wesley Freeman, who was the Director of Operations of OSA</u>; and Mr Amado Yanez Osuna, the President of OSA*". (emphasis added)

13. Although the events to which Mr Freeman had to attest at the hearing had occurred in 2001, the hearing of the Section 67 application took place in April last year and there is no suggestion in the judgment that Mr Freeman was not at that time still employed by OSA.

In accordance with 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 11 day of May 2007.

Signed: ..................................................

**William Luke Marsh**