UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
TRANSPORTES NAVIEROS Y
TERRESTRES, S.A. DE C.V.,

              Plaintiff,              07 CV 3076 (LAP)

    -against-

FAIRMOUNT HEAVY TRANSPORT N.V.,

              Defendant.
-----------------------------------------------------X

## DECLARATION OF WILLIAM LUKE MARSH

---

### EXHIBIT 8

---



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales High Court (Commercial Court) Decisions

---

You are here: BAILII >> Databases >> England and Wales High Court (Commercial Court) Decisions >> Oceanografia SA DE CV v DSND Subsea AS [2006] EWHC 1360 (Comm) (12 June 2006)
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2006/1360.html*
Cite as: [2006] EWHC 1360 (Comm)

---

[New search] [Printable RTF version] [Help]

---

**Neutral Citation Number: [2006] EWHC 1360 (Comm)**

Case No: 2004/871

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

Royal Courts of Justice
Strand, London, WC2A 2LL

12th June 2006

B e f o r e :

**MR JUSTICE AIKENS**

---

Between:

### OCEANOGRAFIA SA DE CV    Claimant

### - and -

### DSND SUBSEA AS    Defendant

---

**Mr Michael McParland (instructed by Waltons & Morse, Solicitors, London) for the Claimant**
**Miss Claire Blanchard (instructed by Ince & Co, Solicitors, London) for the Defendant**
**Hearing dates: 3rd, 4th and 5th April 2006**

---

### HTML VERSION OF JUDGMENT

---

Crown Copyright ©

Mr Justice Aikens :

*A. Introduction*

. 1.   This is an application under section 67 of the Arbitration Act 1996 ("the 1996 Act") challenging an
       Arbitration Award dated 17th September 2004, by which the three Arbitrators held that they had substantive
       jurisdiction to hear and determine a dispute arising out of a Charterparty dated 28th August 2001. The issue
       before the three Arbitrators was whether or not the current claimant, Oceanografia SA de CV ("OSA") was
       bound by the terms of an arbitration clause contained in clause 31 of the terms of an amended Supplytime
       89 form of Charterparty dated 28th August 2001 ("the 28th August Charterparty"). The respondent to the
       current application, DSND Subsea AS ("DSND") purportedly chartered the offshore supply and
       maintenance vessel "***Botnica***" to OSA under the terms of that Charterparty.

2.   The arbitration concerning jurisdiction was held before three well known LMAA arbitrators, Mr Robert
     Gaisford, Mr Christopher Moss and Mr Patrick O'Donovan. Before them OSA argued that the 28th August
     Charterparty had never become valid and binding because it had never been signed by or on behalf of
     OSA as required by clause 18.1. of the terms set out in an Exhibit A to the Charterparty terms and
     conditions. In the arbitration DSND argued that OSA was bound by the terms of the 28th August
     Charterparty, even though OSA did not sign all the pages of the Charterparty terms dated 28th August
     2001. DSND made three submissions. The first was that upon the proper construction of the terms and
     conditions of the 28th August charperparty it was not necessary for a formal contract to be signed, but only
     that there should be agreement as to the terms of a formal contract. DSND submitted that there was
     agreement between the parties as to the terms of the Charterparty. Secondly, DSND argued that OSA was
     bound by the 28th August Charterparty because the term requiring OSA to sign the Charterparty terms was
     waived by OSA in correspondence, and/or by OSA's conduct in accepting the ***Botnica*** for work as
     contemplated under the Charterparty. The third argument of DSND in the arbitration was that OSA was
     bound by the 28th August Charterparty terms by virtue of an "estoppel by convention".

3.   The arbitrators issued an Award dated 17 September 2004 in which they declared that the 28th August
     Charterparty was valid and binding on both parties and that the arbitrators had jurisdiction to decide any
     and all disputes arising out of the 28th August Charterparty. The three arbitrators held, unanimously, that
     OSA was correct in its contention that clause 18.1 of the conditions in Exhibit A to the 28th August
     Charterparty terms provided that the Charterparty terms must be signed before the Charterparty became
     contractually binding on the two parties. The arbitrators held that OSA had not signed the terms. By a
     majority (Mr Moss dissenting) the arbitrators concluded that the term requiring signature of the 28th August
     Charterparty terms was waived by OSA. The arbitrators also concluded (unanimously), that OSA was
     bound by the 28th August Charterparty by virtue of an "estoppel by convention".

4.   It was agreed between the parties that, on the basis of at least 7 decisions of Commercial Court judges,
     culminating in ***Peterson Farms Inc v C M Farming Ltd [2004] 1 Lloyd's Rep 603 (at 607 per Langley J),***
     applications under s.67 of the 1996 Act involve a full rehearing before the Court. The question for the Court
     is not whether the tribunal was entitled to reach the decision to which it came, but whether it was correct to
     do so. Accordingly both parties called witnesses to give oral evidence before me at the hearing which took
     place over three days in April 2006. OSA called Mr Raymond Wesley Freeman, who was the director of
     operations of OSA; and Mr Amado Yanez Osuna, the president of OSA.

5.   DSND called Mr Terje Tellefsen, who was at the relevant time the group vessel director of DSND Subsea
     ASA, the parent company of DSND. He had overall responsibility for running DSND's fleet. DSND also
     called Mr Jan-Roger Olsen. At the relevant time he was the chief operating officer of DSND Subsea
     Americas. In the arbitration Mr Freeman and Mr Osuna had both given evidence on behalf of OSA. Mr
     Tellefsen had also given evidence at the arbitration hearing, on behalf of DSND. Mr Olsen did not. A further
     employee of DSND, Mr Michael Stark, who was very heavily involved in the negotiations concerning the
     Charterparty, did not give evidence either before the arbitrators or before me. It was Mr Freeman's
     evidence that he had known Mr Stark in the offshore business for 35 years and that he had had complete
     trust in him and anything he said. Mr Freeman's view was that Mr Stark had betrayed that trust by what he
     said and did in the course of the negotiations concerning the employment of ***Botnica*** by OSA.

6.   I was satisfied that all four witnesses were attempting to recall events to the best of their ability. However
     all four were hampered by the fact that the events in dispute took place 4½ years ago. Inevitably, therefore,
     they were all heavily reliant upon the contemporaneous documentary and email evidence to refresh their
     memory. I am also convinced that each witness, to a greater or lesser extent, had subconsciously
     persuaded himself that his version of events or analysis of events was the correct one and in accordance

with the arguments being put forward by his side's lawyers at the hearing. I do not mean to suggest that any of the witnesses acted improperly in saying this. However, it means that I must scrutinise the oral evidence of the witnesses carefully and see whether it tallies with the statements made in contemporaneous documents, which were collected in four lever arch files for the purposes of the hearing before me.

### B. The relevant parties and the background to negotiations between DSND and OSA for the hire of the Botnica

7.  OSA is a Mexican company. It operates offshore oil platform services in the Gulf of Mexico. In particular it works with Pemex Exploration y Produccion ("Pemex") which is the Mexican State oil company. DSND is a Norwegian company. Amongst other things it charters vessels from the Finnish Maritime Administration ("FMA") which is a part of the Finnish government.

8.  DSND had chartered three vessels from the FMA prior to the summer of 2001. These were: MSV *Nordica*; MSV *Fennica* and MSV *Botnica*. DSND concluded a bareboat charter with FMA for *Botnica* on 10th February 1999. Under clause 27 of this bareboat charter, DSND hired the vessel for 224 days per year. Under clause 28 of this charter, DSND was entitled to have the vessel at its disposal for an agreed time outside the firm 224 day period. However, this further use of the vessel had to be agreed by both parties. If an extension was not agreed, the vessel would have return to Finnish waters for icebreaking duties during the winter season.

9.  In the spring of 2001 DSND and OSA started negotiations for the charter of vessels by OSA from DSND, in order that OSA could perform offshore oil platform services in the Gulf of Mexico for Pemex. On 9th May 2001, OSA and DSND entered into a charter party on the Supplytime 89 Form for the hire of "*Fennica*" in Mexican waters. There was a contractual requirement under that Charterparty that it would be not be binding until signed. Each party signed each page of the "*Fennica*" Charterparty. It was also a pre-condition for that Charterparty that a Surety Bond should be concluded by OSA. This was also done.

10. In the summer of 2001, OSA, together with its business partner, Construcciones Integrales del Carmen SA de CV ("CIDC") decided to tender for a new contract with Pemex. The contract would be in respect of restoration, servicing and repair work to offshore oil platforms in the Gulf of Mexico, for a period of 807 calendar days starting on 16th October 2001 and finishing on 31st December 2003. In the hearing before me this contract was referred to as the "Pemex contract". The Pemex contract would require a suitable offshore supply/service vessel to be available continuously during this 807 calendar day period. The vessel would therefore have to be available through the winter months of 2001/2 and 2002/3.

### C. The course of the negotiations leading to the Charterparty terms of 28 August 2001.

11. On 26th May 2001, Mr Freeman sent a fax to Mr Stark at DSND's Houston office attaching the detailed requirements of any vessel that might be tendered by OSA for the Pemex contract. The tender document stipulated expressly that the company making the tender must indicate by letter the availability of the vessel during the contract period. On 7th June 2001, Mr Olsen, on behalf of DSND, wrote to Pemex, stating that DSND "as Owners of the ...." MSV "*Botnica*" confirmed that the vessel "is exclusively available to [OSA] for the purpose of the ...... tender." The letter continued "Should [OSA] be awarded the contract, [OSA] will have all rights to utilise the *Botnica* for the terms of the referenced contract".

12. However, it was appreciated at that time that it might not be possible for "*Botnica*" to be used in the Gulf of Mexico during the winter months in 2001/2 and 2002/3, unless there was agreement for this between DSND and FMA. Therefore negotiations took place between DSND and OSA for a joint operation using MSV "*Botnica*" and another vessel, MV "*Mayo*". But ultimately Pemex rejected the proposed use of "*Mayo*".

13. On 15th June 2001, OSA sent a fax to Mr Stark with a copy of the OSA/CIDC tender to Pemex. That tender document stipulated that "*Botnica*" was OSA's proposed vessel for use under the Pemex contract. It indicated that *Botnica* would be available for a period of 807 days.

14. On 19th July 2001, Pemex announced the award of the tender for the service contract (ie. the Pemex contract) to OSA/CIDC. Pemex' acceptance of OSA/CIDC's tender document provided that a contract had to be completed on 7th August 2001. It also stipulated that work under the Pemex contract would start on 16th October 2001. The document also stated that the end date of the work would be 31st December 2003, thus making the period of performance a total of 807 calendar days. This document also provided that the vessel to perform the contract would be **"Botnica".**

15. OSA and DSND then had to agree terms for the charter of **"Botnica"** by OSA, in order that OSA could fulfil its obligations under the Pemex contract. Both parties appreciated that a key question was whether or not **"Botnica"** could be available in Mexican waters during the two winter periods.

16. On 1st August 2001, DSND sent to OSA its proposed terms for the charter of **"Botnica"**. Some of these were set out in a document entitled "Exhibit A. Schedule of Pricing and Conditions". Clauses 1 and 2 of that Exhibit A provided as follows:

> "1. Work period in Mexico for the MSV Botnica is based on a start date within a (5 day window) on or about September 15 in Mexico and continuing to approximate December 1, 2003, a firm 807 days from arrival, subject to notices given by DSND. Additional extensions will be on mutual agreement.
>
> **Notice One.** DSND will provide notice no later than October 1, 2001 of the Botnica extension through the winter 2002 ice season. Should FMA approval not be received DSND will demobilize the Botnica by December 15, 2001.
>
> Winter 2002 extension approved, Botnica continues on project.
>
> **Notice Two.** DSND will provide notice no later than October 1, 2002, of the Botnica extension through the winter 2003 ice season. Should FMA approval not be received DSND will demobilize the Botnica by December 15, 2002.
>
> Winter 2003 extension approved, Botnica continues on project.
>
> 2. Mobilization Norway/Mexico 1,000,000USD Lump Sum (including Fuel & Lubes, and)
>
> 2a Winter 2002 Premium (1) 2,000,000USD Lump Sum
>
> 2b Winter 2003 Premium (2) 2,000,000USD Lump Sum
>
> 3. Demobilization 1,000,000USD Lump Sum (including Fuel & Lubes)".

Each page of the proposed Exhibit A and also the proposed Exhibit B was initialled by Mr Michael Stark on behalf of DSND.

17. Mr Stark sent a covering letter to Mr Yanez of OSA, with these proposed terms. This letter stated:

> "To progress the project for an approximate September 15 start date with the Botnica, DSND will proceed on the bases (*sic*) of the following offer for the full 807 days, but at DSND's option to retract the Botnica in December 2001, or December 2002. Initial response from the FMA has been positive for the Botnica ice breaking season extensions but FMA approval has not been confirmed .......
>
> ......... Your signature confirms [OSA] acceptance to all conditions herein (with item 18.7 still to be confirmed by your Surety Company and a response to DSND by Friday, August 10) .........".

18. On 5th August 2001 OSA faxed back a signed copy of the proposals of DSND but with some manuscript

amendments. The message on the fax coversheet from Mr Yanez to Mr Stark stated: "here is the agreement sign (sic) with the only change as discussed by phone". The change was to the dates on which the winter 2002 premium would be paid.

19.   It was agreed by both sides before me that the terms that were returned by OSA to DSND by the fax of 5th August 2001 were never renegotiated, nor was there ever an attempt to do so.

20.   On 5th August 2001 Mr Freeman sent a further fax to Mr Stark. This fax stated as follows:

> "Please find attached the Proposal for the charter hire of the Botnica put forth by DSND [to OSA]. You will find the agreement signed as per your request.
>
> However, for the sake of being clear and to reflect the recent discussions that have gone on between yourselves and DSND Management and ourselves, I would take this opportunity to mention [OSA's] understanding on a couple of the issues on the proposal.
>
> (1) The DSND offer is not at this time definitely offering the Botnica for the full duration of the contract (807 days) as DSND does not at this time have approval from the Owners of the Botnica to extend past the December 2001 deadline currently in place for the vessel to return to Finland for its annual "Ice Breaking" duties.
>
> (2) DSND will definitely provide [OSA] the Owners answer to the request from DSND to extend for the remainder of 2001 and until December 2002 no later than October 01 2001.
>
> (3) DSND will also offer the option for the second extension for the vessel to remain on charter for the period December 2002 into 2003 and subsequent Owners' approval to [OSA] no later than October 01 2002.
>
> (4) In the case that the Owners of the Botnica do not allow the vessel an extended charter time period, DSND will offer another suitable vessel to [OSA] to take over on the project for the Botnica, subject to [OSA's]".

21.   On 6th August 2001, Mr Stark of DSND sent OSA a revised proposal. This was identical to the proposal signed by OSA and returned to DSND under cover of the fax of 5th August 2001, apart from three changes to the terms of Exhibit A. These were identified as being:

> "(i) an amendment to the provision regarding payment of Mexican tax and duties (item 9);
>
> (ii) an amendment to item 18.9, relating to insurance; and
>
> (iii) a new item 19 to the Exhibit A terms which provided for DSND to offer an alternative vessel if FMA approval was not guaranteed."

22.   On the same day, Mr Stark (who, of course, did not give evidence, either in the arbitration or before me) sent a fax to three colleagues at DSND. These were Mr Tellefsen, Mr Olsen and Mr Magne-Christiansen. That fax stated:

> "I have reviewed and discussed the attached August 6 offer with Wesley [Freeman]. He has given verbal acceptance as is/without changes. Amado [Yanez] will not be back in Carmen until tomorrow morning, at which time Wesley said Amado would sign and return to us.
>
> I am confident we have this agreed and will receive the signed copy ........ ".

23.   On 6th August 2001 Mr Stark sent a fax to Mr Yanez, Mr Freeman and Mr Paul Candies. It stated:

"With reference to the subject maintenance contract with Pemex, DSND .... is pleased to provide our revised proposal for the MSV Botnica.

To progress the project for an approximate September start date with the Botnica, DSND will proceed on the bases of the following offer for the full 807 days, but at DSND's option to retract the Botnica on December 2001 or December 2002. Initial response from the FMA has been positive for the Botnica Ice-Breaking season extensions but FMA approval has not been confirmed...........

Should one or both of the winter extensions not be approved by the FMA, DSND will present another option to [OSA] that may consist of a Botnica/Pelican combination.

........Your signature confirms [OSA's] acceptance to all conditions herein (with item 18.7 to be confirmed by your Surety Company and a response to DSND by Friday August 10).........
"

This letter and the revised terms of Exhibit A were signed by Mr Yanez and returned, without amendment, to DSND.

24. DSND, as a publicly traded company on the Oslo Stock Exchange, was apparently obliged by Norwegian law to announce projects such as the OSA contract. DSND proposed to issue a press release about the matter. On 9/10 August 2001 there was an email exchange between Mr Sark and Mr Freeman concerning the terms of a press release to announce the agreement reached. Mr Freeman complained that the proposed wording of the press release was not accurate because it suggested that the vessel would be provided for the entire 807 days. Mr Freeman pointed out that "the agreement put forward by DSND does not guarantee [OSA] or Pemex that DSND will provide a vessel for the entire 807 days."

25. On 14 August 2001, DSND faxed to OSA a first draft of the Charterparty on an amended Supplytime 89 Form. Each page of the draft was signed on behalf of DSND. The 6th August 2001 signed proposal was attached as Exhibit A. Within Part II of the Supplytime 89 terms was clause 31, dealing with law and arbitration. That provided for English law and London arbitration.

26. On 17th August 2001, OSA sent DSND its comments on the draft charter. Comment 33 stated that OSA preferred "US Law in United States".

27. On 20th August 2001, OSA sent DSND a draft of the Charterparty on a Supplytime 89 Form dated 19th August 2001. This draft had the proposed changes of OSA marked up on the draft charter wording. Each of the pages was signed by Mr Yanez. OSA did not pursue its objection to English law and London arbitration. But it proposed a change to the start date for the work period for the "*Botnica*", moving it from 15th September to 5th October 2001. OSA also proposed a new term to Exhibit A, concerned with the possibility of the cancellation of the Pemex Contract.

28. On 20th August 2001, DSND responded to the draft put forward by OSA. DSND requested a complete copy of the cancellation clause in the Pemex contract, to which reference had been made in the new proposed cancellation clause put forward by OSA. OSA sent DSND the Pemex contract cancellation clause on 21st August 2001.

29. On 22nd August 2001, DSND responded in detail to OSA's proposed changes. DSND accepted all of them apart from four particular matters. First, DSND did not accept the proposed additional Pemex contract cancellation clause, (sent by OSA as proposed clause 20 to Exhibit A) as a part of the draft Charterparty. Secondly, DSND accepted a 5th October 2001 start date, but subject to OSA agreeing to take responsibility for half the "downtime" from 15th September 2001. Thirdly, DSND agreed to reduce the amount of the Surety Bond, but by a figure less than that proposed by OSA. Lastly, DSND proposed minor changes to the wording in boxes 6, 10 and 32 on the first page of the Supplytime 89 Form of Charterparty. In his covering fax to Mr Yanez, Mr Michael Stark invited OSA to consider DSND's revision and to contact him if there were any questions.

30. On 24th August 2002 there was a telephone conversation between Mr Yanez and Mr Stark. This is referred to in a fax sent by Mr Stark to Mr Yanez on the same day. The fax states:

> "Dear Amado
>
> With reference to our phone conversation, this confirms the final changes to the Charter Agreement. Part II, page 2 and Exhibit B, which are attached, can be inserted into the Charter Agreement that was faxed to you August 22; this will then complete the document.
>
> 1: DSND agrees to the October 5, 2001 start date. The Charter Agreement reflects this date.
>
> 2: DSND confirms Part II, Clause 11C applies to the Charter Agreement. Only the reference to this clause was removed from Part I Box 6.14.15.
>
> 3: Charter Agreement Part I Box 3.2 added not to exceed 60 days.
>
> 4: Revised terms of Exhibit B are attached (for your review).
>
> 5: Annex A and Annex B have been previously agreed.
>
> After your review should you have any final questions please call."

Exhibit B contained the proposed terms of a Surety Bond, which was to be arranged and secured by OSA and was to be provided by one of the members of the St Paul Group of Insurance companies. The Surety Bond was to cover amounts due under the Charterparty up to US$9,530,060 and on terms that were in a form acceptable to DSND.

31. On 28th August 2001 DSND signed every page of a full version of the charter, including the standard form Parts I and II of the Supplytime 89 Form. These terms appear to have been sent under cover of DSND's fax of 24th August 2001 except that there was a new form of Exhibit B, dealing with the terms of the Surety Bond, which was sent on 29 August 2001.

32. On 31st August 2001 there was a conversation between Mr Olsen of DSND and Mr Yanez of OSA. There was a dispute between the witnesses concerning what was said in this conversation. Mr Olsen's evidence was that Mr Yanez stated that he was happy with the Charterparty terms as set out in the 28th August draft and that OSA would sign the Charterparty when the language of the Surety Bond had been agreed with the bonding company. In cross-examination, Mr Yanez said that in this conversation Mr Olsen asked him why OSA had not signed the 28th August Charterparty terms. Mr Yanez' evidence was that he told Mr Olsen that before he could sign he needed confirmation of FMA approval for use of **Botnica** in the Gulf of Mexico in the 2001/2 winter season and that Mr Olsen had stated that this would not be a problem. Mr Yanez denied that he had stated that he agreed to all the terms of the Charterparty. His evidence was that he had stated, in terms, that he would not sign the Charterparty terms until OSA had FMA approval for the **"Botnica"** working through the 2001/2002 winter period.

33. The evidence of Mr Olsen is consistent with the terms of a fax sent by Mr Stark to Mr Yanez on 31st August 2001. This states:

> "Reference is made to your conversation with Jan-Roger Olsen and to the Charter Agreement you have in your possession dated August 28, 2001, which is signed by DSND. DSND understands [OSA] will sign the Charter Agreement once the language of the Surety Bond has been completed Monday September 3. This letter is to confirm there are no other changes to the Agreement and also your acceptance of all terms and conditions of the Agreement including the Surety Bond with modifications to the last paragraph of the draft Bond.
>
> This modification in principle is agreed by both DSND and [OSA], that only unpaid hire due;

demobilization, all documented costs and expenses at DSND's option shall be claimed against the Bond should the Bond not be renewed as described.

Your signature below confirms [OSA] acceptance........"

34. Insofar as there appears to be a difference of recollection between Mr Olsen and Mr Yanez, I prefer the evidence of Mr Olsen which is, as I say, more consistent with the contemporaneous record of the fax of 31st August 2001. I cannot see any reason to doubt that this contemporaneous fax would accurately record the conversation between Mr Yanez and Mr Olsen.

35. Mr Olsen's evidence is also more consistent with a fax that Mr Yanez himself sent to Mr Stark on the following day, 1st September 2001. This stated:

"Mike, accordingly to our today phone conversation, by means of this, we agree the terms and conditions subject to Charter Guarantee Bond."

Underneath this Mr Yanez has signed the fax.

36. In cross-examination, Mr Yanez accepted that there was no written or oral statement by OSA during the period between 28th August and 1st September that the Charterparty was "subject to FMA approval" of the **"Botnica"** being available for use during the 2001/2002 winter period. He said, however, that this condition was understood. He accepted that he did not at any stage say that there was "no deal" until OSA signed each page of the Charterparty terms. His evidence was that he did not need to do so because that was plainly the effect of clause 18.1 of Exhibit A of the Charterparty terms. Mr Yanez further confirmed in cross-examination that there was no statement in writing by OSA in the course of the correspondence that FMA approval was a pre-condition of the Charterparty becoming effective.

### D. The course of events from 1 September 2001 until April 2002

37. By 1 September 2001 the terms of the Surety Bond to be provided by OSA had not been agreed. On 3rd September the Bonding company agent, Mr Duffy Tobin, sent by email to Mr Stark of DSND a copy of the "final revised Bond Form". On 4th September 2001, Mr Stark sent an email reply to Mr Tobin, stating that by his email DSND accepted the Bond Form "as you have presented and have attached to this email". Mr Stark asked Mr Tobin to contact Mr Yanez to confirm to him that DSND had accepted the terms of the Surety Bond "so that Amado [Yanez] can sign the Charter Agreement today". In evidence, Mr Yanez accepted that he saw this email exchange at about this time. He agreed that the wording of the Surety Bond was agreed. He explained that there was still a difference on the amount of money to be put up by the Surety Bond, but he said that this was "not a deal breaker". He agreed that in the end OSA would have agreed to the US$9Million odd as proposed by DSND. In the event, however, the Surety Bond was never issued by or on behalf of OSA.

38. On 7th September 2001, Mr Stark sent a fax to Mr Yanez and Mr Freeman (and Mr Curole) of OSA, stating that "DSND in accordance with the Charter Agreement is continuing mobilization of the Botnica and preparations for departure to Mexico". The fax noted that the mobilization payment of US$ 1 million was due to be paid to DSND on 11th September 2001, two days before **Botnica's** departure. On 13th September 2001, OSA's Bank confirmed to DDND that the mobilization fee had been paid. Mr Tellefsen's evidence was that DSND would not have allowed the vessel to sail had this mobilization fee not been received. That was not challenged in cross-examination and I accept that evidence.

39. On 17th September 2001, DSND sent a fax to OSA to confirm that **"Botnica"** had departed for Mexico. The fax gave an ETA of 5th October 2001.

40. Clause 1 of Exhibit A to the Charterparty Terms provided that "DSND will provide notice no later than October 1, 2001 of the Botnica extensions through the winter 2002 ice season. Should FMA approval not be received DSND will demobilize the Botnica by December 15, 2001." This term is referred to as "**Notice One**". By 27th September 2001, FMA had not stated to DSND that it was prepared to permit **"Botnica"** to be used by DSND during the 2001/2002 winter season. Mr Tellefsen stated in evidence that he was

responsible for the negotiations between DSND and FMA and he had to report to DSND on the position of FMA regarding the employment of *Botnica* during the winter seasons. In evidence he stated that, on about 27 September 2001, he had informed DSND that there was not "100% approval" from FMA that *Botnica* could be used by DSND during the winter season for 2001/2. This evidence is consistent with an internal email of the same date from Mr Stark to Mr Tellefsen, Mr Olsen and others. The email states that Mr Stark has prepared a draft "Notice One", which was worded on the assumption that approval *would be* obtained.

41.  The email also posed a question for Mr Trond Eilertsen, an external lawyer of the firm Wikborg Rein, which was used by DSND. The question was: "what are DSND exposures if we submit the letter (ie. the draft Notice One) and then FMA approval later falls through?". This request for legal advice (which was subsequently given) gave rise to an application for specific discovery by OSA, which was made at the start of the hearing before me. I rejected the application at the time and I stated that I would give reasons for my decision in the judgment following the full hearing. I will deal with this question below.

42.  In evidence, Mr Tellefsen accepted that he received a copy of a draft Notice One from Mr Stark. The draft stated that DSND provided written notice that the FMA had approved the extension for "*Botnica*" to work through the winter 2001/2 ice season. Mr Tellefsen's evidence was that this wording was "over optimistic" at that stage, because FMA had not in fact given its approval.

43.  Despite this fact, Mr Stark did send a Notice One to Mr Yanez and Mr Freeman on 1st October 2001. The covering fax stated:

"Attached is Notice One confirming Botnica through 2002 ice season."

The actual Notice, which was signed by Mr Stark, stated:

"In accordance with the Charter Agreement Exhibit A, item 1, DSND is providing this written notice that the Botnica will be available through the winter 2002 ice season.

With the 2002 Botnica extension now confirmed, please arrange to issue the Surety Bond in the form and amount agreed on September 4, 2001 for the project period started October 5, 2001 to October 5, 2002........ ".

44.  In cross-examination, Mr Tellefsen accepted that FMA had not given its approval by the time this Notice One was sent. His evidence was that the Notice One would have been authorised by the CEO of DSND. He could not recall whether he had been asked for his comments before the Notice was sent. He said that DSND expected approval to be given by FMA at that time, but he accepted that formal approval had not been given. He denied that the Notice was put forward in order to mislead OSA. However, Mr Olsen also stated, at the end of his cross – examination, that the Notice One was given on 1 October 2001 in order to get the Charterparty signed and the Surety Bond sum agreed.

45.  "*Botnica*" arrived in the Gulf of Mexico and went on hire at 1900 hours local time on 9th October 2001. Both DSND and OSA signed an On-Hire Statement reflecting these facts.

46.  On 10th October 2001, Mr Markku Mylly, the director of the FMA, sent an email to Mr Tellefsen. This stated that:

"Due to the fact that Finland has been given 5.1 Million Euros of TEN support for MSV Botnica in 1997 and 1998, the European Commission may reimburse the funds paid out for MSV Botnica if the vessel is used outside the scope for which Community funding was granted. Based on before mentioned fact, the Ministry of Transport and Communications does not accept the proposed winter period charter 2002/3 for MSV Botnica and FMA is not allowed to accept the proposed charter and project."

It is clear - and was accepted by both sides before me - that the phrase "may reimburse the funds paid out" means that the European Commission might seek reimbursement of the funds paid out for *Botnica*.

47.   When he received this email, Mr Tellefsen immediately spoke to Mr Mylly. In evidence, Mr Tellefsen explained that in this conversation a proposal was put forward to the FMA that DSND would give a guarantee if the European Commission did indeed seek a reimbursement. This evidence is confirmed by the terms of the email that Mr Tellefsen sent to Mr Mylly immediately following this conversation, on 10th October 2001.

48.   The negotiations between the FMA, DSND and the Ministry of Transport and Communications and other parties continued. On 15th October 2001, Mr Mylly of the FMA signed a statement from the FMA which confirmed that "the one and only reason why the Ministry of Transport and Communication so far has not given their approval for [the] proposed charter over the winter period 2002, is the fact that MSV Botnica has received EU funding, i.e. TEN-support for financing the vessel .... Initiatives have been taken to urgently try to resolve this issue."

49.   Meanwhile, OSA had heard rumours from brokers in Europe that "*Botnica*" would not be available during the 2001/2 winter season. Mr Yanez told Mr Stark that confirmation from FMA in writing should be provided. Mr Yanez' evidence was that he told Mr Stark and Mr Tellefsen that he would sign the Charterparty once he received written proof from the Finnish authorities. Mr Yanez demanded that DSND provide the FMA's confirmation by Friday, 12th October 2001.

50.   On 13 October 2001 Mr Stark sent a fax to Mr Yanez and Mr Freeman. The fax stated that DSND's attempts to reach OSA by telephone on 12th October had failed. The fax continued:

       "Be advised that we have been informed by the Finnish Maritime Administration that the charter has been accepted by the parties concerned. However the Ministry of Transport and Communication is waiting for confirmation from the European Commission that they shall not have to reimburse some of the funds, which the Finnish authorities were granted in connection with the vessel's financing. Please note that we have in writing to the Ministry confirm that DSND is prepared to refund any grants the Finnish authorities may have to reimburse ......".

51.   In evidence, Mr Yanez accepted that at some time after this he received the fax of 13th October 2001. He accepted that he also obtained a copy of the FMA letter dated 15th October 2001. He did not recall whether this was sent under cover of a fax or was given to him in person. However, there were meetings between OSA and DSND on both 15th and 29th October 2001, at which the position regarding the FMA's approval and the attitude of the EU Commission was discussed. This was clear from a draft of a letter prepared by DSND dated 13th November 2001, although it appears this letter was never actually sent to OSA.

52.   By 16th November 2001 it was apparent that FMA approval would not be forthcoming. At a meeting on that date, OSA was informed of this fact. On 19th November 2001, DSND sent a fax to OSA recording that "*Botnica*" would have to return to Finland for ice breaking duties and so demobilisation would have to start on 15th December 2001. The letter of 19th November 2001 proposed that the vessel "*Nordica*" should replace "*Botnica*".

53.   Subsequently, there were telephone discussions and meetings between Mr Stark and Mr Freeman on the question of a replacement for "*Botnica*". On 6th December 2001, Mr Freeman sent an email to Mr Stark. This stated that OSA would begin the demobilisation of "*Botnica*" on 10th December, so that she could depart for Finland by 15th December 2001, as agreed. The email continued:

       "[OSA] has in fact too acted in good faith and fully intend to pay any Invoices due DSND in a timely manner. [OSA] too expects to fully respect the terms of the Charter Agreement and would expect DSND to act in kind."

54.   On 7th December 2001, OSA asked DSND to delay the departure of "*Botnica*" from the field until 14th December 2001. DSND agreed to that, as was confirmed in a fax from Mr Stark to Mr Yanez and Mr Freeman. The fax stated that "The same rates and terms of the Charter Agreement will apply for this period." The final paragraph of the fax stated:

"Additionally you have confirmed that the remaining overdue balance on the Botnica and Fennica invoices of $1,838,156 will be wired to DSND on Monday, December 10. As we do not have a Surety Bond on the Botnica would you confirm that this amount and the $1,000,000 sent November 30 applies to Botnica payments. Remaining *Botnica* invoices will be paid as per the Charter Agreement."

55.  Mr Yanez of OSA countersigned this fax (although the fax identifies Mr Freeman as the person to countersign) and returned it to DSND on 10th December 2001. In cross-examination, Mr Yanez denied that his signature indicated that he understood that the 28th August Charterparty was binding. He said that his signature merely indicated that the day rates to be applied for the use of *"Botnica"* were the same as those set out in the 28th August Charterparty.

56.  On 20th December 2001 the parties signed an Off-Hire Statement for *"Botnica"*. This stated:

"The vessel has completed her services according to Charter Agreement dated 28th August and is off-hire from the agreed handover time above."

57.  On 10th January 2002, there was a conversation between Mr Stark and Mr Yanez. On 11th January 2002, Mr Stark sent a fax, which stated that:

"This Notice is to confirm our conversation on Thursday Jan 10 2002 with regard to payments for the Fennica and Botnica projects."

Point 6 of that fax stated that Mr Yanez had agreed that the demobilisation fee of US$1,000,000 for *"Botnica"* would be paid on 8th February 2002. In evidence Mr Yanez denied that this fax accurately represented what was agreed in the conversation on 10th January 2002. However, there was no protest from Mr Yanez at the time to suggest that this summary was inaccurate in any way. Further, when Mr Stark sent a fax dated 29th January 2001 to Mr Yanez to remind him of the conversation and agreement on 11th January 2002, Mr Yanez did not protest that the fax of 11 January 2002 was inaccurate.

58.  On 26th April 2002, two meetings took place in Mexico. At these meetings, OSA put forward a document which indicated all the sums claimed by DSND in respect of *"Botnica"*. The total balance outstanding was US$2,593,923.53. One of the figures stated as being outstanding was the demobilisation fee of US$1,000,000.

### E. The arbitration and Award on jurisdiction

59.  OSA did not pay the sums that DSND stated were due under the terms of the 28 August Charterparty.

60.  On 12th August 2002, DSND appointed its arbitrator. OSA appointed its arbitrator on 27th August 2002, but indicating at the same time that it "disagreed" that it was obliged to arbitrate disputes with DSND. Whilst reserving its position on the tribunal's jurisdiction, OSA intimated that it had a counterclaim in respect of alleged losses, including those of chartering a substitute vessel for use under the Pemex contract after *"Botnica"* had been demobilised.

61.  After an exchange of written submissions by the parties, the tribunal directed that the question of its jurisdiction should be determined as a preliminary issue after an oral hearing. The hearing took place over three days in June 2004. The arbitrators published their Declaratory Award on 17th September 2004. This is in the terms that I have already indicated.

### F. The submissions of the parties in outline and the issues for decision

62.  On behalf of DSND, Miss Blanchard submits that:

(1) By 28th August 2001 at the latest, all the terms of the Charterparty had been agreed by the parties,

save for the terms of the Surety Bond. Those terms were agreed on 5th September 2001, save as to amount. Therefore, there was a sufficient agreement on the terms of the Charterparty to create a binding contract, subject to any issue about compliance with clause 18.1 of Exhibit A of the Charterparty terms.

(2) Although clause 18.1 does expressly provide that the "offer for the MSV Botnica is subject to the signing of mutually agreeable contract terms and conditions", in the circumstances that was not a condition precedent which had to be fulfilled before a binding contract could come into existence. That term was overtaken by events, in particular the fax from Mr Yanez to Mr Stark on 1st September 2001 in which Mr Yanez states: "we [ie. OSA] agree the terms and conditions subject to Charter Guarantee Bond." That fax was signed by Mr Yanez.

(3) The acts of OSA from early September 2001 constitute a clear and unequivocal representation by OSA that there was a binding Charterparty on the terms of the 28th August 2001 Charterparty. DSND relies in particular on the payment of the mobilisation fees; signature of the On-Hire Statement; acceptance of the vessel for performing work as contemplated under the Charterparty; the letter of 7th December 2001 from DSND to OSA extending the departure date of *"Botnica"* which was counter - signed by Mr Yanez; the Off-Hire/Redelivery Statement; and OSA's agreement to pay the demobilisation fee.

(4) Alternatively, OSA is estopped by convention from asserting that there was not a binding Charterparty. The assumed state of facts or law which was shared by both parties or was, at least, acquiesced in by OSA, was that a binding Charterparty on the terms of 28th August 2001 did exist. That assumption "crossed the line" between the parties by virtue of Mr Yanez's fax of 1st September 2002 and all the exchanges thereafter. It would now be unjust or unconscionable to allow OSA to go back on the assumption on which both sides had acted.

(5) Accordingly, the parties are bound by the terms of the Charterparty of 28th August 2001, including the law and arbitration clause at clause 31 of Part II of the Supplytime 89 Form. Therefore the arbitrators have jurisdiction to hear and determine disputes between OSA and DSND under the Charterparty.

63.    On behalf of OSA, Mr McParland submits:

(1) It was a pre-condition of commercial dealings between the parties that before 28th August 2001 draft Charterparty became binding on them, the formal document had to be completed and signed by both parties. It was never formally executed.

(2) Further or alternatively, there was a collateral conditional precedent to the contract becoming effective (and before OSA had any obligation to sign any formal document) that FMA approval must be given for *Botnica* to remain in the Gulf of Mexico during the 2001/2 winter season. This collateral condition precedent was orally agreed between the parties, in accordance with the evidence of OSA witnesses.

(3) There was no clear and unequivocal conduct of OSA on which DSND can rely to found a plea of waiver of the requirement that the Charterparty terms be signed before a binding contract was created. Any actions or statements by OSA prior to 15th October on which DSND might rely were all made on the basis of assurances by DSND to OSA that FMA approval would be obtained. The "Notice One" of 1st October 2001 was false.

(4) Moreover, DSND repeatedly requested that OSA sign the Charterparty during the period from 31st August 2001 until 25th October 2001. DSND presented the false "Notice One" of 1st October 2001 to induce OSA to sign the draft Charterparty, as Mr Olsen admitted in cross-examination. Therefore, DSND cannot assert that it relied on any acts of OSA to its detriment so as to make good a plea of waiver.

(5) There was no common assumption that there was a binding Charterparty at any stage nor was there any assumption or acquiescence that the signing requirement under the draft Charterparty would not remain. Even if there was, given the action of DSND in putting forward the false "Notice One" on 1st October 2001, it would be neither unjust nor unconscionable to permit OSA to go back on any assumption or acquiescence.

(6) In the circumstances where there had been neither a signing of the draft Charterparty nor confirmation of FMA approval, all that existed was a "handshake" agreement for an *ad hoc* Charterparty for the use of *"Botnica"* in the period October – December 2001. This was what Mr Yanez said in his evidence. That "handshake" agreement did not contain any binding arbitration clause. Therefore, the arbitrators have no jurisdiction. Therefore the appeal must be allowed and the arbitrators' Declaratory Award set aside.

64. The following issues arise for decision:

(1) Whether, and if so when, the terms of the Charterparty were agreed, at least to the extent sufficient to create a binding contract, subject to the effect, if any, of clause 18.1 of Exhibit A. Alternatively, was there only a "handshake" agreement for an *"ad hoc"* charter for the period until *Botnica* would have to return to Finland for ice – breaking duties?

(2) If the terms were agreed so as to create a binding Charterparty contract, subject to the argument concerning signature, then what is the true construction and effect of clause 18.1? In particular, does that clause require that both sides must sign all the terms of the proposed Charterparty before the contract becomes binding?

(3) Was there a collateral condition precedent (or perhaps collateral condition subsequent) that:

a) The Charterparty would not be binding at all until the FMA had given its approval to *"Botnica"* staying in the Mexican Gulf during the winter of 2001/2; or

b) the Charterparty would not be binding at all until DSND had given a valid Notice One that FMA approval had or had not been given;

(4) Whatever the effect of clause 18.1 of Exhibit A and whether or not there was a collateral condition precedent (or subsequent), did OSA by its conduct, waive the need for compliance with those terms, so as to create a binding Charterparty and valid arbitration clause.

(5) Alternatively, did both DSND and OSA act on an assumed state of facts or law, i.e. that there was a binding Charterparty, which assumption was shared by both parties or acquiesced in by OSA, in circumstances where it would now be unjust or unconscionable to permit OSA to go back on this assumed state of facts or law?

### F. The discovery application by OSA

65. Before dealing with those issues, I should dispose of the discovery question. This was raised at the start of the hearing before me by Mr McParland. He sought discovery of documents in the control of DSND relating to legal advice which DSND sought around the end of September 2001 concerning the potential exposure to DSND if it gave a Notice One to OSA which indicated receipt of FMA approval, but then the FMA approval "later falls through". It is clear from the wording used in the email of 27th September 2001 from Mr Stark to various colleagues in DSND and Mr Trond Eilertsen, who was DSND's external lawyer of the Firm Wikborg Rein, that such advice was sought and obtained. This legal advice was sought at a time when DSND did not have FMA approval, although DSND was, at that stage, confident of obtaining it.

66. Mr McParland submitted that this legal advice was relevant to the two arguments put forward by DSND that there was a binding Charterparty because of OSA's waiver or because OSA was estopped by convention from denying the existence of a binding Charterparty and so arbitration clause. Mr McParland submitted that DSND could not rely upon legal professional privilege, in particular "legal advice" privilege, to avoid the obligation of disclosure of the documents sought. He submitted that this legal advice was obtained by DSND in order to further "iniquitous conduct" for the purpose of financial gain, ie. remuneration under the Charterparty. Therefore, there could be no public interest in protecting any communications regarding legal advice on the consequences of giving an inaccurate Notice One and so disclosure and inspection of documents relating to this legal advice (including the advice itself) should be given.

67. At the conclusion of Mr McParland's application, I announced that I would dismiss the application and give

reasons for doing so in the judgment. I had concluded that the documents concerning the legal advice obtained by DSND were not relevant to the issues I had to decide. First, they cannot be relevant to the question of whether or not contractual terms had been agreed. Secondly, they cannot be relevant to the proper construction and effect of clause 18.1 of Exhibit A. Thirdly, they cannot be relevant to the question of whether or not there was a collateral condition precedent or subsequent concerning FMA Approval, because that had either been agreed by then or not. Fourthly, the internal advice obtained by DSND cannot be relevant to the question of waiver or estoppel by convention. I accept, of course, that the effect of the Notice One that was given on 1st October 2001 is relevant to these latter two issues. However it has always been accepted by DSND that FMA approval had not been given at the time that the Notice One was sent on 1st October 2001. Moreover, DSND admitted as much by 15th October 2001 at the latest. If I were to find that OSA acted in reliance upon the Notice One that was given, then I would have to consider the effect of the fact that FMA approval had not been given and the fact that DSND were aware of that fact at the time that Notice One was issued. But the nature of the legal advice given cannot alter the state of mind of OSA (who never knew about the advice), nor the outward representations made by DSND by virtue of the wording in Notice One. Therefore the documents cannot be relevant to advance or hinder the case of either side on waiver or estoppel by convention.

68.   Even if I had though that such documents were relevant, I concluded that I should not order disclosure. Mr McParland told me frankly that no attempt had been made to seek disclosure of those documents before the arbitrators. The application for disclosure was made to me on the morning of the hearing. The hearing of the s.67 appeal to the court had, in fact, already been adjourned from the date which was originally fixed in June 2005. Yet it seems that during the nine months between the adjourned hearing and the hearing before me, no attempt had been made to obtain discovery before an application notice was issued on 27th March 2006. If I had ordered that disclosure had to be given, it would inevitably have meant that the hearing would have to be adjourned again. Therefore, given the very late application and the marginal, if any, relevance of the documents sought, it seemed to me that, as a matter of discretion and trial management, I should refuse the application.

69.   In those circumstances I did not consider, and did not call on Miss Blanchard for argument, on the question of whether or not legal professional privilege could not be asserted by DSND because the legal advice was "sought or given for the purpose on effecting inequity": (see the statement of Schiemann LJ in *Barclays Bank plc v Eustice [1995] 1 WLR 1238 at 1249c*).

   *G. Issue One: were the terms of the Charterparty agreed to an extent sufficient to create a binding contract, subject to the effect if any of clause 18.1 of Exhibit A; and if so when were they agreed? Alternatively, was there only a "handshake" agreement for an "ad hoc" charter?*

70.   At several points in his submissions, Mr McParland appeared to submit that there was never sufficient agreement on the terms of the Charterparty for there to have been a binding contract, quite apart from arguments about the effect of clause 18.1 or a collateral condition precedent or subsequent. I cannot accept this argument. It is quite clear that all the terms of the Charterparty were agreed, apart from the Surety Bond, by the time that Mr Yanez sent the fax of 1 September 2001 to Mr Stark. In that fax Mr Yanez says expressly that OSA agreed to the terms and conditions "subject to charter guarantee bond".

71.   The terms of the Surety Bond were produced by Mr Tobin, who was the bonding company agent. He must have been acting on behalf of OSA, who, by the terms of clause 18.7 of Exhibit A, had to produce a surety bond that was acceptable to DSND. DSND indicated that it was satisfied with the terms of the bond as drafted by Mr Tobin in the email of 4 September sent by Mr Stark to Mr Tobin. The only question that was then left outstanding was the amount of the bond.

72.   That outstanding issue could not, by itself, lead to a conclusion that insufficient terms of the contract had been agreed to create a binding contract – leaving aside the question of the effect of clause 18.1 or the alleged condition precedent concerning FMA approval. It is clear from the terms of clause 18.7 of Exhibit A that the precise amount had to be agreed at a later date; hence the wording that the amount "will be provided to cover 140 days of project charges plus 10% and demobilization". This contemplates discussion on the amount between the parties. As Mr Yanez accepted in cross – examination, the amount of the surety bond was not a "deal breaker".

73. Therefore, I conclude that all the necessary terms of the Charterparty were agreed by the two parties. The only two matters that prevented there having been a concluded, binding contract by 4 September 2001 were: first, the provisions of clause 18.1 of Exhibit A; and, secondly, the suggestion that there was a collateral condition precedent to a binding contract that the FMA had given its approval to *Botnica* being used in the Gulf of Mexico for the 2001/2 winter season.

74. The terms of the 28 August Charterparty, in particular those set out in Exhibit A, show that the parties did not agree that there would be an "*ad hoc*" arrangement. Mr McParland relies on the fact that Mr Freeman had prepared a critique of the terms of the draft Charterparty, (see: **C4/1196**) probably in about mid August 2001, which he had shown to Mr Yanez. This document pointed out the danger that DSND might not get FMA approval, which would leave OSA very exposed. Mr Freeman's recommendation to Mr Yanez was that OSA should either enter into a contract with DSND that was guaranteed for one year or longer; or a contract that had some penalties associated with any failure by DSND to obtain approval for *Botnica* to stay for the winter 2010/2. Mr Freeman was particularly concerned with the terms of the "Lease Bond", by which he meant the Surety Bond.

75. In re-examination Mr Freeman said that this critique was seen by Mr Yanez, who agreed with it. However, on 20 August 2001 Mr Yanez signed and returned to DSND the terms of Exhibit A (as amended by OSA). But the terms of Exhibit A which Mr Yanez had signed provided for a Notice One to be given concerning whether or not FMA approval had been given. If Mr Yanez had agreed with Mr Stark that the full Charterparty would only become effective once FMA approval had been given, then the terms in Exhibit A concerning Notice One and Notice Two would be inapposite. This strongly suggests that there was no agreement for an "*ad hoc*" charter at that time.

76. Mr Yanez stated in his written evidence that he spoke to Mr Stark on 1 September before sending the fax which agreed on the Charterparty terms. Mr Yanez said that he indicated that OSA would not sign the Charterparty until the FMA approval had been obtained, although OSA would pay for the mobilisation. He repeated this evidence in cross examination. Yet he had to accept that at no stage in the correspondence between Mr Stark or Mr Olsen and himself did he indicate that the Charterparty was subject to FMA approval or that until such approval had been given, there would only be an "*ad hoc*" charter.

77. Given the contemporaneous documentary evidence, my conclusion is that Mr Yanez knew full well that there was still a doubt about FMA approval during the whole period until the Notice One of 1 October 2001. He decided that OSA would not sign the Charterparty terms agreed and signed by DSND on 28 August 2001. His motives for this are obscure, but he probably hoped to bring some kind of pressure on DSND, for whom the Charterparty was financially important, just as the Pemex contract was important for OSA.

### H. Issue Two: The construction of clause 18.1 of Exhibit A. Does that clause require that both sides must sign all the terms of the proposed Charterparty before the contract becomes binding?

78. The key sentence of clause 18.1 is the first one of the two in this clause: "Offer for the MSV Botnica is subject to the signing of mutually agreeable contract terms and conditions". Mr McParland submits that this is a classic "subject" clause, whereby the parties agree that there will be no binding contract until both parties have signed all the terms of the proposed contract. He submits that is the clear and obvious meaning of the words. He points out that both sides had signed each page of the *"Fennica"* Charterparty which was signed in May 2001. That, he submits, must be part of the "factual matrix" against which to determine the parties' intentions and therefore the correct construction of this provision.

79. Miss Blanchard submits that the sentence does not mean that each side must sign each page of the proposed wording. She submits it means that each side must indicate its agreement to the contract words and conditions by a statement to that effect that is signed. Alternatively, she submits that the sentence – and the requirement to sign mutually agreeable contract terms - was intended to apply to the earlier stage when the terms of Exhibit A were being discussed by the parties. In fact, both parties had signed Exhibit A as agreed, because OSA had signed the terms sent by DSND on 6 August 2001 and then DSND had signed them. Those agreed and signed terms were sent by DSND to OSA as a part of the full Charterparty terms, including the Supplytime 89 terms Parts I and II, on 14 August 2001.

80. I was referred to a number of authorities by both parties on this point. The only assistance I obtain from them is in the classic statement of Parker J in *Von Hatzfeldt – Wildenburg v Alexander [1912] 1 Ch 284*

*at 288 – 9,* where he stated:

> "It appears to be well settled by the authorities that if the documents or letters
> relied on as constituting a contract contemplate the execution of a further
> contract between the parties, it is a question of construction whether the
> execution of the further contract is a condition or term of the bargain or whether
> it is a mere expression of the desire of the parties as to the manner in which the
> transaction already agree to will in fact go through. In the former case there is
> no enforceable contract either because the condition is unfulfilled or because
> the law does not recognize a contract to enter into a contact. In the latter case
> there is a binding contract and the reference to the more formal document may
> be ignored. The fact that the reference to the more formal document is in words
> which according to their natural construction import a conditions is generally if
> not invariably conclusive against the reference being treated as the expression
> of a mere desire."

81. I have concluded, after some hesitation, that the proper construction of clause 18.1 of Exhibit A is that there is no binding contract to charter the vessel until both parties had signed all the contract terms that had to be agreed. I say "after some hesitation" because, I accept the evidence of Mr Tellefsen that it is rare in the shipping world for there to be such a "signing subject" to the creation of a binding contract for the hire of a vessel. But the clear and obvious meaning of the words, in particular the words "is subject to...", whose meaning and effect is well known to commercial men, is that there will not be a binding agreement until that "subject" has been fulfilled. In this case that is done by each side signing the mutually agreeable contract terms and conditions.

82. The next question is: what is covered by the phrase "contract terms and conditions"? The phrase does not cover the wording of the Surety Bond. That would be in a separate document and that document is not part of the terms and conditions of the Charterparty. Moreover, clause 18.7 indicates that the terms of the Surety Bond can be agreed at a later date. However, I have concluded, again after hesitation, that the phrase "contract terms and conditions" means all of them, not just those in Exhibit A. I reach that conclusion because there is no qualification of the words "contract terms and conditions" and Exhibit A itself is not called "contract terms and conditions" but "Schedule of Pricing and Conditions". I reach the conclusion with some hesitation because it seems to me to be a rather uncommercial approach which is not typical of businessmen in the shipping industry. However, in my view, the wording is clear.

83. The fact that the parties signed each page of the *Fennica* Charterparty is not relevant to the construction of the words in clause 18.1 of Exhibit A. There is no similar wording in that Charterparty. The fact that the same parties adopted a particular practice in a prior contract with different terms cannot be a good guide to their objective intentions in relation to the present contract wording, and hence the proper construction of this term.

84. I do not accept that the wording of clause 18.1 of Exhibit A was "overtaken by events" as Miss Blanchard put it, if by that expression she wished to advance an argument separate from the construction and waiver or estoppel arguments. I did not understand how there could be a third argument. I consider the waiver and estoppel arguments below.

### I. Issue Three: was there a collateral condition precedent?

85. Mr McParland's argument, which was really only developed during the course of the hearing before me, was, as I understood it, that there could be no binding Charterparty until DSND had obtained the approval of FMA that *Botnica* could be used in the Gulf of Mexico for the 2001/2 winter season. He appeared to argue, in the alternative, that there would be no valid Charterparty, or that OSA was not obliged to sign it until DSND had given a valid Notice One that FMA approval had – or had not – been given.

86. I cannot accept either argument. First, as Mr McParland accepted, this condition precedent would have had to be an oral collateral condition precedent, because there is no document that contains its terms. But there is also not a single contemporaneous document to support the existence of an oral agreement to that effect. Indeed the contemporaneous correspondence demonstrates that both sides knew that FMA approval had not been given by 28 August 2001 and was still being sought up to 1 October 2001. I accept

that DSND, in particular Mr Stark, indicated to OSA that DSND believed that FMA approval would be forthcoming and that obtaining approval would not be a problem. But that does not elevate obtaining that approval into a condition precedent.

87. Secondly, if there were such a collateral condition precedent it would be quite contrary to the term in Clause 1 of Exhibit A, concerning the requirement that DSND give a Notice One by 1 October 2001. That term contemplates that there would have been by the time of Notice One a binding contract for the use of the vessel and that the vessel was already in service. Clause 1 of Exhibit A assumes that the parties will not know whether FMA approval has been given or not at a time before DSND gives the Notice to OSA to inform it of whether approval has been given or not. Mr McParland could not explain how there could be an oral condition precedent that was entirely at odds with the agreed terms of the Charterparty.

88. Thirdly, the effect of the evidence of Mr Freeman and Mr Yanez was not that FMA approval was a pre-condition to a binding contract, but that they took the view that they were not obliged to sign the contract terms until they knew that there was FMA approval. That is not a correct construction of clause 1, as is obvious if the terms of clause 1 of Exhibit A concerning Notice One are read carefully.

*J. Issue Four: Did OSA waive the requirement of clause 18.1 of Exhibit A as to "the signing of mutually agreeable contract terms and conditions" so that there was a binding contract between the parties containing a valid arbitration clause?*

89. As Lord Goff of Chievely pointed out in *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corporation of India (The "Kanchenjunga") [1990] 1 Lloyd's Rep 391 at 397,* "it is a commonplace that the expression "waiver" is one which may, in law, bear different meanings". In the present case the assumption is that, as at 1 September 2001, there was no binding contract between DSND and OSA for the charter of *Botnica.* That was because the parties had agreed that before a binding contract came into existence, both sides had to sign the terms and conditions that they had agreed. That was, as it were, a condition precedent to the creation of a binding contract between the parties. As DSND *had* signed all the terms and conditions, the only thing that prevented the creation of a binding contract was the signature of OSA. OSA could stand on that requirement, in which case there would be no binding contract on the terms of the 28 August 2001 draft. Alternatively, OSA could dispense with – or waive - that requirement, in a way that indicated to DSND that signature by OSA was no longer a pre – condition to the creation of a binding contract on the terms of the 28 August Charterparty terms.

90. In my view the kind of waiver that has to be considered in this case is that which is concerned with the abandonment of a right by OSA. It is a non – contractual right in the sense that there is no pre-existing contract between DSND and OSA that gives rise to rights of OSA that it might abandon. But OSA had a "right" to refuse to sign the contract terms. If OSA abandoned that right in such a way as to indicate to DSND that it no longer insisted on signing the terms before a valid contract was created, then it was, in my view, exercising a kind of election. Neither Miss Blanchard nor Mr McParland analysed the matter in this way in the course of argument, but it seems to me that this is the correct approach to this issue.

91. In *The Kanchenjunga,* Lord Goff stated that the doctrine of waiver by election operated in the following way: (i) there must be a choice or election between two inconsistent or mutually exclusive courses; (ii) a waiver by election must be made in clear and unequivocal terms either by words or conduct; and (iii) a party can only waive a right if it is aware of the right and elects to waive it. (See *page 398* of the report).

92. In the present case, as I have already indicated, on the basis of my analysis so far, on 1 September 2001 OSA had a clear choice between two inconsistent or mutually exclusive courses. It could insist on the term requiring signature of the terms and in that case no binding contract on the terms of the 28 August Charterparty could come into existence. Alternatively it could abandon that requirement and indicate that, notwithstanding the lack of signing, there was a valid and binding contract. So the first condition identified by Lord Goff was fulfilled.

93. The third condition is also fulfilled. It is quite clear from the evidence of Mr Yanez and Mr Freeman that they understood at the time that OSA had the right to refuse to sign the charter terms and conditions, thus preventing a binding contract from coming into existence.

94.  So the question is, did OSA, with knowledge of the fact that it could refuse to sign, by clear and unequivocal words or acts abandon its right to insist on signature, and elect to conclude a binding contract without a signature by OSA? It does not matter if OSA had private reservations and intended that it should not be bound. What is important is the outward manifestation of its position.

95.  Miss Blanchard relies on the following facts and matters: (i) payment of the mobilisation fee; (ii) signature of the On – Hire Statement; (iii) acceptance of the vessel for performing work as contemplated under the Charterparty; (iv) the letter from DSND to OSA dated 7 December 2001 extending the departure date of *Botnica,* which was countersigned by Mr Yanez; (v) the Off – Hire/Redelivery Statement; and (vi) the agreement by OSA to pay the demobilization fee, although that was not in fact paid.

96.  Mr McParland submits that none of these actions by OSA are sufficiently clear and unequivocal to constitute an abandonment of the right to insist on signature of the terms and conditions of the Charterparty. He relies in particular on a statement by Leggatt LJ in *Atlantic Marine Transport Corporation v Coscol Petroleum Corporation (The "Pina") [1992] 2 Lloyd's rep 103 at 107,* in which the judge held that various addenda to Charterparty terms that had not been agreed because not signed by the parties, "...*[do] not afford the Charterparty incidentally a contractual force that it would not otherwise enjoy".* However it should be pointed out that in that case it was common ground not only that there was no agreement to dispense with signatures, but also that there was no waiver of that requirement. So the comments of Leggatt LJ are not apposite to the present case.

97.  The invoice for the mobilization fee was sent by DSND on 7 September 2001, that is after the terms for the Surety Bond had been agreed. On the same day Mr Torbergsen of DSND emailed Mr Olsen and asked him whether it was intended that *Botnica* should leave for Mexico before the mobilisation fee was paid. Also on the same day Mr Stark emailed Mr Torbergsen and Mr Olsen and said that the vessel should not depart before payment. So it is clear that DSND regarded the payment of the fee as a precondition of the Charterparty being operative.

98.  The mobilization fee was wired to DSND on 13 September 2001. The fee was received by DSND's bank on 14 September 2001. The vessel departed for Mexico on 17 September 2001. In evidence, Mr Olsen stated that he spoke to Mr Yanez before sending the vessel off in order to satisfy himself he had a "binding agreement". He said that he was satisfied and that it was not just a "handshake" agreement and that he would never have mobilised the vessel on a "handshake". I accept that evidence.

99.  On 1 October 2001, DSND gave Notice One, which falsely indicated that FMA approval had been given. After that, on 9 October, both parties signed the On Hire Statement. This, after payment of the mobilisation fee, might normally be regarded as a clear and unequivocal act showing that OSA had elected to dispense with the signing requirement, and regarded the Charterparty as fully binding and operative. However, I cannot draw that conclusion in this case, at least at that stage, because the On Hire Statement may have been signed by OSA in response to the false statement in Notice One, which implied that FMA has given its approval.

100. The evidence of Mr Yanez was that he saw the letter from FMA dated 15 October 2001 sometime after that date, although he did not know when. As soon as he saw it he must have appreciated that final FMA approval had not yet been obtained. That was also made clear at the meeting between Mr Yanez and Mr Stark on 15 October and again at the meeting of 29 October 2001. In the latter meeting OSA was told that because of the uncertainty as to FMA approval, DSND was also pursuing *Nordica* as an alternative. On 13 November 2001 Mr Stark sent a letter to OSA, stating expressly that *Botnica* would not be available over the 2001/2 winter season. The letter continues:

> "As addressed in the Charter Agreement DSND is offering the Nordica or Fennica as a replacement to the Botnica and DSND is prepared to make this vessel swap at no cost to [OSA] for the DSND portion of the exchange, with the exception of fuel and personnel subsistence".

101. During this period, DSND had been sending invoices to OSA for the use of the vessel. Each had referred to the "Charterparty dated 28.08.01". Chasing emails and faxes were sent in November 2001 by DSND. On 30 November 2001, OSA's bank wired US$1 million to DSND's bank.

102.    On 6 December 2001 Mr Freeman sent an email to Mr Stark in response to a fax of the same day from Mr Stark, concerning the question of a possible replacement vessel for *Botnica.* The email from Mr Freeman states, in part:

> "Our intentions concerning "Termination of the current charter" are only as the charter agreement states. The options to gain approval from FMA for the *Botnica* to stay in contract in Mexico were in fact not obtained by yourselves, this despite DSND assurances and communications that the extension of stay for the vessel would in fact be granted by MFA.
>
> [OSA] has only acted in a professional manner throughout this whole situation and will continue to do so. [OSA] will begin demobilization on 10 Dec. and expect the vessel to be returned to the condition as we received it and depart for Finland (sic) by December 15, 2001 as agreed.
>
> [OSA] has in fact too acted in good faith and fully intend to pay any Invoices due DSND in a timely manner, [OSA] too expects to fully respect the terms of the Charter Agreement and would expect DSND to act in kind".

103.    Then on the following day, 7 December, DSND sent to OSA in which it agreed to delay the departure of *Botnica* until 14 December 2001. The letter says: "the same rates and terms of the Charter Agreement will apply for this period". Mr Yanez countersigned a copy of this letter and returned it to DSND.

104.    The vessel was redelivered to DSND on 19 December and on 20 December 2001 both parties signed an Off Hire Statement. In the third paragraph of that statement it declares:

> "The vessel has completed her services according to the Charter Agreement dated 28 August and is off hire from the agreed hand over time above".

105.    On 11 January 2002 Mr Stark sent a fax to Mr Yanez in which he recorded that Mr Yanez had stated on 10 January 2002 that OSA would pay the demobilization fee of US$1 million for *Botnica.*

106.    In cross – examination Mr Yanez denied that he had made that statement in the conversation with Mr Stark. But in the schedule of payments to be made that OSA produced on 26 April 2002, the demobilisation fee of US1 million is still present. I note that Clause 3 of Exhibit A to the 28 August Charterparty terms provides that OSA will pay a demobilization fee of US$1 million. Given those terms, Mr Freeman's email of 6 December ("OSA expects to fully respect the terms of the Charter Agreement"), and Mr Yanez' counter – signature to the 7 December 2001 letter, in my view it is not surprising that Mr Yanez should have confirmed orally to Mr Stark on 10 January 2001 that the demobilisation fee would be paid. I conclude that Mr Yanez was incorrect in stating in evidence that he had not stated in his conversation with Mr Stark that the demobilisation fee would be paid.

107.    Looking at these matters overall, in my view they lead clearly to the conclusion that OSA elected not to insist in the need for signature of the Charterparty terms and elected to go ahead with the Charterparty, on its terms, without signature. I accept that the payment of the mobilisation fee and the signature of the on – hire statement might, in themselves, be thought of as equivocal, because the position of FMA approval was unsure. But the FMA position was clear from 15 October and made even plainer by 14 November. But after that date, OSA agreed to the extension of the Charterparty departure date and confirmed that the extension would be at the rates and on the terms of the Charter Agreement. The vessel's Off – Hire/Redelivery certificate was made by reference to the 28 August Charter Agreement. Mr Yanez then confirmed that the demobilization fee would be paid, which accords with the terms of the 28 August Charter Agreement.

108.    Therefore I conclude that as a result of the waiver by OSA, the 28 August Charterparty terms bound the parties. The parties are therefore bound by clause 31 of Part II of the Supplytime 89 terms, ie. the London arbitration clause.

*K. Issue Five: Is there an estoppel by convention?*

109. Having concluded that OSA is bound by the 28 August Charterparty terms, including the arbitration clause by virtue of OSA's waiver by election, I do not need to consider this argument at length. It seems to me that the same facts that show that OSA waived its right to insist on a signature and so elected to be bound by the terms of the 28 August Charterparty must also lead to the conclusion that both parties assumed that *Botnica* was operating on the terms of the 28 August Charterparty. This assumption was something that was common between the parties as a result of the numerous communications between them with references to the "28 August Charter Agreement", which I have set out above.

110. If these communications had been made simply on the basis of the false information in Notice One, then I would have had great sympathy with Mr McParland's submission that it would not have been unconscionable or unjust to permit OSA to go back on that assumption. But the mobilisation fee was paid before Notice One and could not have been influenced by it. Mr Freeman's email of 6 December, the letter from DSND to OSA dated 7 December 2001 and OSA's counter signature to that letter, the Off – Hire/Redelivery statement and the agreement by OSA to pay the demobilisation fee were all actions by OSA with full knowledge of the lack of FMA approval.

111. Therefore I have concluded that OSA is estopped by convention from denying that *Botnica* operated on the terms of the 28 August Charterparty and OSA is estopped by convention from denying that it is bound by the terms of clause 31 of Part II of the Supplytime 89 form – the arbitration clause.

### L. Conclusion

112. I have concluded that the arbitrators reached the correct conclusion on jurisdiction. Clause 18.1 of Exhibit A does have the effect of preventing a binding contract from being created until both parties have signed the terms and conditions as agreed. OSA did not sign the terms agreed. But OSA waived that requirement and elected to be bound by the terms of the 28 August Charterparty. Furthermore, by the parties' conduct and communications, they acted on the assumption that *Botnica* was operating under the terms of the 28 August Charterparty.

113. Therefore OSA and DSND are bound the terms of the 28 August Charterparty, in particular the terms of clause 31 of Part II of the Supplytime 89 form. Accordingly the arbitrators were correct to conclude that they have jurisdiction to hear and determine disputes arising out of that Charterparty.

---

BAILII: Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: http://www.bailii.org/ew/cases/EWHC/Comm/2006/1360.html